**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VERTICAL BRIDGE REIT, LLC, | ) | No. 2:23-cv-1017 |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | |
| EVEREST INFRASTRUCTURE PARTNERS, | ) | |
| INC.; EIP HOLDINGS II, LLC, | ) | |
| | ) | |
| *Defendants*. | | |

## COMPLAINT

Plaintiff Vertical Bridge REIT, LLC ("Vertical Bridge"), by and through its attorneys,

K&L Gates LLP, files this complaint against Defendants Everest Infrastructure Partners, Inc. and

EIP Holdings II, LLC (collectively referred to as "Everest"), stating as follows:

## INTRODUCTION

1.      Plaintiff Vertical Bridge owns, operates, and manages telecommunications

infrastructure, including cellular communication and television/radio broadcast towers.  Vertical

Bridge is currently the country's fourth largest telecommunications infrastructure company.

2.      Defendant Everest is Vertical Bridge's direct competitor in the

telecommunications infrastructure industry.

3.      Everest has developed and implemented an improper, multi-state, and multi-

million dollar scheme to unlawfully improve its market share at Vertical Bridge's expense

through trade secret misappropriation, false advertising, tortious interference with contract, and

unfair competition.

4.      Everest's scheme is not new.  A number of Everest's current principals, including both its CEO and general counsel, previously owned and operated a company called TriStar Investors, Inc. (hereinafter, "TriStar").  In 2012, American Tower Company ("ATC")—the largest telecommunications infrastructure company in the United States—sued TriStar and its principals in the United States District Court for the Northern District of Texas for unlawful business practices, including misappropriation of trade secrets, Lanham Act violations, tortious interference with contractual relations, and unfair competition.  *See TriStar Investors, Inc. v. American Tower Corp.*, No. 3:12-cv-0499-M, 2014 WL 1327663 (N.D. Tex. Apr. 3, 2014) (the "TriStar/ATC Litigation").

5.      TriStar ceased operations shortly after the conclusion of the TriStar/ATC Litigation.  But some time later, certain principals of TriStar created Everest to continue the scheme under a new name.

6.      Everest's scheme targets all of the country's major telecommunications infrastructure companies, including Vertical Bridge.

## **PARTIES**

7.      Vertical Bridge REIT, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

8.      Vertical Bridge REIT, LLC is the parent company of all of the Vertical Bridge subsidiaries that are party to the contracts relevant to this action.

9.      Defendant Everest Infrastructure Partners, Inc. is a corporation formed under the laws of Delaware with its principal place of business in Pittsburgh, Pennsylvania.

10.     Defendant EIP Holdings II, LLC, an affiliate of Everest Infrastructure Partners, Inc., is a limited liability company formed under the laws of Delaware with its principal place of business in Pittsburgh, Pennsylvania.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action involves claims arising under federal law, and this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy under Article III of the United States Constitution.

12.     This Court has personal jurisdiction over Defendants because they have their principal place of business within this district.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and a substantial part of the events giving rise to this dispute occurred within this district.

## FACTUAL ALLEGATIONS

### A.  Vertical Bridge's Business

14.     Vertical Bridge was founded in 2014.  Since then, it has grown into the country's largest private owner and operator of telecommunications infrastructure, and the country's fourth largest telecommunications infrastructure company overall.

15.     Vertical Bridge owns and manages telecommunications infrastructure at hundreds of thousands of sites all across the United States.  Vertical Bridge's assets include, *inter alia*, telecommunications towers, building rooftops, small cells, and billboards.

16.     With respect to telecommunications towers, Vertical Bridge typically owns the

tower and has a lease or an easement for the real property on which the tower sits. Vertical Bridge earns revenue by leasing space on its towers ("Towers") to national wireless cellular carriers—Verizon Wireless, T-Mobile, AT&T, and DISH—as well as national and local television stations, radio stations, and government entities such as the Federal Bureau of Investigations ("Vertical Bridge Tenants" or "Tenants").

17. Many of Vertical Bridge's Towers have multiple Tenants leasing space on the Tower in exchange for paying Vertical Bridge thousands of dollars of rent per month over decades-long leasing terms; thus, each Tower represents millions of dollars of value for Vertical Bridge.

18. Vertical Bridge chooses its Tower locations based on a number of factors, principal among which is reliable network connectivity for its Tenants and their customers.

19. Vertical Bridge's landlords ("Landlords") receive revenue for allowing Vertical Bridge to build, maintain, manage, repair, and/or service Towers on the Landlords' real property.

20. Most Landlords are individuals or small businesses that do not have expertise in the telecommunications infrastructure industry.

21. Vertical Bridge's core business depends on its ability to obtain and maintain a lease, license, or easement for the real property on which its Towers sit. If Vertical Bridge is not able to secure and/or maintain these real property rights, then it cannot construct and/or operate Towers. If Vertical Bridge cannot construct and/or operate Towers, then it cannot lease space to Tenants and thereby generate revenue.

22. Vertical Bridge has long-term contractual relationships with Landlords across the country that permit Vertical Bridge to install and operate Towers on the Landlords' real property

in exchange for rent (in the case of a lease) or some other form of payment (in the case of an easement) (these contracts are collectively referred to as "VB Contracts").

23.     In certain cases, Vertical Bridge purchases existing Towers.  In other cases, Vertical Bridge builds Towers.  Building a tower takes months and can cost over half a million dollars.  Managing and operating a tower typically costs tens of thousands of dollars a year, including tower rents, utility costs, regulatory costs, and facilities-maintenance costs.

24.     For each Tower it owns—whether it be an acquired Tower or a self-built Tower—Vertical Bridge leases space on the Tower to Tenants.  A Tower can typically accommodate 4+ Tenants, and Vertical Bridge attempts to maximize Tower tenancy.

25.     Installing Tenant equipment on the Towers is a time-consuming and expensive process.  Once Tenants are situated on Vertical Bridge's Towers, they prefer to remain in place for decades in order to service their customers without interruption. The costs for a tenant to relocate can cost tens of thousands of relocation dollars and wireless network disruption.

26.     In light of that Tenant preference, Vertical Bridge contracts with Landlords for extended leasing or easement terms lasting decades, and frequently renews its existing VB Contracts for additional decades-long terms in order to maintain its existing Tower locations.  In certain cases, Vertical Bridge secures perpetual easements.

27.     The VB Contracts typically provide Vertical Bridge with the right to remove the Tower in the unlikely and infrequent event that a VB Contract terminates or expires.  Upon the expiration or termination of any VB Contract, Vertical Bridge, as a matter of course, typically decommissions the relevant Tower and relocates Tenants on the decommissioned Tower to a new Tower location that will suit their business needs.  The new Tower is built during the decommissioning process, so that the transition from Tower to Tower can happen in a single

night with minimal interruption to the Tenants' broadcasting needs.  As is standard in the telecommunications infrastructure industry, Vertical Bridge's relationships with its national Tenants are not limited to specific Towers.  This means that the decommissioning of any particular Tower does not terminate the relationship.

28.     Many VB Contracts contain rights of first refusal ("ROFR(s)") whereby Vertical Bridge has the option to purchase an interest in the Landlord's property on substantially the same material terms as those made in a *bona fide* offer to the Landlord by a third-party potential purchaser.  Vertical Bridge's ROFR, pursuant to the terms of the VB Contracts, is always superior with respect to the third party potential purchaser, such that if Vertical Bridge exercises its ROFR, the Landlord must execute the transaction with Vertical Bridge and not the third party.

29.     VB Contracts also contain non-interference and consent-for-assignment provisions.  A typical VB Contract non-interference provision prohibits a Landlord from granting to a third party any lease, license, or easement if such a grant would have a detrimental impact on Vertical Bridge's operations.  A typical VB Contract consent-for-assignment provision prohibits the Landlord from assigning the VB Contract to any person or entity without Vertical Bridge's prior consent.

30.     Most VB Contracts include confidential, trade secret-protected pricing terms and price structure information, including information relating to rental payments and periodic rental payment increases (known as "escalators").  Using internal pricing models and market analyses that it pays its own employees and contractors to develop, Vertical Bridge utilizes a confidential formula to set the pricing terms and pricing structure (including timing and amounts of escalators) that are found in VB Contracts, on an individual-site basis.

31.     Vertical Bridge has taken reasonable measures to maintain the confidentiality of these trade secrets, including (i) incorporating confidentiality provisions into VB Contracts that prohibit Landlords from disclosing the terms of their VB Contract to third parties; (ii) maintaining documentation referring or reflecting its trade secrets on an internal, password-protected database; and (iii) taking steps to ensure that all trade-secret information is specifically redacted in all publicly recorded "memoranda of lease" ("MOLs") to the fullest extent allowed by law.  Vertical Bridge expends substantial time and expense to develop and deploy these protections.

**B.  Everest's Scheme**

32.     Everest is Vertical Bridge's direct competitor in the telecommunications infrastructure industry.  However, unlike Vertical Bridge and almost all other telecommunications infrastructure companies, Everest's operations include an extreme form of a business practice known as "tower land aggregation" or simply "tower aggregation."

33.     Legitimate tower aggregators offer landowners lump-sum payments that are a fraction of the expected total rental revenue, based on the tower aggregator's estimation of market rent and utilizing a market-determined multiple.  In exchange, the tower aggregator assumes the landowner's interest in their lease agreements with the telecommunications infrastructure company and receives the monthly rent payments that the company would have made to the landowner.  In so doing, the tower aggregator receives a steady stream of income and the landowner exchanges that stream for a one-time up-front payment.  Tower aggregators are typically not themselves telecommunications infrastructure companies in that they do not own or manage or operate towers, or have relationships with telecommunications tenants. Everest, by contrast, is a telecommunications infrastructure company that deploys a form of tower aggregation made possible only by unlawful misappropriation of trade secrets in order to

tortiously interfere with existing VB Contracts (as well as the contracts of other telecommunications infrastructure companies) to increase its market share.

34.     Everest first targets Towers that it believes are subject to soon-to-be expiring ground leases.

35.     In this industry, any ground lease with less than 10 remaining years is considered "soon-to-be-expiring."

36.     Everest then solicits the Landlords on whose property these targeted Towers sit to share with Everest Vertical Bridge's confidential, trade secret-protected information.

37.     Everest knows that the information it solicits includes protected trade secrets. Confidentiality provisions are standard in contracts in this industry.  Indeed, Everest itself includes such provisions in its own contracts.  Pricing information, including escalator amounts and timing, is jealously guarded by industry participants to the fullest extent of the law.

38.     As part of its solicitation efforts, Everest makes illusory promises to Landlords that they will receive a percentage of the revenue that Everest will supposedly receive from Tenants in the event that Everest supplants Vertical Bridge as the owner/operator of the Tower. The promise is illusory because Everest knows full well that even if it supplants Vertical Bridge, Everest will have no Tenant revenue to share.  In certain instances, Everest's illusory promise includes an offer to buy a small portion of the Landlords' land to host its own tenants to provide revenue share to the Landlords.  In making that offer, Everest does not inform the Landlords that, as a matter of industry practice, tenants are highly unlikely to sublease space on Everest's sites if Vertical Bridge's Towers are already operating nearby, and as a result, Everest would have no revenue to share with the Landlords.

39.     Everest specifically conditions its illusory promises to Landlords on their first sharing with Everest Vertical Bridge's confidential, trade secret-protected information.

40.     Everest uses the trade secrets it has misappropriated to craft an offer to purchase a Landlord's lessor rights in the property that is specifically designed to subvert Vertical Bridge's ROFR, violate Vertical Bridge's non-interference rights, and violate Vertical Bridge's consent-for-assignment rights.

41.     Everest's scheme is not new.  In the TriStar/ATC Litigation, ATC challenged business practices substantially similar to the ones described at paragraphs 33-40.  *See* Def.'s Answer to Pl.'s Compl., *TriStar Investors, Inc.*, 2014 WL 1327663.

42.     For illustrative purposes, an example of how this scheme works includes (but is not limited to) the following: Everest targets a Vertical Bridge Landlord, induces the Landlord to share Vertical Bridge's confidential, trade secret-protected lease terms, and then crafts an offer to purchase the Landlord's leasing rights for a substantial lump-sum payment at closing, plus a going forward monthly rental rate that is five-to-ten times higher than the current rent that Vertical Bridge pays (a number that Everest has misappropriated), plus a promise to pay the Landlord 50% of Everest's revenue from tenant leases.

43.     Of course, Everest does not have any tenant leases in place at the time it makes its offer, and there is zero guarantee—and extremely low likelihood—that Everest will ever have any tenant leases on that particular Tower, which Vertical Bridge owns and will decommission if it abandons the site.  Vertical Bridge decommissions its Towers upon the termination of its VB Contracts and finds suitable locations to move Tenants from decommissioned Towers onto other Vertical Bridge Towers.  Consequently, once a VB Contract terminates, there would be no

Tower on a Landlord's real property, and no Tenants on the Tower from whom Everest could collect revenue to share with Landlords.

44.     While the termination of VB Contracts and Vertical Bridge's subsequent decommissioning of its Towers would cause significant harm to the Landlords, Everest's agreements with Landlords insulate it from any financial harm.  Everest's agreements with Landlords typically include provisions allowing Everest to terminate the agreement merely by providing the Landlord with written notice.  These provisions allow Everest to walk away from its agreements without financial consequences, while leaving Landlords both without a Tower on their real property and without the steady revenue stream they once had under the VB Contracts.

45.     Having received notice of Everest's sham offer pursuant to the ROFR provision in the relevant VB Contract, Vertical Bridge is put in a position of either trying to match this offer or allowing Everest—its direct competitor—to become its landlord.  The trouble is that Vertical Bridge cannot possibly match Everest's offer on the same material terms as Everest because, as Everest well knows, 50% of Vertical Bridge's revenue on Vertical Bridge's existing Tenant leases typically comes to tens or hundreds of thousands of dollars, whereas Everest's revenue on tenant leases that it does not have is zero.  Even in the highly unlikely circumstance where Vertical Bridge abandons the site, Everest builds its own tower, and Everest signs up tenants to this tower (tenants who for some reason choose to wait for months or years for Everest to build a tower rather than just moving to Vertical Bridge's new Tower immediately upon decommissioning of the old Tower), it would be years before Everest would have any revenue to share.  On the other hand, Vertical Bridge—if it were to try and "match" Everest's sham offer— would be forced to share its existing revenue immediately.

46.     In this way, Everest intentionally puts Vertical Bridge on the horns of a dilemma. Vertical Bridge must either (i) pay many times the market rate for a long-standing and existing lease relationship, and give up half of its revenue, or (ii) have its ROFR subverted through the misappropriation of its own trade secrets and getting its competitor as a Landlord, at which point Vertical Bridge is forced to either pay grossly inflated rent or abandon the site.  Abandoning the site and relocating Tenants, in turn, results in substantial costs and effort stemming from:

      a.     Reviewing local, state, and federal regulations, including the Federal Aviation Administration ("FAA") regulations to ensure compliance;

      b.     Satisfying local zoning ordinances or applying for variances to such ordinances;

      c.     Obtaining any applicable permits;

      d.     Identifying a suitable location that meets the requirements listed above; and

      e.     Relocating the Tenant's previous equipment and/or setting up upgraded equipment at the new location.

47.     In furtherance of the scheme described above, Everest knowingly makes misrepresentations and/or omissions to Landlords to interfere with the VB Contracts.

48.     This scheme has resulted, and continues to result, in injury to Vertical Bridge, including but not limited to loss of market share, loss of value in Vertical Bridge's trade secrets, loss of secrecy of Vertical Bridge's trade secrets, loss of Vertical Bridge's valuable ROFRs, reputational damage with Landlords and Tenants, and increased operational costs.

49.     This scheme has also resulted and/or will result in injury to Landlords, including but not limited to loss of the Landlords' valuable leasing rights in exchange for Everest's illusory promises of future revenue.

## COUNT I
## LANHAM ACT - FALSE ADVERTISING

50.     Vertical Bridge repeats and re-alleges each and every paragraph above as if fully set forth herein.

51.     Everest makes false and/or misleading statements of fact regarding the nature of the services and commercial activities of Vertical Bridge and Everest to Landlords with limited industry knowledge, including the following:

  a.     Everest knowingly offers a revenue share that is illusory;

  b.     Everest represents to the Landlords that the Landlords would have a certain projected revenue at some point in the future, even though Everest is aware that the Landlords will never receive that projected revenue and that Everest can terminate its agreements with Landlords without financial consequences in the event that Vertical Bridge removes its Towers;

  c.     Everest fails to inform Landlords that most of the financial benefit promised is contingent on Vertical Bridge keeping the Towers in place after the current VB Contracts expire, which Everest is aware that Vertical Bridge would not and does not do; and

  d.     Everest communicates to Landlords an offer to buy a small portion of the Landlords' land to host its own tenants to provide revenue share to the Landlords, but misleadingly omits from the communication that, as industry practice, tenants are unlikely to sublease space on Everest's sites

if Vertical Bridge's Towers are already operating nearby, as a result of which the sale to Everest of an additional portion of the Landlords' land will not result in any revenue share for the Landlords.

52.     Everest's statements to Landlords were and are made in interstate commerce.

53.     Everest's knowingly false and/or misleading statements of fact were and are made in promotional communications to Vertical Bridge's Landlords that seek to convince the Landlords to do business with Everest.

54.     Everest's false and/or misleading statements have the capacity to deceive a substantial portion of the existing and potential Landlords contacted by Everest who otherwise would contract with Vertical Bridge.

55.     Everest's false and/or misleading statements were material in that they persuaded Landlords to entertain and accept non-*bona fide* offers and have influenced, or are likely to influence, Landlords' decisions to not renew their VB Contracts, to the detriment of both Vertical Bridge and the Landlords.

56.     Vertical Bridge has been or is likely to be harmed as a result of Everest's false and/or misleading statements to Vertical Bridge's Landlords.  As a direct result of Everest's statements, Vertical Bridge has suffered reputational harm and damages in the form of lost market share, lost Tower sites, and increased operational costs that it would not otherwise have incurred.

## COUNT II
## FEDERAL DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *et seq*.)

57.     Vertical Bridge repeats and re-alleges each and every paragraph above as if fully set forth herein.

58.     Vertical Bridge uses its trade secret pricing information to enter into VB Contracts with Landlords for Towers across the country, which facilitates cellular communications as well as regional and national broadcasting; thus, this information is related to services used in, or intended for use in, interstate commerce.

59.     Vertical Bridge's confidential information with respect to its VB Contract price terms and price structure is entitled to trade secret protection under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, ("DTSA"), which allows an owner of trade secrets to recover damages for the misappropriation of its trade secrets.

60.     Vertical Bridge has invested and continues to invest substantial time, resources, and expense into developing its competitive price terms and price structure information for VB Contracts in order to maintain its competitive place in the market.

61.     This information confers a competitive advantage to Vertical Bridge with respect to its competitors in the telecommunications infrastructure industry.  Vertical Bridge's trade secret pricing strategy and terms have allowed it to grow into the fourth largest owner and operator of telecommunications infrastructure in the United States.

62.     Vertical Bridge takes reasonable measures and incurs substantial expense to maintain the secrecy of its trade-secret pricing information, including (i) incorporating confidentiality provisions into VB Contracts that prohibit Landlords from disclosing the terms of their VB Contract to third parties, like Everest; (ii) maintaining documentation referring to or reflecting its trade secrets on an internal, password-protected database; and (iii) taking steps to ensure that all trade-secret information is specifically redacted in all publicly recorded MOLs to the fullest extent allowed by law.  Vertical Bridge expends substantial time and expense to develop and deploy these protections.

63.     The telecommunications infrastructure industry as a whole considers the type of pricing information at issue here to be trade secret-protected.  All industry participants generally take the same steps as those described at paragraph 62 to maintain the secrecy of their respective information.

64.     Vertical Bridge uses its trade secret pricing information to contract with Landlords to obtain access to real property on which to put Towers, and thereafter Vertical Bridge derives revenue from subleases on those Towers to its Tenants.  As such, the information has independent economic value to Vertical Bridge.

65.     The information likewise would have independent economic value for competitors if they were to obtain this trade secret-protected information, as it would allow competitors to undercut Vertical Bridge by negotiating with Landlords knowing the precise terms of existing VB Contracts.

66.     Vertical Bridge's trade secret-protected information is not generally known to the public or readily accessible by the public using proper means.

67.     Vertical Bridge's trade secret-protected information derives independent value from not being generally known to the public or readily accessible by the public using proper means.

68.     Everest knowingly induces the Landlords to provide it with Vertical Bridge's trade secret-protected information, and even full copies of the VB Contracts, in breach of the Landlords' contractual duty to maintain the secrecy of the terms of their VB Contracts.

69.     Everest knows that the VB Contracts contain trade secret-protected information and that the Landlords have a duty to maintain the secrecy of that information because Everest has seen copies of VB Contracts that contain confidentiality provisions, and because

confidentiality provisions are standard provisions in agreements used throughout the telecommunications infrastructure industry.  Everest itself includes confidentiality provisions in its contracts.

70.     Vertical Bridge has never consented to or authorized any Landlords to disclose its trade secret-protected information to Everest.  Nor has Vertical Bridge consented to or authorized Everest to use the improperly obtained trade secret-protected information.

71.     Everest willfully and maliciously misappropriates Vertical Bridge's trade secret-protected information by acquiring and using the information to directly and wrongfully compete with Vertical Bridge.

72.     For instance, Everest uses Vertical Bridge's trade-secret price terms and price structure information to undercut Vertical Bridge in negotiations with Landlords, soliciting Landlords to contract with Everest in furtherance of Everest's unlawful business scheme.

73.     As alleged above, Everest uses the Vertical Bridge trade secret protected information that it unlawfully solicits from Landlords, and therefore misappropriates Vertical Bridge's trade secrets in violation of the DTSA.

74.     Everest's misappropriation of Vertical Bridge's trade secret-protected information has caused Vertical Bridge harm by depreciating the independent economic value of Vertical Bridge's trade secret-protected information attributable to the secrecy of such information.

75.     As a direct and proximate result of Everest's improper conduct, Vertical Bridge has sustained damages and losses in an amount to be determined at trial.

76.     Vertical Bridge is entitled to damages pursuant to the DTSA, including its costs, attorneys' fees, and exemplary damages.

77.     Everest's acquisition and use of Vertical Bridge's trade secrets has caused and will continue to cause Vertical Bridge irreparable harm.  Unless permanently enjoined, Everest's misappropriation, as alleged herein, will continue to cause Vertical Bridge irreparable harm, loss, and injury.

**COUNT III**
**<u>PENNSYLVANIA UNIFORM TRADE SECRETS ACT (12 Pa. C.S.A. § 5301 *et seq.*)</u>**

78.     Vertical Bridge repeats and re-alleges each and every paragraph above as if fully set forth herein.

79.     Vertical Bridge's confidential information with respect to its contract price terms and price structure is entitled to trade secret protection under the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S.A. § 5301, *et seq.*, ("PUTSA"), which allows an owner of trade secrets to recover damages for the misappropriation of its trade secrets.

80.     Vertical Bridge has invested and continues to invest substantial time, resources, and expense into developing its confidential price terms and price structure information for its VB Contracts.  Due to the time, resources, and expense used to develop the price terms and price structure information, the confidential information would be difficult for others to acquire or duplicate using proper means.

81.     Vertical Bridge uses reasonable efforts under the circumstances to maintain the secrecy of its trade secrets, including (i) maintaining its trade secret-protected information in a password-protected internal database; (ii) redacting the VB Contracts when providing them to Tenants; (iii) redacting publicly filed MOLs to prevent disclosure of its price terms and price structure; and (iv) including confidentiality provisions in the VB Contracts that prohibit Landlords from disclosing the terms of their VB Contracts to third parties.

82.     Vertical Bridge uses its trade secret pricing information to successfully contract with Landlords to obtain access to real property on which to put Towers, and thereafter Vertical Bridge derives revenue from subleases on those Towers to its Tenants.  As such, the information has actual independent economic value to Vertical Bridge.

83.     The information would also have independent economic value for competitors if they were to obtain this trade secret-protected information, as it would allow competitors to undercut Vertical Bridge by negotiating with Landlords knowing the precise terms of existing VB Contracts.

84.     Vertical Bridge's trade secret-protected information is not generally known to the public or readily accessible by the public using proper means.

85.     Everest knowingly induces the Landlords to breach their contractual duty to maintain the secrecy of the VB Contracts by disclosing Vertical Bridge's trade secret-protected information to Everest.

86.     Vertical Bridge has never consented to or authorized any Landlords to disclose its trade secret-protected information to Everest.  Nor has Vertical Bridge consented to or authorized Everest to use the improperly obtained trade secret-protected information.

87.     Everest willfully and maliciously misappropriates Vertical Bridge's trade secret-protected information by acquiring and using the information to directly and wrongfully compete with Vertical Bridge.

88.     As a direct and proximate result of Everest's improper conduct, Vertical Bridge has sustained damages and losses in an amount to be determined at trial.

89.     Vertical Bridge is entitled to damages pursuant to the PUTSA, including its costs, attorneys' fees, and exemplary damages.

90.     Everest's acquisition and use of Vertical Bridge's trade secrets has caused and will continue to cause Vertical Bridge irreparable harm.  Unless permanently enjoined, Everest's misappropriation, as alleged herein, will continue to cause Vertical Bridge irreparable harm, loss, and injury.

**COUNT IV**
**UNJUST ENRICHMENT**

91.     Vertical Bridge repeats and re-alleges each and every paragraph above as if fully set forth herein.

92.     Vertical Bridge has involuntarily conferred a benefit upon Everest of which Everest has knowledge.

93.     Specifically, Everest has acquired multiple VB Contracts that contain confidential information regarding Vertical Bridge's price terms and price structure information.

94.     Everest appreciated the benefit of Vertical Bridge's trade secret protected information by using that information to structure offers specifically tailored to subvert Vertical Bridge's ROFRs and damage Vertical Bridge's reputation with Landlords and Tenants.

95.     Everest has retained, and continues to retain, the benefit conferred upon it without providing any compensation to Vertical Bridge for the benefit.

96.     The circumstances are such that it would be inequitable for Everest to retain the benefit of the use of Vertical Bridge's trade secrets.

**COUNT V**
**TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS**

97.     Vertical Bridge repeats and re-alleges each and every paragraph above as if fully set forth herein.

98.     Vertical Bridge has valid and enforceable contractual relationships with various Landlords, which are memorialized in VB Contracts.

99.     Everest specifically targets VB Contracts for interference.

100.    Everest intentionally interferes with the contractual relationships between Vertical Bridge and its Landlords when Everest induces the Landlords to disclose Vertical Bridge's trade secret-protected information, in violation of the Landlords' confidentiality obligations to Vertical Bridge under the VB Contracts.

101.    Everest intentionally interferes with the contractual relationships between Vertical Bridge and its Landlords when Everest persuades the Landlords to assign VB Contracts to Everest without Vertical Bridge's prior consent, in violation of the VB Contracts' consent-for-assignment provisions.

102.    Everest intentionally interferes with the contractual relationships between Vertical Bridge and its Landlords when Everest persuades the Landlords to assign property interests to Everest that would have a detrimental impact on Vertical Bridge's operations, in violation of the VB Contracts' non-interference provisions.

103.    Everest intentionally interferes with the contractual relationships between Vertical Bridge and its Landlords when Everest presents Landlords with non-*bona fide* purchase offers that Everest specifically structures to subvert Vertical Bridge's ROFRs.  Everest interferes with the contractual relationships when it persuades Vertical Bridge's Landlords to entertain, and even accept, the non-*bona fide* offers.

104.    Everest intentionally interferes with the contractual relationships between Vertical Bridge and its Landlords with the intent of harming Vertical Bridge.

105.    In so interfering, Everest has acted and continues to act without any privilege or justification.

106.    Everest acted and continues to act wrongfully in intentionally interfering with Vertical Bridge's contractual relationships with its Landlords.

107.    Everest's intentional interference has caused Vertical Bridge's Landlords to breach the VB Contracts.

108.    As a direct and proximate cause of Everest's improper conduct, Vertical Bridge has sustained damages and losses in an amount to be determined at trial.

## COUNT VI
## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

109.    Vertical Bridge repeats and re-alleges each and every paragraph above as if fully set forth herein.

110.    Vertical Bridge has a long history of renewing its VB Contracts with Landlords upon expiration of the final term.  Indeed, this is standard industry practice.

111.    Everest has knowledge of the existence of the VB Contracts, the terms therein, and the business relationship between Vertical Bridge and its Landlords.

112.    Due to the cost of relocating Vertical Bridge's Tenants, of which Everest has knowledge of, there is a reasonable likelihood that Vertical Bridge will attempt to renew its contractual relationships with various Landlords.

113.    Based on Vertical Bridge's history with Landlords, which reflects that Landlords routinely renew their VB Contracts, there is a reasonable likelihood that Landlords would renew their VB Contracts but for Everest's interference.

114.    Everest knew of the confidentiality provisions in the VB Contracts, yet requested the contracts from Vertical Bridge's Landlords to structure highly competitive offers to the Landlords in order to obtain an interest in the property where Vertical Bridge's Towers sit.

115.    Everest knew that acquiring the VB Contracts through Vertical Bridge's Landlords would result in the Landlords breaching the confidentiality provisions within the VB Contracts.

116.    Everest intentionally interferes with Vertical Bridge's prospective contractual relationships by using the wrongfully obtained trade secret-protected information to negotiate with Vertical Bridge's Landlords under more favorable terms and thereby obtain a competitive advantage against Vertical Bridge.

117.    Everest purposefully subverts Vertical Bridge's ROFR by using the trade secret-protected information it has misappropriated to make offers subject to the ROFRs that are impossible for Vertical Bridge to match on substantially the same material terms as Everest.

118.    Everest also intentionally interferes with Vertical Bridge's prospective contractual relations by making misrepresentations to Landlords regarding its own and Vertical Bridge's services and commercial activities in order to induce the Landlords to enter into contracts with it instead of Vertical Bridge.

119.    Everest has demonstrated its desire and intent to prevent the Landlords from renewing or extending the VB Contracts, and either knew or should have known that interference with Vertical Bridge and its Landlords' prospective contractual relations was substantially likely to occur as a result of Everest's tortious conduct.

120.    But for Everest's intentional interference, Vertical Bridge would have renewed certain VB Contracts with certain Landlords that in fact were not renewed.

121.    Everest intentionally interferes with the prospective contractual relationships between Vertical Bridge and its Landlords with the intent of harming Vertical Bridge.

122.    Everest is not privileged or justified in its interference with Vertical Bridge's prospective contractual relationships.

123.    As a direct and proximate cause of Everest's improper conduct, Vertical Bridge has sustained damages and losses in an amount to be determined at trial.

## COUNT VII
## UNFAIR COMPETITION

124.    Vertical Bridge repeats and re-alleges each and every paragraph above as if fully set forth herein.

125.    As set forth herein, Everest engages in unfair and/or deceptive business practices.

126.    Vertical Bridge has the right to be free from unfair competition caused by Everest's unfair and/or deceptive business practices and wrongful use of Vertical Bridge's confidential and trade secret-protected information.

127.    Vertical Bridge has the right to be free from unfair competition caused by Everest's interference with Vertical Bridge's existing and prospective contractual relations.

128.    Upon information and belief, Everest uses and intends to continue to use Vertical Bridge's confidential and trade secret-protected information in order to gain an unfair competitive advantage over Vertical Bridge.

129.    Upon information and belief, Everest uses and intends to continue to use Vertical Bridge's confidential and trade secret-protected information to interfere with existing and prospective VB Contracts.

130.    Everest has benefitted by, or will benefit by reason of, and as a direct result of, its unfair competitive acts.

131.    Everest's unfair competitive acts are willful, wanton, and malicious.

132.    Because of Everest's unfair competitive acts, Vertical Bridge has suffered actual damages, including increased ROFR payments necessary to maintain its interest in the property underneath its Towers, and will likely suffer loss of its expectancy interests with Landlords induced by Everest's unfair competitive acts.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court issue a judgment in its favor and enter an order:

(i)     Directing Everest to provide an accounting of all sums earned by Everest from its unlawful actions described in the Complaint;

(ii)    Permanently enjoining Everest from engaging in unfair competition with Vertical Bridge, falsely advertising the nature of the services and commercial activities of Vertical Bridge and Everest to the Landlords, misappropriating Vertical Bridge's trade secret-protected information, and tortiously interfering with Vertical Bridge's existing and prospective contractual relationships with Landlords;

(iii)   Awarding to Vertical Bridge any and all monetary damages sustained as a result of Everest's unlawful actions described in the Complaint, including actual, consequential, special, exemplary, treble, and punitive damages, lost profits, loss of business expectancy, and disgorgement of Everest's profits;

(iv)    Awarding to Vertical Bridge the cost of the suit, including attorneys' fees, as well as pre- and post-judgment interest; and

(v)     Such other relief as the Court deems to be fair and appropriate.

Dated: June 8, 2023

/s/ David R. Osipovich
David R. Osipovich (PA ID No. 306687)
Anna Shabalov (PA ID No. 315949)
Jessica L.G. Moran (PA ID No. 325912)
Kira M. Geary (PA ID No. 330334)
**K&L Gates LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222

Tel: (412) 355-6500
david.osipovich@klgates.com
anna.shabalov@klgates.com
jessica.moran@klgates.com
kira.geary@klgates.com

Kelsi E. Robinson (PA ID No. 330452)
**K&L Gates LLP**
10100 Santa Monica Boulevard
Los Angeles, CA 90067
Tel: (310) 552-5060
kelsi.robinson@klgates.com

*Attorneys for Plaintiff Vertical Bridge REIT, LLC*