**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VERTICAL BRIDGE REIT, LLC, et al.<br><br>        Plaintiffs,<br><br>   v.<br><br>EVEREST INFRASTRUCTURE<br>PARTNERS, INC.; EIP HOLDINGS II, LLC,<br><br>       Defendants. | No. 2:23-cv-1017-WSH<br><br><br>Judge W. Scott Hardy |

**MEMORANDUM OF LAW IN SUPPORT OF EVEREST'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 4

      A.    Vertical Bridge Concedes Tower Aggregation Is A "Legitimate" Practice........................................................................................... 4

      B.    Vertical Bridge's Rent Terms Cannot Be "Trade Secrets" Because They Have Spent Time In The Hands Of Third Parties With Every Right To Disclose Them. ..................................................... 5

      C.    Vertical Bridge Does Not Dispute That "Legitimate" Tower Aggregators Get Access To The Exact Same Information As Everest.......................................................................................... 7

      D.    Vertical Bridge Alleges That Everest Makes "Illusory" Promises To Landowners But Also Confirms That Everest Can Fulfill Those Promises. ................................................................................ 8

STANDARD OF REVIEW .................................................................................. 9

ARGUMENT ....................................................................................................... 10

  I.    VERTICAL BRIDGE'S TRADE SECRET CLAIMS MUST BE DISMISSED ............................................................................ 10

      A.    Vertical Bridge's Trade Secret Claims All Fail Because All Of Its Rent Terms Have Spent Time In The Hands Of Third Parties With Every Right And Incentive To Share Them. .......................................... 11

      B.    The Rent Terms Are Not Trade Secrets Because They Are Readily Available Via Permissible Means. ........................................... 14

      C.    Vertical Bridge's Rent Terms Cannot Be Trade Secrets If They Were Not Developed Using Vertical Bridge's "Confidential Formula." ........................................................................................ 15

      D.    If Any Trade Secret Claims Survive, The Landowners Must Be Joined As Necessary Parties Pursuant To FRCP 19. ............................. 16

  II.    VERTICAL BRIDGE'S LANHAM ACT CLAIMS MUST BE DISMISSED ............................................................................ 17

      A.    Vertical Bridge Fails To Allege Any "Description Of Fact" Or "Representation Of Fact," Let Alone A "False" One. ............................. 17

      B.    Vertical Bridge Does Not Allege That The "Scheme" Has Ever Actually Happened................................................................. 19

      C.    Vertical Bridge's Own Allegations Confirm That Everest's Alleged Contractual Duties Are Not "Knowingly False."...................... 21

i

**TABLE OF CONTENTS**
(continued)

**Page**

D.      Vertical Bridge Still Does Not Allege Any False Statements In
        Connection With Goods Or Services. ....................................................... 23

III.    VERTICAL BRIDGE'S STATE LAW CLAIMS MUST BE DISMISSED
        BECAUSE THEY ARE PREDICATED ON ITS TRADE SECRET AND
        LANHAM ACT CLAIMS ..................................................................................... 24

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

CASES

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................10, 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................9, 10

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011)..........................................................................................10

*Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*,
   80 F.4th 223 (3d Cir. 2023) .......................................................................................2, 17

*Dille Fam. Tr. v. Nowlan Fam. Tr.*,
   No. 15-6231, 2016 WL 7202073 (E.D. Pa. Apr. 21, 2016)................................4, 24

*EMC Outdoor, LLC v. Stuart*,
   No. 17-5172, 2021 WL 1224064 (E.D. Pa. Mar. 31, 2021) ...................................10

*Grayson v. Mayview State Hosp.*,
   293 F.3d 103 (3d Cir. 2002)..........................................................................................10

*Hirtle Callaghan Holdings, Inc. v. Thompson*,
   No. 18-2322, 2022 WL 2048656 (E.D. Pa. June 7, 2022).....................................25

*Max Daetwyler Corp. v. Input Graphics, Inc.*,
   608 F. Supp. 1549 (E.D. Pa. 1985) ............................................................................21

*Nicolo v. Patterson Belknap Webb & Tyler, LLP*,
   No. 2:13-cv-706, 2016 WL 5661737 (W.D. Pa. Sept. 30, 2016) ..........................15

*Oakwood Labs. LLC v. Thanoo*,
   999 F.3d 892 (3d Cir. 2021)...........................................................................10, 11, 12

*Pittsburgh Logistics Sys., Inc. v. Cox Logistics LLC*,
   No. 20-817, 2021 WL 811394 (W.D. Pa. Mar. 3, 2021) ........................................25

*Registered Agent Sols., Inc. v. Corp. Serv. Co.*,
   No. 1:21-cv-786-SB, 2022 WL 911253 (D. Del. Mar. 28, 2022).....................18, 21

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984)..........................................................................................11, 13

*Shire US, Inc. v. Allergan, Inc.*,
   375 F. Supp. 3d 538 (D.N.J. 2019) .......................................................................25

*SI Handling Sys., Inc. v. Heisley*,
   753 F.2d 1244 (3d Cir. 1985)...........................................................................2, 11

*Whitaker v. Herr Foods, Inc.*,
   198 F. Supp. 3d 476 (E.D. Pa. 2016) ...................................................................25

**STATUTES**

12 Pa. Cons. Stat. § 5302 ...............................................................................................2, 15

15 U.S.C. § 1125 ......................................................................................................3, 17, 19

18 U.S.C. § 1839.............................................................................................................2, 15

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 8 .....................................................................................21

Federal Rule of Civil Procedure 9 .....................................................................................21

Federal Rule of Civil Procedure 12 ...............................................................................1, 25

Federal Rule of Civil Procedure 19 ...........................................................................2, 16, 17

## INTRODUCTION

The Court dismissed Vertical Bridge's original complaint (ECF # 1, "Compl.") for failure to include, as necessary parties, its affiliated entities ("VB Affiliates") that are signatories to the cell tower ground leases that form the basis of this litigation ("VB Contracts").  ECF # 36.  The Court also advised Vertical Bridge that it was "a bit skeptical that some, if not all of the claims that are alleged in the [original] compliant [were] sufficiently pled."  ECF # 37 ("1/9/24 Hr'g Tr.") at 47:10–12.  In its amended complaint (ECF # 38, "Am. Compl."), Vertical Bridge has added VB-Affiliates as plaintiffs and tried to fix its numerous other pleading deficiencies.  But instead the amended complaint reveals why the initial complaint was so vague:  The new allegations confirm that Vertical Bridge has no claims.  This case remains a ham-fisted attempt to stifle competition and restrict property rights by making a federal case out of lawful competition.  Further amendment would be futile, and the amended complaint should be dismissed with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(7).

**Trade Secret Claims**.  The amended complaint adds fatal concessions that doom Vertical Bridge's trade secret claims.  For instance, Vertical Bridge now concedes that it does not require landowners to sign non-disclosure agreements (NDAs) before making offers to them that contain the purported "trade secrets"; instead it "[v]erbally inform[s]" landowners that the proposed rent terms are a secret.  Am. Compl. ¶ 39.  But Vertical Bridge cannot unilaterally impose an obligation of secrecy on landowners (which Vertical Bridge implicitly acknowledges by emphasizing its own "attempts" to amend VB Contracts it acquires from third parties to add confidentiality clauses).  *Id*. ¶ 29.  Vertical Bridge could insist on execution of NDAs before sharing its "trade secrets," but the amended complaint confirms that Vertical Bridge's landowners undertake no binding obligation during the negotiation phase.  For this reason alone, none of Vertical Bridge's rent terms can be trade secrets because they have all "already [been] in

1

the hands of third parties . . . who have every incentive, and every right to disclose" them. *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1257 (3d Cir. 1985).

As another example, Vertical Bridge has been forced to acknowledge that certain VB Contracts were acquired from unrelated third parties, but it does not plead any facts to support the contention that those terms were ever a predecessor's trade secrets, including any allegations that the predecessors took any steps to keep the terms secret or what those steps might have been.

There are some things that Vertical Bridge's amended complaint does not even try to remedy. Both complaints have the unfixable problem that both Everest and "legitimate" ground lease aggregators learn Vertical Bridge's rent terms when they step into the landowner's shoes and start receiving the rent payments. That also ends the trade secret claims. *See* 18 U.S.C. § 1839(3)(B) (information can be a trade secret only where, among other things, it is "not . . . readily ascertainable through proper means by, another person"); 12 Pa. Cons. Stat. § 5302 (same).

Finally, the amended complaint places the landowners front and center by explicitly claiming that they had, and violated, a duty to withhold the rent terms—which are critical to value their property—from potential buyers. That means adjudicating Vertical Bridge's trade secret claims requires the Court to determine whether such restrictions are enforceable restraints on the alienability of each absent landowner's property under the law of the state of that particular property. To the extent that any trade secret claims survive (and they should not), Vertical Bridge's landowners must be joined pursuant to FRCP 19(a)(1)(B)(i) so they have an opportunity to protect their contract and property rights. *C.f., Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, 80 F.4th 223, 233 (3d Cir. 2023) ("parties owning rights under disputed contracts . . . generally have a legally protected interest under Rule 19(a)(1)(B)(i)").

**Lanham Act (False Advertising)**.  Vertical Bridge's claim remains predicated on a "scheme" that has never happened and makes no sense.  One thing is clear:  Everest's alleged offer to Vertical Bridge's landowners to "pay the Landlord the greater of either (1) 50% of Everest's revenue from any tenant . . . or (2) $30,000 per year" is not a "description of fact" or "representation of fact" as required to state a false advertising claim under the Lanham Act, let alone a false one.  Am. Compl. ¶ 60 (emphasis removed); 15 U.S.C. § 1125(a)(1).  No formulation of Everest's alleged promises of future performance can ever be a "description of fact" or "representation of fact" as required by the Lanham Act.  This alone is fatal.

Like Vertical Bridge's original complaint, the amended complaint is at war with itself and common sense, describing an alleged "scheme" that is an irreparable mess of self-contradictions.  Vertical Bridge alleges that "Everest makes knowingly false and/or misleading statements of fact to Landlords" by offering the greater of 50% of future tenant revenue or $30,000 annually.  *Id*. ¶¶ 60, 73.  According to Vertical Bridge, this promise is false or misleading because, Everest knows, there will be no revenue to share.  *Id*. ¶ 53.  Here comes the fatal contradiction:  Vertical Bridge expressly alleges that Everest makes these offers "***because Everest knows*** that . . . ***Everest will have the opportunity*** to substantially increase Vertical Bridge's rent payments, thereby recouping its initial payment to the Landlord and earning excess revenue if Vertical Bridge remains at the site" *__or__* "[i]n the event that Vertical Bridge does not remain at the site, ***Everest can attempt to take over Vertical Bridge's relationships with its Tenants*** remaining at the site."  *Id*. ¶ 59 (emphasis added).  In both of these scenarios, Vertical Bridge concedes there will be revenue to share:  If Everest becomes Vertical Bridge's landlord, it will have tenant revenue to share, and if it "takes over Vertical Bridge's" tenant relationships, it will also have tenant revenue to share.  Of course, if Everest "knows that" it may have future

revenue, it cannot be true that Everest knowingly makes false promises of a future revenue share. It is rare, and remarkable, for a plaintiff to refute its own claims within the four corners of its complaint. Yet that is exactly what the amended complaint does.

Vertical Bridge also attempted to articulate "services" that Everest supposedly promises to perform. *See id*. ¶ 46. But they all boil down to the acquisition of real property rights, which are neither goods nor services under the Lanham Act. *Dille Fam. Tr. v. Nowlan Fam. Tr.*, No. 15-6231, 2016 WL 7202073, at *1 n.1 (E.D. Pa. Apr. 21, 2016) ("Courts have consistently held that intangible property rights," like trademarks or the real property rights at issue, "are not 'goods or services' for Lanham Act purposes.").

Vertical Bridge will never be able to allege a coherent trade secret or false advertising claim because the facts it has already alleged establish that there are no trade secrets and there are no false advertisements. Vertical Bridge's trade secret and Lanham Act claims should therefore be dismissed with prejudice, as should its "related state-law claims" predicated on the same facts and alleged conduct. *See* ECF # 33 at ¶ 2.

## STATEMENT OF FACTS

### A.    Vertical Bridge Concedes Tower Aggregation Is A "Legitimate" Practice.

Vertical Bridge (specifically the VB Affiliates) own telecommunications towers and enter into ground leases (the VB Contracts) with the owners of the property where their towers sit. Am. Compl. ¶ 28. Vertical Bridge then leases space on the towers to wireless carriers like Verizon and other tenants ("Tower Tenants"). *Id.* ¶ 22. The Tower Tenants pay rent to Vertical Bridge, and Vertical Bridge in turn pays rent to the landowners pursuant to the VB Contracts. *Id.* ¶ 28.

This basic business model is depicted below:



Everest also owns towers and leases space to wireless carriers. *Id*. ¶ 49. Vertical Bridge's claims in this case focus on an alleged part of Everest's overall business known as "tower aggregation" or "tower land aggregation." *Id*. ¶ 47. Tower aggregators approach the owners of the property under other companies' towers and offer to purchase the landowner's ground lease rights, namely the stream of rent paid by the tower owner. *Id*. ¶ 48. If the landowner accepts, the tower aggregator steps into the shoes of the landowner "and receives the monthly rent payments that the [tower owner] would have made to the landowner." *Id*. "In so doing, the tower aggregator receives a steady stream of income and the landowner exchanges that stream for a one-time up-front payment." *Id*.

**B.     Vertical Bridge's Rent Terms Cannot Be "Trade Secrets" Because They Have Spent Time In The Hands Of Third Parties With Every Right To Disclose Them.**

In the original complaint, Vertical Bridge alleged that rent terms in unidentified VB Contracts were trade secrets on the basis that it "utilizes a confidential formula to set the pricing terms and pricing structure" and that the VB Contracts were subject to confidentiality provisions contained in the VB Contracts. Compl. ¶¶ 30–31, 37, 62, 69, 81, 100, 114–115. Everest's first

motion to dismiss attached the VB Contracts for the only Vertical Bridge sites where Everest had acquired leasing rights ("Everest-VB Sites"),[1] forcing Vertical Bridge to acknowledge that (i) six out of eight of the leases do not have confidentiality provisions and (ii) the same six were acquired from third parties who negotiated their terms before Vertical Bridge even existed.  ECF # 22 ("Baltruzak Declaration") at Exs. 1–6.

At that point, Vertical Bridge deployed an "amendment by briefing" strategy, taking the extraordinary position that its rent terms qualify for trade secret status even where the landowner has no contractual obligation to keep the terms a secret and even where they are not the product of Vertical Bridge's "confidential formula."  ECF # 24 at 13–17.  In the amended complaint, Vertical Bridge has tried to plead that extreme position.  The problem is that Vertical Bridge has only clarified that *all* of the trade secrets have to be dismissed because they have *all* spent time in the hands of third parties with every right to share them with whomever they wish.

Start with the VB contracts without confidentiality provisions.  For these, Vertical Bridge claims that it "[v]erbally inform[s]" the landowners that the terms are confidential—but it does *not* allege that the landowners ever *agree* not to disclose them.  Am. Compl. ¶ 39(c).  And Vertical Bridge alleges that it "attempts to negotiate an amendment to each lease" to include confidentiality provisions "[w]henever possible," indicating that where a lease does not contain a confidentiality provision, the landowner did not agree to that term (which it is free to do).  *Id*. ¶29.  Of course, any leases that were *amended* to include a confidentiality provision have necessarily spent time in the hands of third parties, the landowners, with every right and incentive to share their rent terms to get a better deal.  For example, Vertical Bridge alleges that

---

[1] At the time there were only eight Everest-VB Sites.  Since then, Everest has acquired leasing rights on a ninth site.  Everest will be happy to provide that new VB Contract upon request.

because Everest knows the rent terms, it is able to "craft an offer" for a "substantial lump-sum payment at closing" plus "a going forward monthly rental rate that is five-to-ten times higher than the current rent that Vertical Bridge pays." *Id.* ¶¶ 55, 57–58.

Vertical Bridge now also acknowledges (as it must) that it acquired the VB Contracts without confidentiality provisions from unaffiliated third parties. *Id.* ¶ 39(b). But Vertical Bridge does not allege *anything* to support its allegation that these terms ever qualified as trade secrets in the first place, let alone that its predecessors took reasonable steps to maintain their confidentiality before the contracts were acquired by Vertical Bridge.

Now turn to the leases that *have* confidentiality provisions. Vertical Bridge originally failed to plead any steps that it takes to keep those terms secret during negotiations before the VB Contracts are executed. ECF # 21 (Everest's original motion to dismiss) at 16. Vertical Bridge now alleges that it "[d]esignat[es] offer letters to Landlords as 'Confidential'" and "[v]erbally inform[s] Landlords that Vertical Bridge's offers are 'confidential.'" Am. Compl. ¶ 39(d)–(e). But Vertical Bridge does not allege that the landowners *agree* to keep the offers confidential.

## C.    Vertical Bridge Does Not Dispute That "Legitimate" Tower Aggregators Get Access To The Exact Same Information As Everest.

In both complaints, Vertical Bridge acknowledges land tower aggregation is a "legitimate" practice but claims Everest's tower aggregation crosses the line from legitimate to illegitimate because Everest learns the (allegedly trade secret) rent terms before purchasing leasing rights rather than afterwards. Compl. ¶ 33; Am. Compl. ¶ 48.

According to Vertical Bridge, "[l]egitimate" tower aggregators do not find out the rent amount when they offer to purchase the landowner's rent stream. Am. Compl. ¶ 48. Rather, they "offer landowners lump sum-payments" based on the "tower aggregator's ***estimation*** of the

*market* rent." *Id.* (emphasis added).  In other words, Vertical Bridge claims that a legitimate tower aggregator buys a particular rent stream *without actually knowing* how much rent the landowner receives each month based on a hope that the economics will work out for the duration of a ground lease, which typically runs for "decades."  *Id.* ¶ 33.

Vertical Bridge has never disputed that, after closing, the "legitimate" tower aggregators end up with *exactly the same* information as Everest (both know the rent terms when the checks start rolling in).  *See* ECF # 21 at 5, 13-14; ECF # 25 (Everest's original reply brief) at 6-7.

**D.  Vertical Bridge Alleges That Everest Makes "Illusory" Promises To Landowners But Also Confirms That Everest Can Fulfill Those Promises.**

In the original complaint, Vertical Bridge alleged that Everest makes "illusory" promises in its contracts to share revenue from Tower Tenants with the landowners.  Compl. ¶ 38.  In the amended complaint, Vertical Bridge clarifies that the alleged "illusory promise" is actually "to pay the Landlord the greater of either (1) 50% of Everest's revenue from any tenant—whether a tower infrastructure company tenant or telecom carrier subtenant—who occupies the premises following the expiration of the VB Contract or (2) $30,000 per year."  Am. Compl. ¶ 60 (emphasis removed).

Vertical Bridge does not allege that Everest ever broke this promise by failing to pay a landowner the greater of 50% of its tenant revenue or $30,000 per year.  *See generally id*. Rather, Vertical Bridge claims that the promise is "illusory" and "knowingly false" because Everest "does not have any tenant leases in place at the time it makes its offer."  *Id*. ¶¶ 62, 73. Standing alone, this allegation is nonsense:  An offer to pay someone either a revenue share or a minimum amount ($30,000) cannot deceptively suggest there will be no tenant revenue to share because the structure of the alleged offer itself contemplates the possibility that there will be no revenue to share (which would result in the payment of $30,000).

After two tries, Vertical Bridge *still* does not identify any actual tower site subject to such an illusory promise or allege any actual instances where Everest made such a promise. *See generally* Compl. & Am. Compl.  Neither complaint ever identifies any instance where the numerous events required for the alleged "scheme" actually occurred, namely: (i) Everest made the alleged promise to a landowner, resulting in (ii) Everest acquiring the ground lease under a Vertical Bridge tower site, leading to (iii) Vertical Bridge refusing to renew the ground lease after Everest acquired its interest, resulting in (iv) Vertical Bridge actually taking down its tower and leaving the site, (v) but without Everest building its own tower on the site, resulting in (vi) Everest having no revenue to share with the landowner.  Am. Compl. ¶ 53.

Vertical Bridge maintains its allegation from the original complaint that Everest's offer is "knowingly false." *Id*. ¶ 73.  Yet—to explain why Everest would agree to pay a "substantial" sum up front and monthly rental payments "five-to-ten times higher" than the existing rate, *id.* ¶ 58—Vertical Bridge now concedes that Everest makes the offer "because Everest ***knows*** that . . . Everest ***will*** have the opportunity to substantially increase Vertical Bridge's rent payments, thereby recouping its initial payment to the Landlord and earning excess revenue if Vertical Bridge remains at the site" and "[i]n the event that Vertical Bridge does not remain at the site, Everest can attempt to take over Vertical Bridge's relationships with its Tenants remaining at the site." *Id*. ¶ 59 (emphasis added).

Finally, Vertical Bridge alleges that it "has suffered . . . damages in the form of lost market share" and "lost Tower sites." *Id.* ¶ 78.

## STANDARD OF REVIEW

The Court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully,"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and dismissal is required if the factual allegations fail "to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555.  Vertical Bridge must plead enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  The Court must dismiss a complaint that is "merely consistent with a defendant's liability" if there are insufficient facts to make that inference reasonable.  *Id*. (citation omitted).

Although the Court accepts well-pleaded allegations as true, the Court must "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (citation omitted). The Third Circuit requires a three-step process to evaluate whether a complaint alleges sufficient facts to state a facially plausible claim:

> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'  Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'  Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citation omitted) (alteration in original).  Dismissal with prejudice is proper where amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

## <u>ARGUMENT</u>

## I.   VERTICAL BRIDGE'S TRADE SECRET CLAIMS MUST BE DISMISSED

The amended complaint makes plain that Vertical Bridge's trade secret claims fail as a matter of law and should be dismissed with prejudice.[2]

---

[2] Because the required elements for misappropriation under the Pennsylvania Uniform Trade Secrets Act (PUTSA) are "substantively identical" to those under DTSA, Vertical Bridge's federal and state trade secret claims all fall together.  *See EMC Outdoor, LLC v. Stuart*, No. 17-

A.     **Vertical Bridge's Trade Secret Claims All Fail Because All Of Its Rent Terms Have Spent Time In The Hands Of Third Parties With Every Right And Incentive To Share Them.**

Trade secrets are "defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret." *Oakwood Labs.*, 999 F.3d at 905. Information that "is already in the hands of third parties . . . who have every incentive, and every right, to disclose it" is not entitled to trade secret protection. *SI Handling*, 753 F.2d at 1257; *cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right [in the trade secret] is extinguished.").

The commonsense rule of *SI Handling* fits the amended complaint to a T and bars Vertical Bridge's trade secrets claims.  The landowners have the rent terms and are clearly incentivized to share them so that they can shop around for the best offer possible—for example, Vertical Bridge alleges that, because Everest knows the rent terms, it is able to "craft an offer" (Am. Compl. ¶ 55) for a "substantial lump-sum payment at closing" plus "a going forward monthly rental rate that is five-to-ten times higher than the current rent." *Id*. ¶¶ 57–58.

In the original motion to dismiss, Everest explained that the *SI Handling* rule clearly bars trade secret claims with respect to rent terms in any contracts that do not have confidentiality provisions because those landowners indisputably have every right to disclose the terms to whomever they wish.  ECF # 21 at 14.  With respect to contracts that *do* contain confidentiality provisions, Everest explained that Vertical Bridge failed to plead sufficient information from which the court could infer that it took reasonable steps to maintain the secrecy of its proposed rent terms before the VB Contracts are executed.  *Id.* at 16.

_____

5172, 2021 WL 1224064, at *11 (E.D. Pa. Mar. 31, 2021) (analyzing DTSA and PUTSA claims together and dismissing both).

In the amended complaint, Vertical Bridge attempted to salvage its claims by alleging that it (i) verbally informs landowners that the rent terms are confidential, (ii) amends contracts acquired from third parties to incorporate confidentiality provisions, and (iii) designates offers confidential.  Am. Compl. ¶ 39(b)-(d).  But Vertical Bridge has no authority to unilaterally impose confidentiality on the landowners; nor can it take information that was already out in the open and declare it to be a trade secret after the fact.

As explained below, all of these measures are insufficient as a matter of law, and *all* of Vertical Bridge's trade secret claims should be dismissed for failure to take reasonable measures to keep them secret.  *Oakwood Labs.*, 999 F.3d at 905.  The court can—and should—dismiss all of Vertical Bridge's trade secrets with prejudice on this basis alone.

**VB Contracts Without Confidentiality Provisions**.  Vertical Bridge's original trade secret claims were predicated on confidentiality provisions in the VB Contracts at issue. Compl. ¶¶ 30–31, 37, 62, 69, 81, 100, 114–115.  Everest filed the VB Contracts for Everest-VB Sites with the original motion to dismiss, showing that most of the leases for those sites do not have confidentiality provisions.  *See* ECF # 21 at 8-9; ECF # 22 at Exs. 1-6.  Vertical Bridge then took the extraordinary position in its opposition brief that its rent terms are entitled to trade secret protection even if they are in the hands of landowners with every right and incentive to share them with whomever they wish.  *See* ECF # 24 at 13–17.  The Court naturally expressed skepticism at that position.  1/9/24 Hr'g Tr. at 47:17–22.

Now Vertical Bridge alleges that rent terms contained in VB Contracts with no confidentiality provisions are still protected because Vertical Bridge "[v]erbally inform[s] Landlords that the pricing and price structure terms within their VB Contracts are confidential." Am. Compl. ¶ 39(c).  That is insufficient.  First of all, Vertical Bridge allegedly acquired the VB

Contracts without the confidentiality provisions from unaffiliated third parties. *Id*. ¶¶ 37, 39(b). Vertical Bridge pleads no steps whatsoever that its predecessors took to keep these terms a secret. Second, Vertical Bridge cannot unilaterally impose confidentiality on landowners without their agreement. Vertical Bridge obviously knows that; otherwise it would not "attempt[] to negotiate an amendment to each lease" to include confidentiality provisions "[w]henever possible." *Id*. ¶ 29. Where a VB Contract does not contain a confidentiality provision, the third-party landowner has every right, and is incentivized, to share the rent information with whomever they wish. These contracts cannot contain trade secrets.

**VB Contracts Amended to Include Confidentiality Provisions**. Vertical Bridge now claims that it "[a]mend[ed]" some, but presumably not all, "VB Contracts that Vertical Bridge acquires from prior entities to include, *inter alia*, confidentiality provisions." *Id*. ¶ 39(b). Of course, Vertical Bridge has not identified any contracts that fit into this bucket. Even if this allegation is true, it is not good enough.

First of all, and as explained below, Vertical Bridge does not include sufficient allegations to support its claim that the terms of these contracts—which were all acquired from third parties—could *ever* have qualified as trade secrets. *See* page 15, *infra*. But assuming *arguendo* that they could, their trade secret status was "extinguished" when they were "disclose[d] . . . to others who are under no obligation to protect the confidentiality of the information." *Ruckelshaus*, 467 U.S. at 1002. Up until the time a new confidentiality provision was added to a VB Contract, the landowner had the unconditional right to share the information with whomever it wished. For that entire time, the cat was out of the bag, and Vertical Bridge cannot "reignite" the trade secret status with an after-the-fact amendment. That is doubly true here because Vertical Bridge does not allege any steps that its predecessors took to keep the rent

terms a secret before they were assigned to Vertical Bridge (which is, itself, fatal).

**VB Contracts With Confidentiality Provisions**.  In the original motion to dismiss, Everest explained that the rent amounts could not be a trade secret because Vertical Bridge did not allege any measures to keep its proposed rent amounts a secret during the negotiation process before the VB Contract is executed.  ECF # 21 at 16.  In the amended complaint, Vertical Bridge attempts to rectify the problem by pleading that it "[d]esignat[es] offer letters to Landlords as 'Confidential'" and "[v]erbally inform[s] Landlords that Vertical Bridge's offers are 'confidential.'"  Am. Compl. ¶ 39(d)-(e).  Vertical Bridge does ***not*** allege that it enters into NDAs with the landowners before making these offers.  As explained above, Vertical Bridge cannot unilaterally impose confidentiality requirements on landowners without their consent.  Without a nondisclosure *agreement*, the landowner has no obligation to keep Vertical Bridge's proposed rent terms confidential and is incentivized to use those terms to shop for a better deal.

None of Vertical Bridge's rent terms can be trade secrets whether or not the relevant VB Contract includes a confidentiality provision.

**B.    The Rent Terms Are Not Trade Secrets Because They Are Readily Available Via Permissible Means.**

Like the original complaint, the amended complaint acknowledges that there are "[l]egitimate tower aggregators" who buy landowners' interests in ground leases—supposedly based on an "estimation" of rent, without knowing the income stream they are buying.  Am. Compl. ¶ 48.  Everest explained in its original motion to dismiss—and Vertical Bridge has never disputed—that these legitimate tower aggregators end up getting the exact same trade secret information as Everest when the rent checks come in post-closing.  *See* ECF # 21 at 13–14; ECF # 24 at 13.  The amended complaint does not change these allegations, and no amendment could ever cure this problem because it is uncurable.  Vertical Bridge's rent terms cannot be trade

14

secrets because they are "readily ascertainable through proper means by, another person."

18 U.S.C. § 1839(3)(B); 12 Pa. Cons. Stat. § 5302.

### C.      Vertical Bridge's Rent Terms Cannot Be Trade Secrets If They Were Not Developed Using Vertical Bridge's "Confidential Formula."

The original complaint completely failed to acknowledge that most of the contracts

governing Everest-VB sites were inherited from third parties, meaning that the rent terms were

not developed by Vertical Bridge.  The amended complaint acknowledges that fact, but offers

nothing more than the conclusory allegation that Vertical Bridge "purchases the trade-secret-

protected pricing terms and price structure information developed by the predecessor-in-

interest."  Am. Compl. ¶ 38.  That does not cut it.  For general, non-technical information, trade

secret status depends on whether the subject is "the product of time and effort and provides the

owner of the alleged trade secret with an independently-derived economic advantage over

competitors."  *Nicolo v. Patterson Belknap Webb & Tyler, LLP*, No. 2:13-cv-706, 2016 WL

5661737, at *3 (W.D. Pa. Sept. 30, 2016).[3]  Vertical Bridge pleads zero information about how

the predecessors-in-interest developed these rent terms.  Given that we are discussing contract

terms, the only plausible inference is that they are the product of an arms-length negotiation with

landowners.  Vertical Bridge therefore failed to allege sufficient facts to support its claim that

these terms ever qualified as trade secrets in the first place; let alone that they remained so

through Vertical Bridge's acquisition (despite being in the hands of third parties with every right

---

[3] In contrast to the inherited VB Contracts, Vertical Bridge beefed up its allegations regarding the rent terms in contracts that were originally negotiated by Vertical Bridge, alleging that it "develops this trade secret-protected information on an individual-site basis with the help of confidential formulae, pricing models and market analyses that it pays its own employees – as well as outside contractors – to develop."  Am. Compl. ¶ 37.  Everest reserves its rights to argue that that is insufficient to establish a trade secret—and is skeptical that the rent terms in VB Contracts are actually the product of Vertical Bridge's "confidential formulae, pricing models, and market analyses" rather than simply the result of haggling with landowners.  However, for purposes of this motion, Everest does not seek to dismiss the claims on those grounds.

to disclose them to whomever they wished).  *See* page 12, *supra*.

**D.**      **If Any Trade Secret Claims Survive, The Landowners Must Be Joined As Necessary Parties Pursuant To FRCP 19.**

Vertical Bridge alleges that Everest "unlawfully" acquired the rent terms at issue from Vertical Bridge's landowners.  Am. Compl. ¶¶ 96, 138.  That means that to find Everest misappropriated trade secrets, the Court must find that the landowners violated an enforceable duty to withhold rent information—which is key to valuing the property—from Everest.  That raises serious concerns regarding due process for the landowners and the alienability of the landowners' property.

The issue has real world consequences.  For example, Vertical Bridge alleges that because the owner of the Pierce site agreed to a confidentiality provision, it cannot sell its property unless it finds a buyer willing to purchase it without knowing the income stream that comes from the tower.  ECF # 22 (Baltruzak Declaration) at Ex. 7.  That could hurt the owner two ways: (1) it necessarily shrinks the pool of buyers; and (2) a buyer who is willing to buy with the rent amount unseen might pay less to account for the risk that the rent will be lower than expected.  But—stranger still—Vertical Bridge also alleges that the volunteer fire department that owns another of the sites at issue was somehow bound to keep that critical valuation information a secret ***even though the lease does not have a confidentiality provision***.  *Id*. at Ex. 1.  Imagine the surprise of a landowner who refused to amend a lease to add a confidentiality provision when Vertical Bridge took over the lease (*see* Am. Compl. ¶ 39(b)), but is now held to one anyway in an out-of-state litigation where they had no opportunity to defend their interest.

Before the Court can find any trade secrets in these contracts, it will have to do a careful analysis of local contract and property law for each of the tower sites to assess whether and to what extent landowners can be forced to maintain the secrecy of lease terms.  And the Court

16

cannot do that in the landowners' absence because they "claim[] an interest relating to the subject of the action and [are] so situated that disposing of the action in [their] absence may . . . as a practical matter impair or impede [their] ability to protect the interest."  Fed. R. Civ. P. 19(a)(1)(B)(i).

This case cannot be heard without the landowners present for two independently sufficient reasons:  First, their contractual rights and duties are at issue in the litigation and cannot be fairly determined in their absence.  *See Epsilon Energy*, 80 F.4th at 233 (" parties owning rights under disputed contracts . . . generally have a legally protected interest under Rule 19(a)(1)(B)(i)").  Second, their fundamental property rights are at stake.

For the avoidance of doubt, the court can (and should) dismiss Vertical Bridge's claims without the landowners being present.  But to the extent that any trade secret claims survive this motion (and they should not), the landowners must be joined pursuant to Rule 19(a)(1)(B)(i).

## II.  VERTICAL BRIDGE'S LANHAM ACT CLAIMS MUST BE DISMISSED

Vertical Bridge's Lanham Act claims continue to rely on an incomprehensible "scheme" that is insufficient under the Lanham Act, and which Vertical Bridge does not allege ever actually happened (in fact, Vertical Bridge effectively concedes it has not).  The claim fails for at least four independent reasons.

### A.    Vertical Bridge Fails To Allege Any "Description Of Fact" Or "Representation Of Fact," Let Alone A "False" One.

The Lanham Act creates a false advertising claim against individuals who "in connection with any goods or services . . . uses in commerce . . . ***false or misleading description of fact, or false or misleading representation of fact***."  15 U.S.C. § 1125(a)(1) (emphasis added).  After being pressed on this point at oral argument, Vertical Bridge described Everest's supposed offer in the amended complaint:

> Everest's offers to the Landlords frequently include a promise to pay the Landlord the greater of either (1) 50% of Everest's revenue from any tenant—whether a tower infrastructure company tenant or telecom carrier subtenant—who occupies the premises following the expiration of the VB Contract or (2) $30,000 per year.

Am. Compl. ¶ 60 (emphasis removed).  That "promise" does not include any "description of fact" or "representation of fact," as required to state a Lanham Act claim.  Instead, it describes a conditional offer of future performance.

Elsewhere in the complaint, Vertical Bridge tries to confuse the reader by suggesting that Everest makes "a future promise of revenue."  *Id*. ¶¶ 53, 61, 61(a), 62, 70.  But those offhand characterizations are squarely refuted by Vertical Bridge's description of the alleged offer itself, which is for the greater of a revenue share *or* a fixed amount ($30,000).  *Id*. ¶ 60.  In other words, the landowners are allegedly offered an annual fee, and the terms of that offer are (by Vertical Bridge's own allegations) completely clear that the fee may come from Everest's revenue from subtenants or from Everest itself.  And Vertical Bridge never alleges that Everest has ever failed to deliver that fee to any landowner.  There is nothing whatsoever misleading about Everest's alleged offer.

Even if Vertical Bridge *did* allege that Everest represented to landowners that it would have future tenant revenue to share, that would be a nonactionable prediction of a future event, and the Lanham Act claim would still fail.  *Registered Agent Sols., Inc. v. Corp. Serv. Co.*, No. 1:21-cv-786-SB, 2022 WL 911253, at *5 (D. Del. Mar. 28, 2022) (quoting *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 235 (5th Cir. 2014) ("Predictions of future events are . . . non-actionable expressions of opinion.")).

Vertical Bridge also alleges that because "Everest does not have any tenant leases in place at the time it makes its offer," it has "no reasonable basis" for its alleged "promises of revenue share . . . rendering those promises illusory."  Am. Compl. ¶ 62.  Aside from

mischaracterizing Vertical Bridge's own description of the alleged offer, this is an attempt to shift the statutory standard from what is required (a false representation or description of fact) to something non-actionable (an "illusory promise").  *See* 15 U.S.C. § 1125(a)(1).

Moreover, Vertical Bridge's allegations make clear Everest's alleged promise is not "knowingly false."  Am. Compl. ¶ 73.  The amended complaint alleges that Everest "***knows***" that it "will have the opportunity" to obtain future tenant revenue—which directly contradicts the allegation that Everest lacks a "reasonable basis" for its offer.  *Id*. ¶ 59.  Likewise the alleged high cost of moving a tower (*id*. ¶ 67) makes it eminently reasonable for Everest to believe that Vertical Bridge will renew the lease or transfer it to Everest rather than incurring the unnecessary expense.[4]  In short, Vertical Bridge's own allegations tell us that Everest's alleged promise is predicated on a good faith, well-supported belief that there will be revenue to share.

The Court can and should stop here.  Vertical Bridge has not alleged a false "description of fact" or "representation of fact."  It has not even alleged a misleading (but non-actionable) promise of future performance.  And Vertical Bridge cannot fix that with another amendment because the actual offer that it has alleged contradicts any allegation that any statement by Everest about future revenue was misleading.

### B.     Vertical Bridge Does Not Allege That The "Scheme" Has Ever Actually Happened.

Vertical Bridge bases its Lanham Act claim on a so-called "scheme" (Am. Compl. ¶¶ 3-6, 11–12, 14, 19, 56, 68–70, 95), but it *still* does not allege that the "scheme" has ever actually taken place.  Vertical Bridge still has not alleged:

---

[4] In fact, Vertical Bridge *has* renewed the lease on the Wis site.  ECF #22 at Ex. 5. Conversely, Vertical Bridge does not, and cannot, allege any real examples where it has decommissioned its tower in such circumstances.

- An actual instance where Everest promised to share tenant revenue with a landowner resulting in:

  - Everest's actual acquisition of ground lease rights under a Vertical Bridge tower site, leading to:

    - An actual instance where Vertical Bridge refused to renew the ground lease after Everest acquired such interest, resulting in:

      - Vertical Bridge actually taking down its tower and leaving the site, but without:

        - Everest building its own tower on the site, which finally results in:

          - A single actual instance where Everest had "no revenue to share" with the landowner.

The last three dominoes are particularly critical, and bear repeating:  Vertical Bridge's claim makes no sense—even on a theoretical level—unless (i) Vertical Bridge relocates its tower to a new site, taking its tower tenants with it *and* (ii) Everest does not build a new tower with new tower tenants.  That is the only way that (iii) Everest would not have revenue to share.

In the original complaint, Vertical Bridge expressly pleaded Everest's "scheme" in hypothetical terms.  *See, e.g.*, Compl. ¶ 42 ("For illustrative purposes, an example of how this scheme works includes (but is not limited to) the following . . . .").  Vertical Bridge has eliminated some of its linguistic red flags, but its word choice still gives away the game.  *See* Am. Compl. ¶¶ 63–65 ("Under either scenario described above, Vertical Bridge *will* decommission its Tower and abandon the site . . . once a VB Contract terminates and Vertical Bridge decommissions its Tower, Tenants *would* be unable to continuing [sic] broadcasting from the Tower and *would* terminate their leases with Everest, resulting in Everest having no revenue to share with Landlords. . . . [T]he termination of VB Contracts and Vertical Bridge's subsequent decommissioning of its Towers *would* cause significant harm to Landlords.") (emphases added).  Vertical Bridge has to plead the key "facts" in a future or hypothetical tense because this has

never actually happened.

As Everest explained in its previous motion to dismiss, it is not clear whether Rule 9's heightened pleading standard applies to Lanham Act false advertising claims,[5] but it makes no difference for these purposes because even Rule 8 requires a plaintiff to plead that the facts complained of *actually happened*.  Vertical Bridge has now had two bites at the apple, and it still cannot meet even that standard for a simple reason:  No landowner has ever been left without a revenue share because Vertical Bridge moved its tower and Everest declined to build its own.[6] The claim should now be dismissed with prejudice.

### C.  Vertical Bridge's Own Allegations Confirm That Everest's Alleged Contractual Duties Are Not "Knowingly False."

Why can't Vertical Bridge allege that the "scheme" has actually taken place?  Because it is impossible.  The Lanham Act claim is full of irredeemable contradictions.  If anything, the amendment made things worse.

Everest explained in the first round of motion to dismiss briefing that it makes no sense to claim that Everest agrees to pay a "substantial" sum up front and monthly rental payments "five-to-ten times higher" than the existing rate in support of a "knowingly false" promise to share revenue.  Am. Compl. ¶¶ 57–58, 73.[7]  It would be irrational for someone to pay that much

---

[5] *Compare Registered Agent Solutions*, 2022 WL 911253, at *2 (requiring Lanham Act plaintiff to "inject precision . . . by providing the date, place or time of the fraud, and by stating who made the misrepresentation to whom and its general content") (cleaned up) *with Max Daetwyler Corp. v. Input Graphics, Inc.*, 608 F. Supp. 1549, 1556 (E.D. Pa. 1985) (applying intermediate standard because where a party "is charged with making false statements, it is important that the party charged be provided with sufficiently detailed allegations regarding the nature of the alleged falsehoods to allow him to make a proper defense").

[6] Even in that case, Everest's promise would still not be "false" because, according to Vertical Bridge, the landowner would still be entitled to $30,000 per year.  Am. Compl. ¶ 60.

[7] Nor does it make any sense to allege that Everest is only able to "craft an offer" of five-to-ten times the market rate ("knowing" that it would never earn revenue) because of the "trade secrets" it supposedly misappropriated.  Am. Compl. ¶¶ 57–58, 73.  If an entity was foolish enough

money "knowing" that there will be no return.  To the contrary; the allegations support that any

contractual obligation Everest undertakes is based on a good faith belief that it will see a return

on its investment (and therefore have revenue to share with landowners).  *Iqbal*, 556 U.S. at 678

(to have facial plausibility, a plaintiff must plead "factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged.").

When pressed at oral argument, Vertical Bridge's counsel destroyed the "knowingly

false" allegations by explaining that Everest pays for leasing rights  in "an attempt to drive up

[Everest's] market share."  1/9/24 Hr'g Tr. at 36:20.  Under the facts alleged, there is no way for

Everest to increase its market share without *also* producing revenue that can be shared with

landowners (which then defeats the Lanham Act claim because the promise cannot be false).

The amended complaint further clarifies the point:  We are told that Everest engages in

the alleged conduct "***because*** Everest ***knows*** that . . . Everest ***will have the opportunity*** to

substantially increase Vertical Bridge's rent payments, thereby recouping its initial payment to

the Landlord and earning excess revenue if Vertical Bridge remains at the site" *and* "[i]n the

event that Vertical Bridge does not remain at the site, Everest can attempt to take over Vertical

Bridge's relationships with its Tenants remaining at the site."  Am. Compl. ¶ 59 (emphasis

added).  In either situation, Everest will have revenue to share with the landowner.  That is

reinforced by paragraph 61 of the amended complaint, which lays out "two scenarios" into which

Everest "attempts to force Vertical Bridge":  (i) Everest succeeds Vertical Bridge as tower

operator and hosts subtenants on the tower (revenue to share) or (ii) Vertical Bridge retains its

tower and pays increased rent to Everest (also revenue to share).  *Id*. ¶ 61.  This is fatal, and any

---

to make such an irrational investment, with no hope of seeing a return, it could throw its money
away without finding out the current rent.

amendment would be futile because Vertical Bridge cannot erase what it has already pleaded.

At the risk of beating the proverbial dead horse:  The only reason for Everest to do what Vertical Bridge claims is if it believes that there will be revenue to share.  Vertical Bridge claims that it "has suffered . . . damages in the form of lost market share" and "lost Tower sites."  *Id.* ¶ 78; *see also* ¶ 69 ("Everest's scheme has resulted, and continues to result, in injury to Vertical Bridge, including but not limited to loss of market share . . . .").  But that allegation only makes sense in a scenario where Everest has profits to share (in which case the contractual duty to share revenue is not "false").

Below are the only three outcomes of the "scheme" that are supported by the Amended Complaint.  *See id*. ¶¶ 61, 63.  And, as illustrated, there is no scenario where Vertical Bridge loses market share *and* Everest does not have tenant revenue to share with landowners (setting aside the promised $30,000 minimum payment).

| Outcome of "scheme" | Everest has no tenant revenue to share | Vertical Bridge loses market share |
|---|---|---|
| **Vertical Bridge decommissions tower, and Everest builds its own tower** | | ✓ |
| **Vertical Bridge stays on the site and renews VB Contract** | | |
| **Vertical Bridge moves tower and Everest chooses not to build its own tower** | ✓ | |

In order to plausibly allege a "scheme" where Everest's revenue sharing promise to landlords is false, Vertical Bridge would need to plead an outcome of the scheme where there is a checkmark in both columns, which it cannot do.  The Lanham Act claim can never be fixed.

### D.    Vertical Bridge Still Does Not Allege Any False Statements In Connection With Goods Or Services.

Vertical Bridge attempted to address the Court's concerns (1/9/24 Hr'g Tr. at 48:4–11) by

identifying supposed "services" at issue, (Am. Compl. ¶ 46), but they all boil down to the acquisition of real property rights, which is not a good or service under the Lanham Act. *Dille Fam. Tr.*, 2016 WL 7202073, at *1 n.1 ("intangible property rights . . . are not 'goods and services' for Lanham Act purposes.")).

Vertical Bridge fails to support its conclusory allegations with facts. It has not identified any contracts under which Everest provides services, it has not identified any actual services rendered, and it has not identified any recipients of any purported services, but continues to make vague and conclusory allegations like "Everest knowingly makes misrepresentations and/or omissions to Landlords regarding its own and Vertical Bridge's services and commercial activities through offer letters and marketing brochures." Am. Compl. ¶ 68.

## III. VERTICAL BRIDGE'S STATE LAW CLAIMS MUST BE DISMISSED BECAUSE THEY ARE PREDICATED ON ITS TRADE SECRET AND LANHAM ACT CLAIMS

Vertical Bridge did not materially amend any of its remaining claims or add any additional facts to support them. Thus, as in the original complaint, Vertical Bridge's state law claims are still predicated on the same alleged conduct as the trade secret misappropriation and/or Lanham Act claims, and rely on the merits of those claims—and therefore must be dismissed for the reasons explained above. *See* ECF # 33 at ¶ 2 (describing the general nature of the case as "Plaintiff alleges violations of the Lanham Act (False Advertising), the Federal Defend Trade Secrets Act, and related state-law claims.").

- **Unjust Enrichment (Count IV):** Relies on an allegation that "Everest appreciated the benefit of Vertical Bridge's confidential information," and that "[t]he circumstances are such that it would be inequitable for Everest to retain the benefit of the use of Vertical Bridge's confidential pricing terms." Am. Compl. ¶¶ 117, 119.

- **Tortious Interference with Existing and Prospective Contractual Relations (Counts V and VI):** Rely on allegations that Everest intentionally interferes with the existing and prospective contractual relationships between Vertical Bridge and its landowners by "induc[ing] the Landlords to disclose Vertical Bridge's confidential pricing terms," (*id.* ¶ 123), "using the wrongfully obtained

confidential information to negotiate with Vertical Bridge's Landlords," (*id.*
¶ 139), "present[ing] Landlords with non-*bona fide* purchase offers," (*id.* ¶ 126),
and "making misrepresentations to Landlords regarding its own and Vertical
Bridge's services and commercial activities in order to induce the Landlords to
enter into contracts with it" (*id.* ¶ 141).

- **Unfair Competition (Count VII)**:  Relies on allegations that "Everest uses . . .
Vertical Bridge's confidential information and trade secret-protected information
in order to gain an unfair competitive advantage over Vertical Bridge," (*id.*
¶ 151), and "uses . . . Vertical Bridge's confidential information and trade secret
protected information to interfere with existing and prospective VB Contracts"
(*id.* ¶ 152).

Because all of these claims rely on Vertical Bridge's trade secret misappropriation and/or

Lanham Act claims, they "rise or fall" with those underlying claims, and must be dismissed for

the same reasons set out in sections I and II.  *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476,

493 (E.D. Pa. 2016) (dismissing unjust enrichment claim where underlying tort claim was

dismissed); *see also Pittsburgh Logistics Sys., Inc. v. Cox Logistics LLC*, No. 20-817, 2021 WL

811394, at *7 (W.D. Pa. Mar. 3, 2021) (dismissing unjust enrichment claim where it was

premised on inadequately pled violation of a restrictive covenant); *Shire US, Inc. v. Allergan,

Inc.*, 375 F. Supp. 3d 538, 558 (D.N.J. 2019) (dismissing tortious interference claim premised on

insufficiently alleged anticompetitive activity); *Hirtle Callaghan Holdings, Inc. v. Thompson*,

No. 18-2322, 2022 WL 2048656, at *8 (E.D. Pa. June 7, 2022) (dismissing unfair competition

claim where it was premised on underlying claims that were dismissed).

## <u>CONCLUSION</u>

Vertical Bridge's attempt to fix its complaint only highlights that it never had any claims

against Everest in the first place; this litigation is no more than a baseless attempt to chill

competitive conduct (at the expense of the landowners, whom Vertical Bridge wants to keep in

the dark about the true rental value of their property).  The Court should dismiss all of its claims

with prejudice pursuant to Rules 12(b)(6) and 12(b)(7).

Dated:  March 6, 2024

Respectfully submitted:


*/s/ Andrew R. Stanton*

**JONES DAY**
Andrew R. Stanton (Pa. 93409)
Jeffrey Baltruzak (Pa. 318156)
Susan Kessler (Pa. 322558)
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania 15219
(412) 391-3939
astanton@jonesday.com
jbaltruzak@jonesday.com
skessler@jonesday.com

*Attorneys for Defendants Everest
Infrastructure Partners, Inc. and EIP
Holdings II, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Memorandum of Law in Support of Everest's Motion to Dismiss the Amended Complaint was served on counsel of record via the United States District Court for the Western District of Pennsylvania's CM/ECF system.

*/s/ Andrew R. Stanton*
*Attorney for Defendants Everest*
*Infrastructure Partners, Inc. and EIP*
*Holdings II, LLC*