### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VERTICAL BRIDGE REIT, LLC, et al. | Case No. 2:23-cv-1017-WSH |
| Plaintiff, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT** |
| v. | |
| EVEREST INFRASTRUCTURE PARTNERS, INC.; EIP HOLDINGS II, LLC, | |
| Defendants. | Judge W. Scott Hardy |

### PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

PROCEDURAL HISTORY .................................................................................................. 1

RESPONSE TO EVEREST'S STATEMENT OF FACTS ................................................. 3

LEGAL STANDARD ........................................................................................................... 5

ARGUMENT ......................................................................................................................... 6

    I.     VB Sufficiently Pled its Trade Secret Misappropriation Claim ........................... 6

          A.     No Further Parties are Required Under FRCP 19(a)(1)(B)(i) .................. 6

               1.     VB's Landlords Do Not Have an Interest Relating to the Subject of the Action ...................................................................... 8

               2.     Proceeding without VB's Landlords Would Not Impair or Impede the Landlords' Ability to Protect the Interest ................. 11

          B.     VB's Pricing and Price Structure Information is Entitled to Trade Secret Protection ........................................................................... 13

               1.     VB Has Taken Reasonable Measures to Protect the Secrecy of its Pricing and Price Structure Information .............. 13

               2.     Pricing and Price Structure Information Within the Inherited VB Contracts are Entitled to Trade Secret Protection ...................................................................................... 17

    II.     VB Sufficiently Pled its Lanham Act Claim ........................................................ 20

          A.     Everest's Statements Are Actionable Misrepresentations of Fact Under the Lanham Act. .......................................................................... 21

          B.     Everest's Statements Relate to Services to VB's Landlords. ................. 24

    III.    VB's Remaining Claims Do Not "Rise and Fall" With Its Federal Claims. .................................................................................................................. 24

CONCLUSION .................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Fluid Sys. Inc., v. Huber*,
  958 F.3d 168 (3d Cir. 2020).............................................................25

*Alpha Pro Tech, Inc., v. VWR Intern. LLC*,
  984 F. Supp.2d 458 (E.D. Pa. 2013) ........................................7, 11, 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................5

*Cichonke v. Bristol Twp.*,
  No. 14-4243, 2015 WL 1345439 (E.D. Pa. Mar. 25, 2015) ..................5

*Connelly v. Lane Const. Corp.*,
  809 F.3d 780 (3d Cir. 2016)..................................................................5

*Disabled in Action v. Southeastern PA Trans. Authority*,
  635 F.3d 87 (3d Cir. 2011)...............................................................6, 7

*Estate of Alvin v. Herman*,
  No. 2:22-cv-00372-MJH, 2022 WL 2343307 (W.D. Pa. Jun. 29, 2022).................6

*Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*,
  80 F.4th 223 (3d Cir. 2023) ..............................................................8, 9

*Etimine USA Inc. v. Yazici*,
  No. 2:20-cv-713, 2021 WL 1131256 (W.D. Pa. Mar. 24, 2021)..................5, 8, 16

*Hedges v. U.S.*,
  404 F.3d 744 (3d Cir. 2005)..................................................................6

*Holmes Group, Inc. v. Vornado Air Circulation Sys.*,
  535 U.S. 826 (2002)..............................................................................7

*Houser v. Feldman*,
  569 F.Supp.3d 216 (E.D. Pa. 2021) ...............................................13, 19

*Howmedica Osteonics Corp. v. Howard*,
  No. 19-19254, 2022 WL 16362464 (D.N.J. Oct. 28, 2022) ................18

*Kewanee Oil v. Bicron Corp.*,
  94 S.Ct. 1879 (1974).........................................................................14

*Long v. Holtry*,
  673 F. Supp.2d 341 (M.D. Pa. 2022) ...................................................................................6

*Nami v. Fauver*,
  82 F.3d 63 (3d Cir. 1996) ........................................................................................................5

*Oakwood Labs LLc v. Thanoo*,
  999 F.3d 892 (3d Cir. 2021) ....................................................................................14, 15, 16

*Owens-Illinois, Inc. v. Lake Shore Land Co., Inc.*,
  610 F.2d 1185 (3d Cir. 1979) ...............................................................................................12

*Peterson v. Johnston & Rhodes Bluestone, Co.*,
  No. 3:18-cv-2222, 2019 WL 3202166 (M.D. Pa. Jul. 16, 2019) .........................................24

*Phillips v. County of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ...........................................................................................5, 20

*Registered Agent Sols., Inc. v. Corp. Serv. Co.*,
  No. 1:21-cv-786-SB, 2022 WL 911253 (D. Del. Mar. 28, 2022) ..........................................21

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984) ...............................................................................................................13

*Salton, Inc. v. Philips Domestic Appliances and Personal Care B.V.*,
  391 F.3d 871 (7th Cir. 2004) .......................................................................................9, 10, 11

*Shure Inc. v. Clearone, Inc.*,
  No. CV 19-1343-RGA-CJB, 2020 WL 2839294 (D. Del. June 1, 2020) ..............................22

*SI Handling Sys., Inc. v. Heisley*,
  753 F.2d 1244 (3d. Cir. 1985) ....................................................................................15, 17, 19

*Swift Bros. v. Swift & Sons, Inc.*,
  921 F. Supp. 267 (E.D. Pa. 1995) ........................................................................................18

*Temple v. Synthes Corp.*,
  498 U.S. 5 (1990) ........................................................................................................7, 11, 12

*Tungsten Heavy Powder and Parts, Inc. v. Global Tungsten & Powders Corp.*,
  No. 4:17-cv-01948, 2018 WL 3304550 (M.D. Pa. Jul. 5, 2018) ...........................................25

*Valley Forge Military Academy Foundation v. Valley Forge Old Guard, Inc.*,
  24 F. Supp. 3d 451 (E.D. Pa. 2014) .....................................................................................24

*Walter Bennett Comms. of PA, Inc. v. Hibbard*,
  2010 WL 678133 (E.D. Pa. 2010) ........................................................................................18

*Warman v. Local Yokels Fudge, LLC*,
  2022 WL 17960722 (W.D. Pa. Dec. 27, 2022)........................................................16

**Statutes**

12 Pa. Cons. Stat. Ann. § 5302 ........................................................................8, 19

18 U.S.C.A. § 1839 ..........................................................................................8, 19

15 U.S.C. § 1125(a)(1) ...........................................................................................21

Lanham Act............................................................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6).............................................................................................1

Fed. R. Civ. P. 12(b)(7)............................................................................................1

Fed. R. Civ. P. 19(a)(1)............................................................................................7

Fed. R. Civ. P. 19(a)(1)(A)......................................................................................7

Fed. R. Civ. P. 19(a)(1)(B)......................................................................................8

Fed. R. Civ. P. 19(a)(1)(B)(i).........................................................................6, 9, 11

Fed. R. Civ. P. 19(b) ..........................................................................................7, 11

Rule 8 .....................................................................................................................20

Rule 9 .....................................................................................................................20

Rule 12(b)(6) ...........................................................................................3, 4, 5, 14

Rule 12(b)(7) .......................................................................................................6, 11

Rule 19 ..................................................................................................... *passim*

Plaintiffs Vertical Bridge REIT, LLC; Vertical Bridge NTCF, LLC; Vertical Bridge Development, LLC; Vertical Bridge Towers, LLC; Eco-Site, LLC; VB Run, LLC; CIG Comp Tower, LLC; VB BTS, LLC; Vertical Bridge 500, LLC; Midwest NT 1, LLC; Midwest NT 2, LLC; Vertical Bridge VBTS, LLC; VB BTS II, LLC; Vertical Bridge S3 Assets, LLC; VB-S1 Assets, LLC; The Towers, LLC; Vertical Bridge CC FM, LLC; Vertical Bridge CCR, LLC; VB Nimbus, LLC; Vertical Bridge CC AM, LLC; Vogue XIII, LLC; Vertical Bridge Real Estate, LLC; Precision Cell Assets, LLC; Toro Vertical, LLC; Bridger Cell Assets, LLC; VBHV, LLC; DataPath Vertical Bridge II, LLC; NTCH-VB, LLC; Vertical Bridge Towers IV, LLC; and VBT SUB 2, LLC (collectively, "VB"), by and through their undersigned counsel—K&L Gates LLP— hereby respectfully submit this Brief in Opposition to Defendants Everest Infrastructure Partners, Inc. and EIP Holdings II, LLC's (collectively, "Everest") Motion to Dismiss Plaintiffs' Amended Complaint (the "FAC") Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(7) (the "Motion").

## **INTRODUCTION**

In its second attempt to evade responsibility for its admitted and continuing misappropriation of Vertical Bridge's protected trade secrets, Everest deploys an *ipse dixit* approach, asserting various statements and arguments that are unsupported by the law – that are, in fact, contrary to overwhelming legal authority, some of which Everest itself cites but mischaracterizes. Similarly, Everest argues from its own set of – entirely unsupported – factual assertions as if the 12(b) standard permitted it do so, rather than requiring that all of VB's factual allegations be taken as true. Everest substitutes VB's factual allegations for its own, and draws all inferences in *its own* favor.

1

To be clear: Everest has admitted that it targets VB Landlords in the way Vertical Bridge has alleged and that it appropriates VB's confidential and trade secret-protected pricing and price structure information.[1] To escape liability for this behavior, and as explained in detail below, Everest attempts to distract the Court from its indisputable misappropriation and unlawful scheme by muddying the record with inapplicable case cites, out-of-context allegations, and references to factual assertions that are clearly outside the scope of VB's FAC.

Vertical Bridge respectfully requests that Everest's Motion be denied in its entirety.

## **PROCEDURAL HISTORY**

VB filed its Complaint on June 8, 2023, seeking damages and injunctive relief based on Everest's misappropriation of VB's trade secrets, violations of the Lanham Act, and various state law claims. *See* DE No. 1. On August 8, 2023, Everest filed its first Motion to Dismiss, arguing, *inter alia*, that (1) VB's pricing and price structure information was not subject to trade secret protection due to the nature of the information; (2) VB's Lanham Act claim did not sufficiently allege that the statements were made in promotional communications; and (3) VB failed to include necessary parties in the Complaint; namely, VB's subsidiaries that may be parties to the contracts Everest unlawfully obtained. *See* DE No. 21. The Court granted the Motion to Dismiss with leave to amend, solely on the basis that VB did not include its related entities and subsidiaries as additional plaintiffs.[2] *See* DE No. 36. VB filed its FAC on February 7, 2024, following the Court's

---

[1] Everest has even continued its misappropriation throughout this litigation, acknowledging (as it must) that since its last Motion to Dismiss only a few months ago, Everest has acquired at least one additional, *unidentified* VB site—and there is no reason to believe that there are not countless others that Everest *has not* disclosed to the Court. *See* Br. at 6 n.1 ("At the time [of the first Motion to Dismiss] there were only eight Everest-VB Sites. Since then, Everest has acquired leasing rights on a ninth site."). It is apparent that absent a ruling from this Court, Everest will continue its unlawful scheme of misappropriation, irreparably harming VB in the process.

[2] Although the Court did not dismiss any of VB's claims for failure to state a cause of action, the Court did suggest that VB could further strengthen its claims by including information regarding

recommendation to include any VB entities and subsidiaries that may have been affected by Everest's unlawful scheme. *See* DE No. 38. Thereafter, Everest filed the instant Motion to Dismiss, dropping some of its prior arguments relating to the protectable nature of pricing and price information, and whether Everest's misrepresentations were made in promotional communications, and introducing brand new arguments raised for the first time in the current Motion, including that the Landlords are necessary parties. *See* DE No. 41 ("Br.").

## RESPONSE TO EVEREST'S STATEMENT OF FACTS

VB's FAC further clarifies Everest's improper, multi-state, and multi-million-dollar scheme to harm VB through misappropriating VB's trade secret-protected pricing and price structure information, misrepresenting Everest's real estate management services to VB's Landlords, and tortiously interfering with VB's actual and prospective contracts with its Landlords in order to reduce VB's market share while artificially inflating Everest's market share. *See* Dkt. No. 38 ("DE 38" or "FAC") ¶ 2.[3] Perhaps recognizing that VB's FAC is adequately pled, Everest attempts to upend the Rule 12(b)(6) standard by urging the Court to consider ***Everest's*** factual recitation, and to improperly resolve all inferences in ***Everest's*** favor.

---

the reasonable measures VB took to protect its trade secrets, *see* Hr'g Tr. at 47:13–21, and by including a more detailed explanation of the services Everest provides to the Landlords, *see id.* at 48:4–7. VB followed the Court's suggestions and amended the FAC accordingly. *See, e.g.*, FAC ¶¶ 39–40 (detailing reasonable measures taken to protect trade secrets); ¶ 72 (explaining services Everest provides to Landlords).

[3] As explained in VB's prior Opposition to Everest's Motion to Dismiss, this is not the first time Everest's principals have engaged in this scheme. *See* DE 24 at 2 n.1; *see* FAC ¶ 4. TriStar was sued by American Tower Company—the largest telecommunications infrastructure company in the United States—for similar unlawful conduct, including, *inter alia*, misappropriation of trade secrets and Lanham Act violations. *See id.* ¶ 4 (citing *TriStar Investors, Inc. v. American Tower Corp.*, No. 3:12-cv-0499-M, 2014 WL 1327663 (N.D. Tex. Apr. 3, 2014) (the "TriStar Litigation")). The court initially declined to dispose of nearly identical claims under Rule 12(b)(6) until "after the factual record [was] further developed." *See* TriStar Litigation, at DE 77, 321. TriStar subsequently ceased operations, and Everest emerged shortly thereafter. FAC ¶ 5.

For the Court's convenience, included below is a point-by-point rebuttal of the "facts" on which Everest relies for its arguments (which, similar to the last Motion to Dismiss, are squarely contradicted by the FAC's well-pled allegations (*i.e.*, the only factual allegations that courts may consider under Rule 12(b)(6))):

- Everest states, without any support whatsoever, that "all [of VB's trade secrets] spent time in the hands of third parties with every right to share them with whomever they wish." Br. at 6. This is plainly contradicted by VB's FAC, which clearly states that—regardless of any NDA (which is not required for trade secret protection anyway)—VB and others in the telecommunications industry, including VB's predecessors in interest, treat the pricing and price structure information as confidential, jealously guard such information, and further inform their landlords that such information is confidential and cannot be disclosed. *See* FAC ¶¶ 39–40, 42–44, 52. Thus, the reasonable inference drawn in VB's favor is that the Landlords never had a right to share the VB Contracts with "whomever they wish," due to the confidentiality obligations imposed on them by both VB and its predecessors.

- Everest draws an inference in *its* favor, asserting that where VB does not amend a lease to include a confidentiality provision, "the landowner did not agree to that term." Br. at 6. Not so. There are several separate and independent reasons why a certain lease may not be amended, and nowhere in VB's FAC did VB allege (and it is unreasonable to infer) that a decision not to amend was predicated on the Landlord's refusal to agree to a confidentiality provision. *See generally* FAC.

- Everest alleges that the only offers at issue are those where Everest offers the greater of 50% of future tenant revenue or $30,000 annually. Br. at 3. But VB included this offer to demonstrate an offer Everest "frequently" uses, but by no means does VB believe that this is the only offer structure that Everest presents to VB's Landlords. The important thing to note is that *no offer* would result in tenant revenue to share with the Landlord. *Compare* Br. at 3 ("Vertical Bridge concedes there will be revenue to share"), *with* FAC ¶ 53 ("Everest knows full well, at the time it makes such promises, that even if it supplants Vertical Bridge, Everest will have no Tenant revenue to share.").

- Everest asserts that the nine cherry-picked VB sites that it opted to disclose to the Court are in fact "the only" VB sites that Everest has acquired an interest in. Br. at 6. There is no support for this assertion, and discovery is necessary to uncover the entire scope of Everest's ongoing misappropriation. Moreover, Everest's assertion ignores the number of sites Everest has unsuccessfully targeted in the past (*e.g.*, sites where Everest successfully misappropriated VB's trade secrets but was unable to secure a property interest)—or how many sites Everest is currently targeting but has not yet closed. And most importantly, as VB explained in its prior Opposition brief, VB's allegation that Everest has targeted all VB Contracts that are "soon-to-

4

be-expiring" (FAC ¶¶ 59)—and not just the ones Everest decides to disclose—must be taken as true. *See also* FAC ¶ 11 n.1 ("Everest's claim with respect to which sites it has interfered with has not yet been the subject of discovery; thus, Vertical Bridge does not concede the accuracy or completeness of Everest's representation that the sites identified by Everest to date are the only sites with which Everest has interfered.").

## LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) must be denied where—as here—a plaintiff states a claim that is "plausible on its face" and pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 678 (2009); *see also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (noting that a complaint need only allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."). "The 'plausibility' standard required for a complaint to survive a motion to dismiss [only] asks for more than sheer 'possibility.'" *Etimine USA Inc. v. Yazici*, No. 2:20-cv-713, 2021 WL 1131256, at *3 (W.D. Pa. Mar. 24, 2021). Courts "do not inquire whether the plaintiff[ ] will ultimately prevail, only whether [it is] entitled to offer evidence to support [its] claims." *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 226 (3d Cir. 2008).

When deciding a motion to dismiss, the court must accept all of plaintiff's well-pled factual allegations and reasonable inferences arising from the same as true and view them in the light most favorable to the plaintiff, resolving all doubts in the plaintiff's favor. *See Phillips*, 515 F.3d at 228 ("The District Court . . . was required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]").

Moreover, facts that contradict plaintiff's well-pled allegations must be rejected at this stage in the litigation. *See Cichonke v. Bristol Twp.*, No. 14-4243, 2015 WL 1345439, at *13 n.19 (E.D. Pa. Mar. 25, 2015) ("At the motion to dismiss phase, Defendants' unsupported assertions

cannot contradict Plaintiff's allegations in the Amended Complaint."); *Long v. Holtry*, 673 F. Supp.2d 341, 352 (M.D. Pa. 2022) ("[I]n deciding a motion to dismiss, the court is not here to weigh the evidence; instead, the court must take Plaintiffs' well-pled facts as true.").

The defendant "bears the burden of showing that no claim has been presented." *Hedges v. U.S.*, 404 F.3d 744, 750 (3d Cir. 2005). And in reviewing a motion to dismiss under Rule 12(b)(7), the court "must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." *See Estate of Alvin v. Herman*, No. 2:22-cv-00372-MJH, 2022 WL 2343307, at *4 (W.D. Pa. Jun. 29, 2022). The defendant also "bears the burden of showing why an absent party should be joined under Rule 19." *Disabled in Action of PA. v. SEPTA*, 635 F.3d 87, 96 (3d Cir. 2011); *see also Herman*, 2022 WL 2343307, at *4.

## ARGUMENT

### I. VB Sufficiently Pled its Trade Secret Misappropriation Claim

#### A. No Further Parties are Required Under FRCP 19(a)(1)(B)(i)

For the first time in its present Motion,[4] Everest takes the position that VB's Landlords are necessary parties under Rule 19(a)(1)(B)(i). In making this argument (which Everest could have made in its motion to dismiss Vertical Bridge's initial complaint but did not), Everest attempts to hide behind a guise of protecting the Landlords' interests. But Everest's motive is not to safeguard such interests—Everest recognizes that it is in the line of fire, and has thrown the Landlords in front of it, hoping to use the Landlords as a shield to protect Everest from liability for its unlawful scheme.

---

[4] Notably, the landlords were not included in the TriStar Litigation and TriStar did not raise any Rule 19 argument. *See generally* TriStar Litigation; *see also* FN 3 *supra*.

It is axiomatic that the plaintiff is "the master of the complaint," *see Holmes Group, Inc. v. Vornado Air Circulation Sys.*, 535 U.S. 826, 831 (2002); however, Rule 19 provides a limited exception to the general rule that plaintiff has the authority to decide which entities to sue to recover its damages. 7 Charles Alan Wright, Arthur R. Miller, et al., Fed. Prac. & Proc. The defendant "bears the burden of showing why an absent party should be joined under Rule 19." *See Disabled in Action*, 635 F.3d at 97. Yet nowhere in its Brief does Everest clearly identify and explain the standard required for inclusion of necessary parties under the Rule – perhaps because "the bar set by the Third Circuit Court of Appeals [for joinder] is higher than [Everest] can clear." *Alpha Pro Tech, Inc., v. VWR Intern. LLC,* 984 F. Supp.2d 458, 459 (E.D. Pa. 2013).

For the avoidance of doubt, the Rule 19 standard is as follows: The Court must determine whether the absent party is "required" under FRCP 19(a)(1), and whether a party is required depends on whether the court can afford complete relief among existing parties, or whether the party "claims an interest relating to the subject of the action *and* is so situated that disposing of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect the interest;" or subject the party to a risk of inconsistent obligations. Fed. R. Civ. P. 19(a)(1)(A), (B). If the Court finds that the party is not required, "no inquiry under 19(b) is necessary." *Temple v. Synthes Corp.*, 498 U.S. 5, 8 (1990). And even if the party is necessary, the Court may determine whether, "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

Everest only seeks to add the Landlords under 19(a)(1)(B)(i), arguing that VB's Landlords claim an interest in the subject matter of the action and that their interest may be impaired or impeded in their absence. Br. at 17. To determine whether a party is necessary under 19(a)(1)(B)(i), two conditions must be met: (1) the party must "claim[] an interest relating to the subject of the

action;" and (2) the party must be "so situated that disposing of the action in the person's absence" would "impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B).

Applying Rule 19(a)(1)(B) to the facts (which Everest fails to do), it is clear that VB's Landlords are not required parties to the litigation.

### 1. VB's Landlords Do Not Have an Interest Relating to the Subject of the Action

Everest argues, without support, that the Court "must find that the landowners violated an enforceable duty to withhold rent information" in order to hold Everest liable for misappropriating trade secrets. Br. at 16. Not so. To determine liability, the Court needs only to (1) determine whether VB's confidential information is subject to trade secret protection (it is); and (2) determine whether Everest misappropriated such information. The second prong is easy: Everest has never denied misappropriating VB's confidential information through obtaining the VB Contracts (and even attached some of the contracts to its first Motion to Dismiss). *See generally* Br. And the first prong depends on *VB's* reasonable measures to keep its information secret, and whether the information is of the type subject to trade secret protection. *See* 18 U.S.C.A. § 1839; *see also* 12 Pa. Cons. Stat. Ann. § 5302.[5] Neither inquiry requires determining whether and to what extent the Landlords violated their duty to keep the pricing and price structure information confidential.

Because the subject of the action turns on *Everest's* misappropriation of VB's trade secrets, VB's Landlords do not have a legally protected interest in the action. The *only* case that Everest cites in support of its argument, *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, 80 F.4th 223 (3d Cir. 2023), is inapposite. *See* Br. Sec. I.D. In *Epsilon*, the plaintiff entered into several joint operating agreements with various oil and gas companies, one of which was the

---

[5] "Although DTSA and PUTSA use different wording to define a trade secret, both protect the same type of information." *See Etimine*, 2021 WL 1131256, at *4.

defendant, to develop natural gas in Pennsylvania. *Epsilon*, 90 F.4th at 227-28. The parties and non-party signatories to the operating agreements all had correlating rights and obligations under the operating agreements, such that the defendant's performance under the operating agreements directly impacted the non-parties' duties. *Id*. at 228.

The dispute arose when defendant refused to participate and cooperate under the parties' operating agreements and related settlement agreement. *Id*. Plaintiff sued defendant for breach of contract. *Id*. at 235. Because plaintiff did not include the other signatories to the operating agreements in its breach of contract suit, defendant filed a motion to dismiss for failure to join the other co-signatories. The court agreed with defendant that the co-signatories to the contract were necessary parties, noting that "parties owning rights under *disputed contracts*, like the Absent [operating agreement] parties, generally have a legally protected interest under Rule 19(a)(1)(B)(i)." *Id*. at 223.

Unlike the action in *Epsilon*, however, the present dispute does not arise from a breach of contract claim, nor are the contracts dispositive in determining liability due to the nature of the dispute. Whereas disposing of the action in *Epsilon* necessarily would have impacted the co-signatories' rights under the contracts at issue, here, the gravamen of the action is based on Everest's misappropriation of VB's trade secrets, which the VB Landlords have no legally protected interest in.

*Salton,* on the other hand, is more akin to the facts at issue here and is instructive of the Rule 19 application in a trade secrets dispute. *See Salton, Inc. v. Philips Domestic Appliances and Personal Care B.V.*, 391 F.3d 871 (7th Cir. 2004). Plaintiff Philips and defendant Salton were competing makers of kitchen appliances, and the intervening party, Electrical & Electronics ("E&E"), was a Hong Kong firm that developed coffee machines for the parties. *See Salton*, 391

F.3d at 874. Philips originally contracted with E&E to have E&E manufacture a new machine for home coffee brewing, and the contract provided that E&E was prohibited from revealing any of Philip's proprietary information used to develop the machine to third parties. *Id.* at 874.

In violation of the contract, E&E subsequently used Philip's proprietary information to manufacture a similar home brewing machine for Philip's competitor, Salton. *Id.* at 875. Salton filed a declaratory relief action against Philips in Chicago, seeking confirmation that Salton had not misappropriated Phillips' trade secrets, and Philips filed counterclaims against Salton. *Id.* at 875. Following a motion to intervene by E&E, the district court dismissed Salton's complaint and Philips' counterclaims, finding that E&E was a necessary party to the dispute, but could not be joined. *Id.* Philips filed a separate action against Salton alleging the same claims, which the district court also dismissed under Rule 19. The Seventh Circuit appellate court reversed the dismissals.

The appellate court recognized the "fact-intensive and multifaceted character of the inquiry" of indispensability under Rule 19, but nevertheless found that the district court abused its discretion, since E&E did not have a legally protected interest in the subject of Philips' action against Salton (despite E&E being a party to the contract obligating E&E to keep Philips' proprietary information confidential). The court explained that "Philips's essential claim in both suits [wa]s that Salton stole its intellectual property. The fact that Salton did so, Philips contends, in cahoots with E&E, which acted in effect as the conduit between Philips's intellectual property and Salton's competing coffee machine, would not in itself make E&E an indispensable party to Philips's suits." *Id.* at 877. Under the principle of joint and several liability, which governs the tort of misappropriation of trade secrets, "the victim [of the misappropriation] is not required to sue more than one of his oppressors." *Id.* The court further explained the practical consideration for the principle: "To require the victim of a joint tort to sue all the joint tortfeasors would have the

perverse effect of making it more difficult for plaintiffs to obtain relief the greater the number of their tormentors by increasing the plaintiffs' litigation expense . . . ." *Id.*

The district court concluded, as Everest contends here, that "to prove misappropriation by Salton, Philips will have to show that E&E broke its contract with Philips by revealing Philips's trade secrets to Salton without authorization." *Id.* at 880. But, as the appellate court noted, "that is true in any case of tortious interference with contract." *Id.* "[T]here is no rule that you cannot sue the interferer without also suing the party to your contract whom the defendant inveigled into breaking the contract"—to hold otherwise would render the well-settled rule that victims do not need to sue all joint tortfeasors meaningless. *See id.* Accordingly, the appellate court concluded that "there [was] no basis for a finding that E&E [was] an indispensable party . . . ." *Id.* at 880. At least one Pennsylvania district court has already followed *Salton*'s lead. *See, e.g.*, *Alpha Pro Tech, Inc.*, 984 F. Supp.2d at 459 (denying motion to dismiss under Rule 12(b)(7) and explaining that "[t]he mere fact . . . that Party A, in a suit against Party B, intends to introduce evidence that will indicate that a non-party, C, behaved improperly does not, by itself, make C a necessary party."); *see also id.* at 458–60 (referencing *Salton* and noting that defendant's argument "boils down to the contention that to prove misappropriation," plaintiff will need to show that a non-party breached its contract with plaintiff, but that was "insufficient to render th[e] absent party necessary under Rule 19(a)(1)(B)(i)").

## 2.   Proceeding without VB's Landlords Would Not Impair or Impede the Landlords' Ability to Protect the Interest

"[T]he fact of the matter is that [VB's] allegations, taken as true, simply identify [the Landlords] as . . . joint tortfeasor[s] with [Everest]." *Alpha Pro Tech, Inc.*, 984 F. Supp.2d at 458. Because VB's Landlords do not have a legally protected interest in the subject of the action, Rule 19(b) fails to mandate their joinder, and the Court's inquiry can stop there. *See Temple*, 498 U.S.

at 8. But even if the Court found that a legally protected interest exists (it should not), such an interest would not be impaired or impeded by proceeding without VB's Landlords. To be clear, Everest's arguments relating to the Landlords' protected interests all boil down to a determination of whether the Landlords are bound to their confidentiality obligations with respect to the VB Contracts. *See* Br. at § I.D. But that interest is entirely within the scope of Everest's own arguments against liability.[6]

Moreover, as explained *supra* in Section I.A.2, Everest's argument to include the Landlords is simply "an attempted end-run on the general rule that the plaintiff gets to decide who among alleged joint and several tortfeasors to sue." *Alpha Pro Tech, Inc.*, 984 F. Supp.2d at 458. But the Advisory Committees' notes to Rule 19 plainly instruct that "a tortfeasor with the usual 'joint-and-several' liability *is merely a permissive party* to an action against another with like liability." *See* Fed. R. Civ. P. 19, Advisory Committee's Note to 1966 Amendments (emphasis added). As the Supreme Court has explained, "[i]t has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit. […] Nothing in . . . Rule 19 changed that principle." *Temple*, 498 U.S. at 7. Accordingly, although Everest used VB's Landlords as a pawn in its scheme to misappropriate VB's trade secrets, the Landlords are merely permissive parties that VB chose to not sue, and they should not be hauled into court now.

---

[6] Everest's Brief is replete with challenges to the confidential nature of VB's trade secrets. *See, e.g.*, Br. at 11–14. Mandatory joinder is not required where a party's interests are adequately represented by Defendants. *See Owens-Illinois, Inc. v. Lake Shore Land Co., Inc.*, 610 F.2d 1185, 1191 (3d Cir. 1979) ("The fact that the absent person may be affected by the judgment does not itself require his joinder if his interests are fully represented by parties present.").

**B.** **VB's Pricing and Price Structure Information is Entitled to Trade Secret Protection**

**1.** **VB Has Taken Reasonable Measures to Protect the Secrecy of its Pricing and Price Structure Information**

Many of Everest's arguments against trade secret protection are intertwined, overlapping, and constitute the same argument repeated under different headings. *See* Br. at §§ I.A, I.C. Cutting through the repetition, appeals to logic based on unsupported (and untrue) factual premises, and sarcastic tone, the crux of Everest's argument is that VB has not adequately protected its trade secrets from disclosure.[7] But neither DTSA nor PUTSA require perfect protection from disclosure; rather, a party must take *reasonable* measures to keep its trade secrets confidential, which is exactly what VB alleges here. *See Houser v. Feldman*, 569 F.Supp.3d 216, 228 (E.D. Pa. 2021) ("In defining 'trade secret', the DTSA states only that the owner must take 'reasonable measures to keep such information secret'").

In its FAC, VB lists numerous measures that VB takes to keep its pricing and price structure information protected from disclosure. *See, e.g.*, FAC ¶¶ 39–40. Yet Everest conclusively argues that "all of these measures are insufficient," citing *Oakwood Labs* in support. *See* Br. at 12. The court in *Oakwood Labs*, however, found that plaintiff's third amended complaint "easily me[t]

---

[7] Continuing its *ipse dixit* approach, Everest asserts that all of VB's measures to keep its pricing and price structure information confidential "are insufficient *as a matter of law* . . . [a]s explained [in the section below]," but only cites to one inapplicable case (*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984)) in support. *See* Br. at § I.A. Yet *Ruckelshaus* did not involve a claim for misappropriation. *See Ruckelshaus*, 467 U.S. at 990. Instead, the plaintiff alleged that the disclosure of its trade secrets constituted a "taking" of property in violation of the Fourth Amendment. *Id*. at 998–99. Moreover, the Court was not discussing trade secrets where, as here, the party to whom the trade secrets were disclosed had a confidentiality obligation to refrain from divulging the information.  Rather, the Court in *Ruckelshaus* found that plaintiff did not have a reasonable expectation that its trade secret would remain confidential because the plaintiff disclosed its information *after* expressly being informed that the information would not be kept confidential after a certain period of time. *See Ruckelshaus*, 467 U.S. at 1006–007.

the pleading requirements of the Federal Rules of Civil Procedure and pertinent substantive law," where – as here – the plaintiff broadly identified its trade secrets and alleged reasonable measures it took to protect the confidentiality of the same, including, *inter alia*, advising its employees that its information must be held confidential, and controlling access to its information. *Oakwood Labs LLC v. Thanoo*, 999 F.3d 892, 896 (3d Cir. 2021)*.* The reasonable measures described in Everest's cited case are almost identical to the reasonable measures VB alleged. *See, e.g.*, FAC ¶ 40 (describing internal measures VB uses to protect its pricing and price structure information, including "[r]equiring Vertical Bridge personnel to sign confidentiality agreements prior to accessing documentation reflecting its confidential information and trade secrets;" and "[m]aintaining electronic documentation reflecting its confidential information and trade secrets on an internal, password-protected database").

The Supreme Court clearly explained that a trade secret's element of secrecy is not lost "if the holder of the trade secret reveals the trade secret to another in confidence . . . under *an implied obligation* not to use or disclose it . . . ." *Kewanee Oil v. Bicron Corp.*, 94 S.Ct. 1879, 1883 (1974) (emphasis added) ("The protection accorded the trade secret holder is against the disclosure or unauthorized use of the trade secret by those to whom the secret has been confided under the express *or implied restriction of nondisclosure* or nonuse."). Yet Everest ignores Supreme Court precedent, asserting a myriad of unsupported arguments to combat VB's reasonable measures, including that VB lacks authority to impose confidentiality obligations on its Landlords,[8] and that

---

[8] Once again, Everest impermissibly attempts to draw inferences in its *own* favor, rather than in VB's favor (as required by Rule 12(b)(6)), and asserts that the Landlords refuse to agree to VB's proposed confidentiality obligations. Br. at 6. Nowhere in VB's FAC does VB allege that Landlords do not agree to the confidentiality obligations VB imposes on the Landlords, and the reasonable inference from VB's allegations is that the Landlord *does* agree to keep the terms confidential. *See supra* pp. 3–4.  In making this argument, Everest also ignores the VB Contracts that expressly include confidentiality provisions, and asserts a nonsensical argument that even

VB did not take reasonable measures because it did not allege that it entered into NDAs with the Landlords. Br. at 13–14. Unsurprisingly, Everest cites to no cases in support. *See id.* This may be because the cases that Everest does cite elsewhere in its Brief actually confirm that VB's reasonable measures are sufficient for trade secret protection.[9] Thus, VB has "easily me[t] the

---

though the Landlords *sign a contract including a confidentiality provision*, VB "does not allege that the landowners agree to keep the offers confidential." Br. at 7. This argument is meritless.

[9] *Compare SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1251 (3d. Cir. 1985) (recognizing that plaintiff took "the usual and reasonable precautions at its . . . facility to preserve and protect the confidential nature of its development" where, among other things, plaintiff marked certain documents of a highly proprietary nature accordingly, locked files containing sensitive documents, pre-stamped drawings with a proprietary legend, and required employees to sign employment agreements purporting to limit disclosure of confidential information), *and Oakwood Labs*, 999 F.3d at 896 (finding that plaintiff took reasonable measures to protect its trade secrets where plaintiff advised its employees that its information must be held confidential, password protected its electronically stored information, executed NDAs with its scientists, vendors, suppliers, and business partners, and generally controlled access to its information), *with* FAC ¶ 39 (describing reasonable measures VB takes to protect its pricing and price information from disclosure, including "[i]ncorporating confidentiality provisions into VB Contracts that prohibit Landlords from disclosing the terms of their VB Contract to third parties;" "[a]mending VB Contracts that Vertical Bridge acquires from prior entities to include, inter alia, confidentiality provisions;" "[v]erbally informing Landlords that the pricing and price structure terms within their VB Contracts are confidential;" "[d]esignating offer letters to Landlords as 'Confidential'"; "[v]erbally informing Landlords that Vertical Bridge's offers are 'confidential'"; "[r]edacting pricing terms and price structure information from the underlying VB Contracts prior to providing the VB Contracts to Vertical Bridge's Tenants located on the corresponding sites;" and "[t]aking steps to ensure that all confidential and trade-secret information is specifically redacted in all publicly recorded 'memoranda of lease' ('MOLs') to the fullest extent allowed by law"), *and* FAC ¶ 40 (describing internal measures VB takes to protect the confidentiality of its pricing and price structure information, including "[m]aintaining electronic documentation reflecting its confidential information and trade secrets on an internal, password-protected database;" "[m]onitoring Vertical Bridge's internal database activity to ensure that its confidential information is not inappropriately divulged or shared or otherwise misappropriated;" "[m]aintaining physical copies of documentation reflecting its confidential information and trade secrets within a secure room to which only limited Vertical Bridge personnel have access;" "[p]rohibiting Vertical Bridge personnel from publicly uploading documentation reflecting its confidential information and trade secrets;" "[r]equiring Vertical Bridge personnel to sign confidentiality agreements prior to accessing documentation reflecting its confidential information and trade secrets;" "[p]rohibiting Vertical Bridge personnel from disclosing or sharing any of Vertical Bridge's trade secret and confidential information without prior written authorization;" and "[r]equiring Vertical Bridge personnel to immediately destroy, delete, or return all originals

pleading requirements" for its trade secret claim by alleging reasonable measures it has taken to protect the secrecy of its information.[10] *See Oakwood Labs*, 999 F.3d at 896.

Moreover, whether VB took reasonable measures sufficient under DTSA and PUTSA is a quintessential question of fact that is "more appropriately determined with a fully developed record," not on a motion to dismiss. *See Etimine*, 2021 WL 1131256, at *5 ("Moreover, whether a plaintiff has taken sufficient measures to protect its trade secrets is a question of fact more appropriately determined with a fully developed record."); *see also Warman v. Local Yokels Fudge, LLC*, 2022 WL 17960722, at *11 (W.D. Pa. Dec. 27, 2022) (citations omitted); ("Courts have held that . . . 'the determination of whether a plaintiff's efforts to maintain the secrecy of its alleged trade secrets were reasonable is not a question susceptible of black-or-white analysis.'"); *see also id.* (denying summary judgment on plaintiff's trade secret claims where "genuine issues of material fact exist regarding whether [plaintiff] took reasonable measures to guard the secrecy of what he claims to be a trade secret.").

Everest additionally argues that VB's pricing and price structure terms are not entitled to trade secret protection because such information, according to Everest's mischaracterization of the factual allegations, was "already in the hands of third parties" who presumably had the right to disclose such terms. But the only case Everest relies on, *SI Handling*, does not actually support

---

and copies of any documentation reflecting its confidential information and trade secrets upon termination of the individual's relationship with Vertical Bridge.").

[10] Everest's argument that VB's pricing and price structure information cannot be trade secret protected because other entities can procure the information by permissible means is meritless. *See* Br. at 14. Incredibly, Everest argues, in essence, that it can misappropriate VB's trade secrets because "legitimate tower aggregators end up getting the exact same trade secret information as Everest." *See id.* As explained in VB's prior Opposition Brief, however, the plain language of the DTSA confirms that "[m]isappropriation of trade secrets is unlawful regardless of the fact that misappropriation and lawful appropriation can end up with the same result." *See* DE No. 24 at 12.

Everest's argument (despite their statement that the case "fits the amended complaint to a T"). *See* Br. at 11. As explained in VB's Opposition to Everest's First Motion to Dismiss, *see* DE No. 24 at 11, the Third Circuit in *SI Handling* concluded that "costing and pricing information," similar to the information VB seeks to protect, was subject to trade secret protection and not "readily obtainable by anyone in the industry," but *another entity's material costs* was not, because the other entity had every right and incentive to disclose *its own material costs* to buyers. *See SI Handling*, 753 F.2d at 1260. This holding makes sense: if the court had found that another entity's material costs constituted the plaintiff's trade secrets merely through the plaintiff's unique knowledge of the costs, that entity would not be able to disclose their own material costs to third party purchasers without misappropriating plaintiff's trade secret. That would be an absurd result, and inconsistent with the material that trade secret law seeks to protect.

The common sense reading of *SI Handling* supports VB's theory of trade secret protection, since VB's pricing and price structure information was either developed or purchased by VB, and VB's Landlords do not have "every right[] to disclose" VB's trade secret information to others, due to the confidentiality obligations VB imposes on the information.[11] *See SI Handling*, 753 F.2d at 1257.

### 2. Pricing and Price Structure Information Within the Inherited VB Contracts are Entitled to Trade Secret Protection

---

[11] Everest also argues that, despite the confidentiality obligations VB imposes on the Landlords, VB's pricing and price structure information cannot be trade secret-protected because "landowners have the rent terms and are clearly incentivized to share them so that they can shop around for the best offer possible." Br. at 11. But even assuming that *Everest's factual assumption* (which, again, is inappropriate on a motion to dismiss) that landowners want to use the VB Contracts to shop around for the best offer is correct, merely having an interest and incentive to share confidential information does not exclude such information from trade secret protection. Adopting Everest's faulty logic would render the entire DTSA meaningless, since anyone who had an incentive to share another's trade secrets would simply be permitted to do so.

Similar to its previous arguments, Everest's argument that the pricing and price structure information contained in VB's acquired VB Contracts are not trade secret-protected is flawed in both the law and logic.

**First**, Everest argues that the pricing and price structure terms in the acquired VB Contracts cannot qualify as trade secrets because "the landowner had the unconditional right to share the information with whomever it wished." Br. at 13. In so arguing, Everest improperly inserts its own factual assertions that none of the inherited VB Contracts have confidentiality provisions, and Everest assumes therefore that no further confidential obligations were placed on the Landlords to the inherited VB Contracts. But Everest's assertions and assumptions are not supported by any allegations in VB's FAC, *see generally* FAC, and the court "cannot assume this to be true in the context of a motion to dismiss." *See Walter Bennett Comms. of PA, Inc. v. Hibbard*, 2010 WL 678133, at *1 (E.D. Pa. 2010) ("The defendant argues that such [confidential] information is known to anyone in plaintiff's business, but [the court] cannot assume this to be true in the context of a motion to dismiss.").

And even if Everest's assertion that all of the inherited VB Contracts do not have confidentiality provisions was true and could be considered at the motion to dismiss stage (it cannot), Everest conflates a confidentiality provision with confidentiality *obligations*—but the latter can exist without the former. Indeed, courts have consistently held that confidentiality agreements are not required for trade secret protection. *See Howmedica Osteonics Corp. v. Howard,* No. 19-19254, 2022 WL 16362464, at *18–19 (D.N.J. Oct. 28, 2022) (whether plaintiff took reasonable measures to protect secrecy was a question of fact where plaintiff only required non-disclosure agreements "at times"); *see also Swift Bros. v. Swift & Sons, Inc.*, 921 F. Supp. 267, 277 (E.D. Pa. 1995) ("The defendants assert that the plaintiff had no confidentiality

agreements…Such agreements are not necessary in every case, however, if the other precautions taken by the plaintiff are sufficient."). All that matters is that the trade secret owner took reasonable measures to protect the trade secret from disclosure, and that is exactly what VB has done. *See* 18 U.S.C.A. § 1839; *see also* 12 Pa. Cons. Stat. Ann. § 5302 (noting that trade secret information "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."); *see also Houser*, 569 F.Supp.3d at 230 ("Based on the statute's use of the word 'reasonable,' it is clear that an owner need not take 'every conceivable measure' to shroud his or her trade secret in absolute secrecy."); *see supra* § I.B.1.

**Second**, Everest argues that the FAC does not set forth the steps VB's predecessors took to keep the pricing and price structure information a secret.[12] This is incorrect. VB sufficiently alleged the reasonable measures it takes to protect its pricing and price structure information from disclosure, and alleged that similar steps are taken by others in the telecommunications industry (which, by reasonable inference, would include VB's predecessors in interest). *See* FAC ¶ 42–44, 52. Although VB does not yet know the full scope of Everest's scheme and the entirety of VB Contracts that Everest has covertly acquired through its misappropriation (and so cannot list each predecessor and the steps each took to protect the trade secrets), VB does know—and sufficiently alleged—the reasonable measures industry participants take to keep pricing and price structure information from disclosure. *See* FAC ¶¶ 42–44, 52. VB's predecessors, as industry participants,

---

[12] Everest boldly draws another inference in its favor, and argues that "the only plausible inference is that [VB's pricing and price structure information is] the product of an arms-length negotiation with landowners." Br. at 15. Not only is this inaccurate, unsupported by anything in VB's FAC, and at its core a disputed issue of fact, but even if it were true (it is not), the fact that an entity negotiated with another in the process of developing pricing terms does not in itself preclude trade secret protection. Everest's own cited case confirms the same. *See SI Handling*, 753 F.2d at 1257 (affirming finding that plaintiff's precise numbers were trade secrets where the specifications used "required special negotiations with bearing manufacturers, and under the terms of [plaintiff's] purchase orders the specifications were to be treated as confidential").

necessarily have taken the same. *Id*. Moreover, VB alleged that pricing and price structure information is jealously guarded in the industry. *See* FAC ¶ 52. Such allegations, taken to be true, support the reasonable inference that the acquired VB Contracts contain trade secret-protected pricing and price structure information, and Everest's argument to the contrary should be rejected.

## II.   VB Sufficiently Pled its Lanham Act Claim.

In arguing for dismissal of the Lanham Act claim, Everest sets forth several issues of fact that are inappropriate for the Court to decide at this stage without the benefit of discovery. Everest's Lanham Act argument does not analyze whether VB sufficiently pled a claim under the Lanham Act when taking all of VB's allegations as true. Rather, its argument analyzes whether, when considering VB's allegations out of context, coupled with unsupported factual allegations that Everest has (improperly) introduced, and with all inferences drawn in *Everest's* favor, VB's Lanham Act claim can survive. This is not the standard on a motion to dismiss. *See Phillips*, 515 F.3d at 228.

For example, Everest's argument relies on several factual disputes that the Court would need to resolve in Everest's favor in order to grant Everest's Motion, including:

- To what extent Everest has failed to deliver its fixed amount fee to landowners, Br. at 18;
- Instances where Everest promised to share tenant revenue with a landowner, Br. at 20;
- Instances where Everest has rebuilt its tower on the site, Br. at 20;
- Instances where Everest has had no revenue to share with the landowner, Br. at 20;
- Whether any landowner "has ever been left without a revenue share because Vertical Bridge moved its tower and Everest declined to build its own," Br. at 21; and
- Which of VB's Landlords Everest misrepresented its real estate management services to, Br. at 24.

Discovery is needed to properly resolve these questions. As explained below, when reviewing VB's Lanham Act claims as a whole, and in the context of the statute, it is clear that VB sufficiently pled its Lanham Act claim beyond the requirements of Rule 8.[13]

To be clear, a cause of action under the Lanham Act exists where the defendant (1) misrepresented the nature (2) of its services or commercial activities (3) during commercial advertising or promotion, (4) in connection with goods or services. *See* 15 U.S.C. § 1125(a)(1). That is exactly what VB has alleged. *See* FAC ¶¶ 72–77 (alleging that Everest "made knowingly false and/or misleading statements of fact to Landlords with limited industry knowledge regarding the nature of the services and commercial activities of Vertical Bridge and Everest . . . in written, promotional communications to Vertical Bridge's Landlords, including offer letters and marketing brochures").

Despite VB's sufficient allegations under the Lanham Act, Everest asserts that VB's claim "fails for at least four independent reasons"—but its circular and repetitive briefing only identifies two independent arguments: (1) that Everest does not think its knowingly false statements are actionable misrepresentations of fact; and (2) that Everest does not think its services fall within the scope of the Lanham Act. Both arguments are meritless.

**A.      Everest's Statements Are Actionable Misrepresentations of Fact Under the Lanham Act.**

Everest argues that VB's Lanham Act claim fails because Everest's knowingly false statement to VB's Landlords is a "nonactionable prediction of a future event." Br. at 18. Similar to its prior motion to dismiss, Everest cites to *Registered Agent Sols.* in support. *See id.* (citing

---

[13] As explained in VB's Opposition to Everest's first Motion to Dismiss, whether Lanham Act claims are subject to Rule 8 or Rule 9 pleading requirements is unsettled in this Circuit. *See* DE 24 at § II.A. Nevertheless, VB's FAC sufficiently states a cause of action under either standard.

*Registered Agent Sols., Inc. v. Corp. Serv. Co.*, No. 1:21-cv-786-SB, 2022 WL 911253, at *5 (D. Del. Mar. 28, 2022). The *Registered Agent* case was inapplicable then, and it remains inapplicable now. Unlike the knowingly false statements Everest makes to VB's Landlords, the defendant in *Registered Agent* represented to customers that plaintiff was "going out of business soon," which the court considered an expression of opinion. *See Registered Agent*, 2022 WL 911253, at *5.

Contrary to Everest's argument otherwise, VB sufficiently alleged that Everest's statements are made to VB's Landlords when Everest knows, at the exact time it promises a revenue share payment to VB's Landlords, that Everest will have no revenue to share in the future. *See Shure Inc. v. Clearone, Inc.*, No. CV 19-1343-RGA-CJB, 2020 WL 2839294, at *7 (D. Del. June 1, 2020) (denying motion to dismiss Lanham Act claim where defendant stated that plaintiff's allegedly infringing product "would soon be 'unavailable'" because the statement was "clearly untrue, in light of the then-current state" of the patent litigation); *see also* DE No. 24 at § II.B. Indeed, VB alleged the following scheme: "Everest presents offer letters and marketing brochures to Landlords, which contain illusory promises to Landlords that they will receive a percentage of the revenue that Everest will supposedly receive from Tenants [*i.e.*, the "fact" at issue] . . . . Everest knows full well, at the time it makes such promises, that even if it supplants Vertical Bridge, Everest will have no Tenant revenue to share." FAC ¶ 53. Taking this allegation as true, it is clear that Everest's offer constitutes an actionable "misrepresentation of fact" under the Lanham Act.

In an attempt to further mischaracterize VB's allegations, Everest inserts a chart of supposed "outcomes of [Everest's] 'scheme'" based entirely on Everest's say-so (and unsupported by the actual allegations of VB's FAC). *See* Br. at 23. Everest's chart misconstrues VB's allegations by asserting that there is some scenario where Everest obtains an interest in VB's site and actually has tenant revenue to share with VB's Landlord. But that is not what VB alleged in

its FAC. *See supra* pp. 3–4. Instead, VB alleged that in instances where Everest obtains an interest

in the site, Everest knows that VB will decommission its tower, and there will be no tenant revenue

to share because tenants would relocate to VB's tower. *See id.*; *see also* FAC ¶ 64.

When considering the allegations set forth in the FAC, and drawing all reasonable

inferences in VB's favor, the chart is actually as follows:

| Outcome of scheme | Everest has no tenant revenue to share | Vertical Bridge loses market share, loses tower sites, and/or suffers increased operational costs[14] |
|---|---|---|
| **Vertical Bridge decommissions tower, and Everest builds its own tower** | ✓[15] | ✓ |
| **Vertical Bridge stays on the site and renews VB Contract** | N/A[16] | N/A |
| **Vertical Bridge moves tower and Everest chooses not to build its own tower** | ✓ | ✓ |

As Everest acknowledged, "[i]n order to plausibly allege a 'scheme' where Everest's

revenue sharing promise to landlords is false, Vertical Bridge would need to plead an outcome of

---

[14] In its chart, Everest conveniently omits the additional harm VB alleged as a result of Everest's scheme, including lost tower sites and increased operational costs. The revised and complete chart is included herein.

[15] Although Everest notably left this section of the chart blank in its Brief, *see* Br. at 23, VB's FAC clearly states that Everest would have no tenant revenue to share upon VB decommissioning its tower. *See* FAC ¶ 64 ("Vertical Bridge decommissions its Towers upon the termination of its VB Contracts and finds suitable locations to move Tenants from decommissioned Towers onto other Vertical Bridge Towers. Consequently, once a VB Contract terminates and Vertical Bridge decommissions its Tower, Tenants would be unable to continue broadcasting from the Tower and would terminate their leases with Everest, resulting in Everest having no revenue to share with Landlords."). Even *if* Everest built a new tower, VB's complaint sufficiently alleges that VB's tenants would relocate their operations to VB's new tower. *See id.*

[16] VB's FAC clearly alleged that under any scenario where Everest obtains an interest in the site, "Vertical Bridge will decommission its Tower and abandon the site . . . as soon as the VB Contract expires." FAC ¶ 63.

the scheme where there is a checkmark in both columns . . . ." Br. at 23. That is exactly what VB has done.

### B.    Everest's Statements Relate to Services to VB's Landlords.

Once again, Everest disputes whether VB sufficiently alleges that Everest's statements are made in connection with goods and services. *See* Br. at Sec. II.D. In an attempt to sidestep the inevitable conclusion that VB sufficiently alleged its claim under the Lanham Act, Everest asserts a conclusory statement that the services identified "all boil down to the acquisition of real property rights." Br. at 24. Not so. VB sufficiently alleged several services that Everest's misrepresentations relate to, including "facilitation of communications between the landlord, telecommunications companies, and cellular tenants; land acquisition and real estate management services, including the acquisition and management of ground leases for the landlord's property wherein telecommunications infrastructure is situated; and procurement of tenant leases and collection of revenue pursuant to a 'revenue share.'" FAC ¶ 72.

Everest deliberately ignores VB's allegations listing the various services provided, and for good reason—the Lanham Act broadly construes "services," and VB's description of the parties' real estate management services are squarely within the broad scope of the statute. *See Valley Forge Military Academy Foundation v. Valley Forge Old Guard, Inc.*, 24 F. Supp. 3d 451, 456 (E.D. Pa. 2014) (acknowledging that "[t]he term 'services' as used in the Lanham Act [is] interpreted broadly."). Everest's argument, therefore, is meritless.

### III.    <u>VB's Remaining Claims Do Not "Rise and Fall" With Its Federal Claims.</u>

VB's unjust enrichment, tortious interference, and unfair competition claims do not solely "rely" on Everest's trade secret misappropriation and Lanham Act violations, and indeed the FAC clarifies that the state law claims relate to both misappropriation of VB's trade secrets *and* VB's

confidential information generally. Contrary to Everest's incorrect assertion, and as explained more fully below, VB's state law claims do not rise and fall with VB's federal claims.

- **Unjust Enrichment**: Everest unjustly enriched itself upon acquiring VB Contracts reflecting VB's confidential pricing information, and further appreciated the benefit of such information by using it to structure its offers to Landlords and damage VB's reputation with the Landlords. *See* FAC ¶ 117 ("Everest appreciated the benefit of Vertical Bridge's confidential information by using that information to structure offers specifically tailored to subvert Vertical Bridge's ROFRs and damage Vertical Bridge's reputation with Landlords and Tenants."); *see also Peterson v. Johnston & Rhodes Bluestone, Co.*, No. 3:18-cv-2222, 2019 WL 3202166, at *2 (M.D. Pa. Jul. 16, 2019). Thus, the claim does not "rise and fall" with VB's trade secret claims.

- **Tortious Interference**: Everest improperly interfered with VB's Landlords by (1) inducing the Landlords to disclose information protected by confidentiality obligations (whether or not trade secret-protected); (2) persuading the Landlords to violate VB Contracts' consent-for-assignment provisions; and (3) presenting Landlords with non-*bona fide* purchase offers specifically structured to circumvent VB's ROFRs. *See* FAC ¶ 123 ("Everest intentionally interferes with the contractual relationships between Vertical Bridge and its Landlords when Everest induces the Landlords to disclose Vertical Bridge's confidential pricing terms and price structure information, in violation of the Landlords' confidentiality obligations to Vertical Bridge."); ¶ 137 (alleging tortious interference with prospective contractual relations where "Everest knew of the confidential nature of pricing and price structure terms including within VB Contracts, yet requested such confidential information from Vertical Bridge's Landlords to structure offers to the Landlords in order to obtain an interest in the property where Vertical Bridge's Towers sit."); *see also Advanced Fluid Sys., v. Huber*, 28 F. Supp.3d 1683, 336 (3d Cir. 2020). Because VB's allegations are not limited to Everest's trade secret misappropriation in interfering with VB Contracts, the claim does not "rise and fall" with VB's trade secret claims.

- **Unfair Competition**: Everest improperly interferes with VB Contracts and wrongfully uses VB's confidential information (whether or not trade secret-protected). *See* FAC ¶ 149 (alleging unfair competition because "Vertical Bridge has the right to be free from unfair competition caused by Everest's unfair and/or deceptive business practices and wrongful use of Vertical Bridge's confidential information and trade secret-protected information."); *see also Tungsten Heavy Powder and Parts, Inc. v. Global Tungsten & Powders Corp.*, No. 4:17-cv-01948, 2018 WL 3304550, at *3 (M.D. Pa. Jul. 5, 2018). Because VB's allegations are not limited to Everest's trade secret misappropriation, the claim does not "rise and fall" with VB's trade secret claims.

Accordingly, VB has adequately alleged each of the foregoing claims.

## <u>CONCLUSION</u>

In light of the foregoing, VB respectfully requests that the Court deny Everest's Motion in its entirety.

Dated: March 27, 2024                    Respectfully submitted,

<u>/s/ Jessica L.G. Moran</u>
David R. Osipovich (PA ID No. 306687)
Anna Shabalov (PA ID No. 315949)
Jessica L.G. Moran (PA ID No. 325912)
Eleanora M. Kaloyeropoulou (PA ID No. 328937)
Kira M. Geary (PA ID No. 330334)
**K&L Gates LLP**
K&L Gates Center
210 Sixth Ave.
Pittsburgh, PA 15222
Tel: (412) 355-6578
david.osipovich@klgates.com
anna.shabalov@klgates.com
jessica.moran@klgates.com
eleanora.kaloyeropoulou@klgates.com
kira.geary@klgates.com

-and-

Kelsi E. Robinson (PA ID No. 330452)
**K&L Gates LLP**
10100 Santa Monica Blvd., 8th Floor
Los Angeles, CA 90067
Tel: (310) 552-5060
kelsi.robinson@klgates.com

***Attorneys for Plaintiff Vertical Bridge REIT, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 27, 2024, a true and correct copy of the foregoing was filed electronically with the Clerk of the Court using CM/ECF system and will be served upon the registered participants identified on the Notice of Electronic Filing.

 */s/ Jessica L.G. Moran*_____
Jessica L.G. Moran
