**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VERTICAL BRIDGE REIT, LLC, VERTICAL BRIDGE CCR, LLC,  VBHV, LLC,  VB-S1 ASSETS, LLC,  NTCH-VB, LLC,  BRIDGER CELL ASSETS, LLC, ECO-SITE, LLC,  MIDWEST NT 1 LLC, DATAPATH VERTICAL BRIDGE II, LLC, VB NIMBUS, LLC,  VB RUN, LLC, VERTICAL BRIDGE TOWERS IV, LLC, TORO VERTICAL, LLC,  VERTICAL BRIDGE NTCF, LLC,  PRECISION CELL ASSETS, LLC,  VERTICAL BRIDGE DEVELOPMENT, LLC,  VBT SUB 2, LLC, VERTICAL BRIDGE CC FM, LLC, VOGUE XIII, LLC,  THE TOWERS, LLC, VERTICAL BRIDGE CC AM, LLC,  VB BTS II, LLC,  CIG COMP TOWER, LLC, VERTICAL BRIDGE TOWERS, LLC, VERTICAL BRIDGE VBTS, LLC, MIDWEST NT 2, LLC,  VERTICAL BRIDGE S3 ASSETS, LLC,  VERTICAL BRIDGE REAL ESTATE, LLC, VERTICAL BRIDGE 500, LLC,  VB BTS, LLC, <br><br>          Plaintiffs, <br><br>     v. <br><br> EVEREST INFRASTRUCTURE PARTNERS, INC.,  EIP HOLDINGS II, LLC, <br><br>          Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )      Civil Action No. 23-1017 |

## MEMORANDUM OPINION

Presently before the Court is Defendants' Motion to Dismiss the Amended Complaint (Docket No. 40), Defendants' brief in support of the motion (Docket No. 41), Plaintiffs' brief in opposition to the motion (Docket No. 42), and Defendants' reply (Docket No. 43).   Upon

consideration thereof and for the reasons set forth herein, the Court will grant Defendants' motion and will dismiss Plaintiffs' claims without prejudice.

## I.   <u>Background</u>

Plaintiff Vertical Bridge REIT, LLC filed the original complaint in this action on June 8, 2023.  (Docket No. 1).  Therein, Vertical Bridge REIT, LLC (hereinafter "VB REIT") alleged violations of the Lanham Act, the Defend Trade Secrets Act ("DTSA"), and the Pennsylvania Uniform Trade Secrets Act ("PUTSA").  (*Id.*).  VB REIT also alleged unjust enrichment, tortious interference with existing and prospective contractual relations, and unfair competition.  (*Id.*).  Defendants moved to dismiss the complaint for failure to state a claim (Docket No. 20) and the Court held argument on the motion on January 9, 2024.  (Docket Nos. 31, 35, 37 (Oral Argument Transcript, hereinafter "OA at [ ]")).  On January 10th, the Court entered an order indicating that Defendants' motion to dismiss was granted for the reasons stated on the record at the time of argument, *i.e.*, that VB REIT failed to prosecute in the name of the real parties in interest: its affiliates.  (Docket No. 36; OA at 46).[1]

Plaintiffs thereafter filed their First Amended Complaint ("Amended Complaint") on February 7, 2024.  (Docket No. 38).  VB REIT and twenty-nine of its wholly controlled subsidiaries are named plaintiffs in the Amended Complaint (hereinafter referred to as "the VB Plaintiffs").  In the Amended Complaint, the VB Plaintiffs reassert the claims from the original

---

[1]      At that time, the Court offered several other observations relevant to amendment, including that the Court was "a bit skeptical that some … of the claims … alleged in the … complaint are sufficiently pled." (OA at 47).  For instance, the Court observed it was dubious of VB REIT's allegation of a protectable trade secret.  (*Id.* ("I struggle to see it … particularly in the context of those contracts in which there was not a confidentiality provision.  I mean, that pricing information is out there in the universe.  There's no restriction on how third parties can use it.  I'm skeptical that it actually states a trade secret.")).  And, with respect to the Lanham Act claim, the Court observed that it was "struggling to see how a good or service is related to these representations or advertisements, as the case may be, when we're talking about a lease of land [or] dirt." (*Id.* at 48).

complaint, *i.e.*, violations of the Lanham Act, the DTSA, and the PUTSA, as well as alleged unjust enrichment, tortious interference with existing and prospective contractual relations, and unfair competition. (*Id.*). The VB Plaintiffs allege that Defendants Everest Infrastructure Partners, Inc. and EIP Holdings II, LLC—hereinafter "Everest"—are direct competition in the telecommunications infrastructure industry. (*Id.* at ¶ 2). At the broadest level, the VB Plaintiffs allege that Everest has an "improper, multi-state, and multi-million[-]dollar scheme to unlawfully improve its market share at Vertical Bridge's expense through trade secret misappropriation, false advertising, tortious interference with contract, and unfair competition." (*Id.* at ¶ 3).

More specifically, the VB Plaintiffs allege that they own and manage telecommunications infrastructure at "hundreds of thousands of sites all across the United States." (*Id.* at ¶ 21). The infrastructure at the center of this case are telecommunications towers that the VB Plaintiffs own on property they lease or for which they have an easement. (*Id.* at ¶ 22). The VB Plaintiffs rent space on their towers to subtenants like national wireless cellular carriers (*e.g.*, Verizon Wireless, AT&T, etc.), television stations, radio stations, and government agencies. (*Id.*). These subtenants, or tower tenants, often pay thousands of dollars in monthly rent under decades-long leasing agreements; accordingly, to the VB Plaintiffs, "each Tower represents millions of dollars of value." (*Id.* at ¶ 23). The VB Plaintiffs refer to their contractual relationships with property-owner landlords as "VB Contracts." (*Id.* at ¶ 28).

The VB Contracts described in the Amended Complaint can be classified into three groups or types. One type of VB Contract appears to have arisen when a VB Plaintiff purchased a pre-existing tower and, with it, acquired the lease between the landlord and the prior owner of the tower. (*Id.* at ¶ 29). The VB Plaintiffs aver that the purchase of these predecessor-in-interest contracts include the predecessors' "trade-secret-protected pricing terms and price structure

information developed by the predecessor-in-interest." (*Id.* at ¶ 38).  The second type of VB Contract appears to have arisen in instances where a VB Plaintiff took the predecessor-in-interest agreement described above (type-1) and amended it to add a confidentiality provision if one was not already included therein.  To that end the VB Plaintiffs allege that "[w]henever possible, [they] attempt[] to negotiate an amendment to each lease to increase the lease renewal terms and include, *inter alia*, **confidentiality provisions**, assignment provisions, and right of first refusal provisions to the extent such provisions are not already included in the lease." (*Id.* at ¶ 29 (emphasis added)).  A third type of VB Contract described in the Amended Complaint appears to arise in instances where a VB Plaintiff constructs its own tower on a property and negotiates its own contract with a landlord instead of inheriting one.  The VB Plaintiffs allege that these VB contracts generally contain rights of first refusal, and "non-interference and consent-for-assignment provisions" that typically "prohibit[] a Landlord from granting to a third party any lease, license, or easement if such a grant would have a detrimental impact on Vertical Bridge's operations." (*Id.* at ¶ 36).[2] Elsewhere in the Amended Complaint, the VB Plaintiffs allege that when they initiate such a contract, they include "confidential, trade secret-protected pricing terms and price structure information, including information relating to rental payments and periodic rental payment increases." (*Id.* at ¶ 37).  The VB Plaintiffs allege that they "develop[] this trade secret-protected information on an individual-site basis with the help of confidential formulae, pricing models and market analyses" that are developed by its employees and outside contracts. (*Id.*).

---

[2]     The VB Plaintiffs' generalized descriptions of VB Contracts in the Amended Complaint do not adequately specify which aggrieved subsidiaries have, for example, type-2 contracts with landlords as opposed to type-1 contracts.  Everest previously submitted eight VB Contracts to the Court in support of its motion to dismiss VB REIT's original complaint. (Docket No. 22).  But considering there are now nearly thirty VB REIT subsidiaries that are plaintiffs in this action, the Amended Complaint's averments of various VB Contracts remains inadequate.

Concerning their pricing terms and price structure related to rental payments and periodic rent increases, the VB Plaintiffs allege that they take reasonable measures to keep this information confidential.  This includes incorporating confidentiality provisions into VB Contracts (especially for type-3 contracts); amending type-1 contracts without confidentiality provisions to include them, *i.e.*, turning them into type-2 contracts; verbally informing landlords that pricing and price structure terms are confidential; designating offer letters "confidential"; verbally informing landlords that offers are confidential; redacting price terms and price structure information from VB Contracts; and redacting as much trade-secret information from public memoranda as they lawfully may.  (*Id.* at ¶ 39).  The VB Plaintiffs also employ internal security measures to protect confidential and trade secret information.  (*Id.* at ¶ 40).  In their Amended Complaint, the VB Plaintiffs emphasize the time and expense that is invested into protecting their trade secrets, which they seem to define as inclusive of "confidential pricing terms, price structure information, and escalator amounts, as well as the formulae, models, and market analyses used to develop the same." (*Id.* at ¶ 41).  The VB Plaintiffs allege that even with respect to type-1 contracts that lack confidentiality provisions, they are entitled to trade-secret protection because they inform their landlords of confidentiality and advise them to maintain secrecy throughout the negotiation process.  (*Id.* at ¶ 43).

The VB Plaintiffs allege that despite their efforts to keep these matters confidential, Everest undermined their confidentiality with its tower aggregation business practices.  (*Id.* at ¶ 47). Everest is alleged to take these practices to the "extreme"[3] by "misappropriat[ing] … confidential

---

[3]    The VB Plaintiffs distinguish Everest's "extreme form" of tower aggregation from the business practices of "legitimate tower aggregators" who "typically [are] not themselves telecommunications infrastructure companies in that they do not own or manage or operate towers, or have relationships with telecommunications tenants."  (*Id.* at ¶¶ 47-48).  By contrast, the VB Plaintiffs allege that Everest is a competing telecommunications infrastructure company that uses tower aggregation "made possible only by

information and trade secrets in order to tortiously interfere with existing VB Contracts[.]" (*Id.* at ¶ 49). According to the VB Plaintiffs, Everest targets landlords that it believes have less than ten years left on their VB Contract, "solicits the Landlords … to share with Everest Vertical Bridge's confidential and trade secret-protected information,"[4] and "presents offer letters and marketing brochures" with "illusory promises"[5] about receiving a percentage of Everest's future revenue to induce the unlawful disclosures. (*Id.* at ¶¶ 51-54). The VB Plaintiffs allege that, with that confidential/trade-secret-protected information in hand, Everest has all it needs to "craft an offer to purchase a Landlord's lessor rights in the property that is specifically designed to subvert Vertical Bridge's ROFR, violate Vertical Bridge's non-interference rights, and violate Vertical Bridge's assignment rights." (*Id.* at ¶ 55). As alleged, this scheme works because once Everest has the VB Plaintiffs' trade secret-protected pricing and price terms, it can offer a large lump-sum payment—sometimes in addition to a monthly rate that is perhaps five to ten times higher than the

---

unlawful misappropriation of confidential information and trade secrets in order to tortiously interfere with the VB Plaintiffs' [and others' existing contracts] to increase its market share." (*Id*. at ¶ 49).

[4]     The VB Plaintiffs additionally allege that "[p]ricing terms and price structure information is regularly viewed as confidential in this industry." (*Id.* at ¶ 52).

[5]     In allegations specific to their Lanham Act claim, the VB Plaintiffs allege that the promises Everest makes to the landlords during its solicitation efforts are "illusory because Everest knows full well, at the time it makes such promises, that even if it supplants Vertical Bridge" as the owner/operator of a tower, it "will have no Tenant revenue to share" because tower tenants are "highly unlikely" as a matter of industry practice to "sublease space on Everest's sites when Vertical Bridge's Towers are already operating nearby, and as a result, Everest would have no revenue to share with the Landlords." (*Id.* at ¶ 53). They also allege that Everest's usual offer is to pay the landlord "the greater of either (1) 50% of Everest's revenue *from any tenant*" which presumably would refer to either them *or* a carrier subtenant or "(2) $30,000 per year." (*Id.* at ¶ 60). The VB Plaintiffs allege/argue that because Everest "does not have any tenant leases in place at the time it makes its offer," the promises it makes to the landlords are illusory. (*Id.* at ¶ 62). The VB Plaintiffs also allege (upon information and belief) that the agreements between Everest and the landlords put the landlords in peril but insulate Everest from harm insofar as they allow Everest to get out of the agreement if it provides written notice, potentially leaving the landlords holding the bag without any of the revenue they had under their prior VB Contracts. (*Id.* at ¶ 65). The VB Plaintiffs also generally allege that "Everest knowingly makes misrepresentations and/or omissions to Landlords regarding its own and Vertical Bridge's services and commercial activities" in letters and brochures. (*Id.* at ¶ 68).

rent the VB Plaintiffs paid—to undercut the relationship between the landlord and VB Plaintiff in question. (*Id.* at ¶ 57).

According to the VB Plaintiffs, Everest's plan once it secures agreements with the landlords is to "substantially increase Vertical Bridge's rent payments, thereby recouping its initial [lump-sum] payment to the Landlord and earning excess revenue if Vertical Bridge remains at the site." (*Id.* at ¶ 59). It's alleged that Everest's back-up plan is to either take over the VB Plaintiffs' relationships with tower tenants or to "simply terminate its agreement with the Landlord at Everest's convenience." (*Id.*). The VB Plaintiffs further allege that to the extent Everest anticipates that the VB Plaintiff in question will continue to maintain its tower after Everest secures an agreement with a landlord, the cost of rent imposed by Everest will eventually, if not immediately, force that VB Plaintiff to decommission its tower and abandon the site. (*Id.* at ¶¶ 63-64).[6]

In addition to their general factual averments, the VB Plaintiffs repeat and re-allege those factual averments that are specific to the individual claims in their seven counts. For Count One—Lanham Act—the VB Plaintiffs explain that "Everest makes knowingly false and/or misleading statements of fact to Landlords," such as an illusory promise of revenue sharing. (*Id.* at ¶ 73). These statements are alleged to have been included in written promotional materials, in interstate commerce, and to have the "capacity to deceive a substantial portion of the … Landlords." (*Id.* at ¶¶ 74-76). The harm attendant thereto is the VB Plaintiffs' lost market share, reputational harm, lost tower sites, and increased operational costs. (*Id.* at ¶ 78).

---

[6]     The VB Plaintiffs allege this puts them in the "horns of a dilemma" because they must either pay "grossly inflated rent" or "abandon the site" both of which constitute harm caused by, *inter alia*, the loss of secrecy of their confidential information and trade secrets. (*Id.* at ¶ 67).

For Counts Two and Three—DTSA and PUTSA—the VB Plaintiffs explain that they invest significant time, resources, and expense into developing pricing terms and structure and that they have a competitive advantage because of it and that these resources have "independent economic value." (*Id.* at ¶¶ 82-83, 87).  They also allege that they have "taken reasonable measures to maintain the secrecy of these trade secrets" and that the "telecommunications infrastructure industry … considers the type of pricing information at issue here to be trade secret-protected." (*Id.* at ¶¶ 84-86).  The VB Plaintiffs allege that just as they see independent economic value in this trade-secret protected information, so too do their competitors, and the VB Plaintiffs thus derive value from the information "not being generally known … or readily accessible" to or by others. (*Id.* at ¶¶ 88, 90).  The VB Plaintiffs thus seek to recoup damages and further seek a permanent injunction of Everest's misappropriation of trade-secret-protected information.  (*Id.* at ¶¶ 99, 100).

For Count Four—unjust enrichment—the VB Plaintiffs allege that Everest has been unjustly enriched by acquiring VB Contracts that contain confidential information on pricing terms and price structure.  (*Id.* at ¶ 116).  For Count Five—tortious interference with existing contracts— the VB Plaintiffs allege that Everest has intentionally interfered with  their contractual relationships with various landlords, particularly when Everest has solicited information known to be confidential.  (*Id.* at ¶ 123).  The VB Plaintiffs allege that Everest interferes with the relationships intentionally when it "persuades the Landlords to assign VB Contracts to Everest without Vertical Bridge's prior consent, in violation of the VB Contracts' consent-for-assignment provisions." (*Id.* at ¶ 124).  And the VB Plaintiffs suggest other acts of interference, such as persuading the landlords to assign property interests to Everest and presenting  non-bona fide offers to the landlords that are subversive of the VB Plaintiffs' ROFRs.  (*Id.* at ¶¶ 125-26).  Many of these same averments are repeated for Count Six—tortious interference with prospective

contractual relations.  Concerning this alleged interference with these inchoate relationships, the VB Plaintiffs allege that their history of renewing landlord contracts indicates a reasonable likelihood of renewal of those contracts but for Everest's interference.  (*Id.* at ¶ 136).

Finally, at Count seven—unfair competition—the VB Plaintiffs explain that Everest's actions constitute unfair and/or deceptive business practices, the wrongful use of the VB Plaintiffs' confidential/trade secret-protected information, and interference with existing and prospective contractual relations such that they have or will gain an advantage by these unfair competitive acts.  (*Id.* at ¶¶ 149, 150, 153).  Everest has moved to dismiss all the claims in the VB Plaintiffs' Amended Complaint with prejudice.  (Docket Nos. 40, 41, 43).  The VB Plaintiffs oppose the motion.  (Docket No. 42).  The motion is fully briefed and ripe for disposition.

## II.   <u>Standard of Review</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To review a complaint under this standard, the Court proceeds in three steps.  *Id.* at 787.  First, the Court notes the elements of a claim.  *Id.* (quoting *Iqbal*, 556 U.S. at 675).  Second, the Court eliminates conclusory allegations.  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  And finally, the Court assumes the remaining well-pleaded facts are true, draws all reasonable inferences in the plaintiff's favor, and assesses whether the allegations "plausibly give rise to an entitlement to relief."  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  The courts' obligation to accept as true all factual allegations does not extend to legal conclusions; thus, the Court is "not bound to accept as true a legal

conclusion couched as a factual allegation." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).[7]

## III.   **Discussion**

Everest argues that the Court should dismiss the VB Plaintiffs' DTSA and PUTSA claims (hereinafter "trade secret claims") because the VB Plaintiffs have failed to allege the existence of trade secrets.  Everest argues that the VB Plaintiffs' price terms and related information was in the hands of third parties—the landlords—who were not prohibited from sharing such information; therefore, there is no trade *secret* in this case.  Everest further argues that the information that the VB Plaintiffs seek to protect was readily available by permissible means insofar as aggregators usually estimate rent charged by landlords and can confirm their estimates upon execution of an agreement.  As to the Lanham Act claim, Everest argues that there is not an adequate allegation of any false or misleading statement(s) it made to landlords.  Everest also argues that the VB Plaintiffs' allegations do not support an actionable Lanham Act claim because the Lanham Act concerns goods and services, not the acquisition of real property.  Finally, Everest argues that, should the Court agree with its arguments for dismissal of the trade secrets and Lanham Act claims, then the Court should dismiss the VB Plaintiffs' remaining claims because they are predicated on the same alleged conduct.  The VB Plaintiffs oppose the motion and argue that they have adequately alleged trade secrets and the reasonable measures they took to keep their trade secrets

---

[7]     Everest has argued that if the Court does not dismiss the VB Plaintiffs' claims pursuant to Rule 12(b)(6), the landlord-landowners should be joined pursuant to Rule 19(a)(1)(B)(i) because their interests are in jeopardy insofar as their (a) contractual rights and duties are at stake, and (b) their fundamental property rights may be affected by a decision as well.  (Docket No. 41, pg. 6).  In the Court's evaluation of a motion brought pursuant to Fed. R. Civ. P. 12(b)(7) (failure to join a party under Rule 19), it "must accept all factual allegations in the complaint as true and draw all reasonable inferences therefrom in favor of the non-moving party," though it may "consider evidence outside the pleadings." *Pittsburgh Logistics Sys., Inc. v. C.R. England, Inc.*, 669 F. Supp. 2d 613, 618 (W.D. Pa. 2009) (citations omitted).  "The moving party bears the burden of showing that a non-party is both necessary and indispensable." *Id.*

confidential.  Regarding their Lanham Act claim, the VB Plaintiffs insist that they have alleged that Everest makes illusory promises to landlords knowing full-well its promises of revenue sharing will never come to fruition.  Finally, they argue that their other claims do not rise and fall with their trade secret and Lanham Act claims.  The Court herein addresses the parties' arguments on Everest's motion to dismiss, starting with the VB Plaintiffs' Lanham Act claim.

A.    Lanham Act – False Advertising

The VB Plaintiffs allege that Everest engaged in false advertising in violation of the Lanham Act.  (Amended Complaint at ¶¶ 71-78).  The Lanham Act creates a false advertising claim against "any person who, on or in connection with *any goods or services*, or any container for goods, uses in commerce any … *false or misleading description of fact, or false or misleading representation of fact*, which … is likely to cause confusion, or to cause mistake, or to deceive …." 15 U.S.C. § 1125(a)(1) (emphasis added)).  To prevail upon a Lanham Act false advertising claim, a plaintiff must eventually prove:

> 1) that the defendant has made false or misleading statements as to his own product or [another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 198 (3d Cir. 2014) (quoting *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011)).  Everest contends that the VB Plaintiffs' averments do not sufficiently plead any misleading description or representation of fact, nor that they have pled that this claim pertains to goods or services.[8]

---

[8]      The parties point out that whether Lanham Act claims are subject to Rule 8 or Rule 9 pleadings standards is an unsettled question in the Third Circuit.  The Court need not answer this question to decide Everest's motion to dismiss because even without application of Rule 9's "heightened 'particularity'

Falsity in a Lanham Act false advertising claim includes both "literal falsity" and a statement that is "literally true or ambiguous, but has the tendency to deceive consumers." *Groupe SEB USA, Inc.*, 774 F.3d at 198-99 (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)).    With this understanding in mind, the VB Plaintiffs argue that they have alleged that Everest "knows, at the exact time it promises a revenue share payment to VB's landlords, that [it] will have no revenue to share in the future"; therefore, those promises are misrepresentations of fact and not merely unactionable predictions of the future or expressions of opinion.  (Docket No. 42, pg. 22).  The VB Plaintiffs also aver that "Everest knows that VB will decommission its tower, and there will be no tenant revenue to share because tenants would relocate to VB's tower."  (*Id.* at pg. 23 (citing Amended Complaint at ¶ 64)).  Therefore, the VB Plaintiffs argue that they have "clearly alleged that under any scenario where Everest obtains an interest in the site, 'Vertical Bridge will decommission its Tower and abandon the site … as soon as the VB Contract expires.'"  (*Id.* at pg. 23 n.16 (citing Amended Complaint at ¶ 63)).

Having considered the VB Plaintiffs' averments in support of their Lanham Act claim and Everest's arguments for dismissal thereof, the Court is ultimately unconvinced that the VB Plaintiffs' pleadings are sufficient with respect to the Lanham Act claim.  As an initial matter, the VB Plaintiffs' most specific allegations with respect to statements and/or promises that Everest makes to landlords is that Everest offers landlords a dual fee structure whereby the landlords will *either* receive a share of future revenue *or* a flat $30,000 annual payment.  To that end, the VB Plaintiffs allege that "Everest's offers to the Landlords frequently include a promise to pay the Landlord the greater of either (1) 50% of Everest's revenue *from any tenant*—whether a tower

standard for pleading fraud," *Registered Agent Sols., Inc. v. Corp. Serv. Co.*, No. 1:21-CV-786-SB, 2022 WL 911253, at *1 (D. Del. Mar. 28, 2022) (Bibas, J.), the Court finds the VB Plaintiffs' pleadings fall short.

infrastructure company tenant or a telecom carrier subtenant—who occupies the premises following the expiration of the VB Contract **or (2) $30,000 per year**." (*Id.* at ¶ 60 (second emphasis added)).  Even if the Court infers—in the VB Plaintiffs' favor—that these alleged promises are statements or descriptions of fact and not merely unactionable predictions of future performance[9]—it is patently clear to the Court that a statement or offer which contains the possibility of *either* revenue sharing *or* a flat annual payment unquestionably implies to the offeree that there is a possibility there will be no revenue sharing.  Such a statement cannot be said to be a literally false or literally-true-but-deceptive statement that Everest will have share revenue.  *See Groupe SEB USA, Inc.*, 774 F.3d at 198-99.  Accordingly, the VB Plaintiffs' allegations in this regard are inadequate for their Lanham Act pleadings.

Not only that, but the Court further observes that the VB Plaintiffs' averments that Everest falsely represents that it will have revenue to share with landlords is inconsistent with the VB Plaintiffs' other allegations concerning Everest's scheme.  On the one hand the VB Plaintiffs allege that Everest engages in an "extreme" tower aggregation scheme so that it can grossly inflate the rent that the VB Plaintiffs pay for the tower sites in question; on the other hand, the VB Plaintiffs allege that Everest has no expectation that the sites it targets will generate revenue and thus makes promises to landlords that are totally illusory with respect to the prospect of revenue sharing.[10]  It

---

[9]     *See Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 235 (5th Cir. 2014) (delineating the difference between actionable statements of fact and unactionable statements of opinion, and explaining that "[p]redictions of future events are … non-actionable expressions of opinion"); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 632 F. Supp. 2d 362, 366 (D. Del. 2009) (explaining unverifiable opinions and puffery are not actionable).

[10]     Allegations in the Amended Complaint that Everest intends to earn revenue include that Everest can only afford the large up-front-payment it offers to landlords because "Everest knows that, immediately upon the VB Contract expiring, Everest will have the opportunity to substantially increase Vertical Bridge's rent payments, thereby recouping its initial payment to the Landlord and earning excess revenue if Vertical Bridge remains at the site.  In the event that Vertical Bridge does not remain at the site, Everest can attempt to take over Vertical Bridge's relationships with its tenants remaining at the site, or simply terminate its agreement with the Landlord at Everest's convenience."  (Amended Complaint at ¶ 59).  With respect to

is unclear to the Court how the latter averment might be reconciled to the former, and "[w]hile pleading in the alternative is certainly permitted … what is pled alternatively must still have a plausible basis grounded in fact." *Kovach v. Turner Dairy Farms*, Inc., 929 F. Supp. 2d 477, 500 (W.D. Pa. 2013) (citing *Iqbal*, 556 U.S. at 663).  Here the VB Plaintiffs' allegations that Everest made false or misleading representations or descriptions of fact are conclusory in that the VB Plaintiffs have not factually supported their allegation that Everest *knows* the landlords "will never receive [the] projected revenue" (Amended Complaint at ¶ 73) or *knows* but fails to inform the landlords that the VB-Plaintiff on site will decommission its tower and that Everest will be unable to generate revenue directly from tower tenants.  Accordingly, the Court will dismiss the VB Plaintiffs' Lanham Act claim.  The Court is dubious that the VB Plaintiffs could amend to cure the deficiencies of their Lanham Act claim discussed herein.  For instance, the future-looking or hypothetical framing of many of the VB Plaintiffs' allegations give the Court some pause as to whether they can adequately allege likelihood of damage under the Act.  15 U.S.C. § 1125(a). However, because it is not clear that amendment would be completely futile, dismissal will be without prejudice.  *See Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) (listing factors that justify denial of opportunity to amend).[11]

---

revenue and revenue-sharing, the VB Plaintiffs further allege that if the VB Plaintiff in question leaves the site in question upon execution of a landlord-Everest contract, then Everest may try to take over the tenant leases—which it may or may not be able to do—"and will resultantly pay a revenue share to the landlord that is "significantly less than originally promised." (*Id.* at ¶¶ 61(a), 62).  If the VB Plaintiff in question remains on site, then the VB Plaintiffs allege that  Everest will "obtain[] a sizeable increase in revenue at the expense of its direct competitor, Vertical Bridge." (*Id.* at ¶ 61(b)).  Given these allegations concerning Everest's plans for revenue generation, it's perplexing that the VB Plaintiffs also allege, *e.g.*, that "Everest knowingly offers a revenue share that is illusory." (*Id.* at ¶ 73(a)).

[11]    The Court notes that Everest also challenges the VB Plaintiffs' Lanham Act allegations with respect to whether they have adequately alleged false statements *in connection with goods or services*. Despite having an extensive list of statutory definitions, 15 U.S.C. § 1127, the Lanham Act does not define "goods" or "services."  *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 323-24 (4th Cir. 2015).  Accordingly, this Court must construe those terms "'in accordance with [their] ordinary meaning,' considering

'definitions of the term, the statutory text, and the case law.'" *Dille Family Trust v. Nowlan Family Trust*, 207 F. Supp. 3d 535, 542-43 (E.D. Pa. 2016) (citing *United States v. Husmann*, 765 F.3d 169, 173 (3d Cir. 2014)). *See e.g., Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31 (2003) (defining goods for Lanham Act purposes as "wares; merchandise" by quoting Webster's New Int'l Dictionary 1079 (2d ed. 1949)). *But cf. Radiance Found., Inc.*, 786 F.3d at 323 (stating that "services" are a more "amorphous concept" than are "goods," and that the term should be construed broadly commensurate with the Lanham Act's purpose, "to protect consumers from confusion in the marketplace"); *Valley Forge Mil. Acad. Found. v. Valley Forge Old Guard, Inc.*, 24 F. Supp. 3d 451, 456 (E.D. Pa. 2014) ("The term 'services' as used in the Lanham Act has been interpreted broadly."). *See also New Prime Inc. v. Oliveira*, 586 U.S. 105, 113-16 (2019). The parties' briefing on this issue is relatively sparse. They do not supply any proposed dictionary definition of "service," nor do they offer any interpretive analyses using semantic, syntactic, contextual, or other appropriate canons of interpretation. The VB Plaintiffs merely argue that they have alleged Everest's purported misrepresentations pertain to its real estate management services. (Docket No. 42, pg. 24). Everest argues that it seeks only to acquire real property rights which cannot constitute goods or services under the Lanham Act. (Docket No. 41, pg. 24). The Court must turn to the actual averments contained in the Amended Complaint. The VB Plaintiffs' Amended Complaint does contain averments identifying services Everest allegedly performs, such as facilitation of communications between landlord, telecommunications companies, and cellular tenants; land acquisition and real estate management services; and procurement of tenant leases and collection of revenue. (Amended Complaint at ¶ 46). However, a close examination of the Amended Complaint reveals averments that Everest's purportedly false or misleading statements were made seemingly in connection with the acquisition of property rights and not in connection with its services because the VB Plaintiffs allege that Everest purchased Landlords' "lessor rights" or "leasing rights" in exchange for "rent payments." (*Id.* at ¶¶ 55, 57-59). "Under Pennsylvania law, real property is defined to include rents." *In re Scarborough*, 461 F.3d 406, 410 (3d Cir. 2006) (citing 21 Pa. Stat. Ann. §3); *In re Steslow*, 225 B.R. 883, 884–85 (Bkrtcy. E.D. Pa. 1998) ("It is clear that rents are real property in Pennsylvania by virtue of Pennsylvania law.").

In the Court's estimation, such real property interests are not among the goods and services addressed in the Lanham Act's prohibition of false advertising. *See Dille Family Trust*, 207 F. Supp. 3d at 543 (explaining, with respect to goods, that construing the Lanham Act "to cover only tangible goods offered for sale" is supported by the International Schedule of Goods and Services' ("International Schedule") enumeration of 34 classes of *tangible goods* (citing 37 C.F.R. § 6.1 (International Schedule))). Rents are not addressed in the International Schedule, and seem to be more akin to intellectual property interests such as trademarks and patents that courts have deemed to be outside the scope of a good or service pursuant to 15 U.S.C. § 1125(a). *Id.* at 543-44 (finding that trademarks are not goods and thus outside the purview of the Lanham Act); *Digigan, Inc. v. Ivalidate, Inc.*, No. 02-420, 2004 WL 203010, at *5 (S.D.N.Y. Feb. 3, 2004) ("A patent is not a 'good or service' as those terms are used in the Lanham Act."). Because the Court herein dismisses the VB Plaintiffs' Lanham Act claim for not plausibly alleging any false representations, it need not resolve this secondary question presented by Everest about whether the VB Plaintiffs have adequately alleged a connection to goods or services. However, the Court is highly dubious that the Amended Complaint in its present form plausibly avers falsity in connection with a *good or service* such that any further attempt to amend the complaint should incorporate specific factual averments connecting Everest's services with the alleged falsities.

B.    Misappropriation of Trade Secrets

Turning to the VB Plaintiffs' trade secrets claims, as discussed in Section I (Background), the VB Plaintiffs allege that Everest misappropriated their trade-secret pricing terms and price structure information in violation of the DTSA and PUTSA.  The elements of a trade-secrets misappropriation claim[12] are: "(1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce'; and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret."  *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (citing 18 U.S.C. §§ 1839(3), 1836(b)(1), 1839(5)).  The substance of a trade secret may be "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  *123 Exteriors, Inc. v. N. Star Exteriors, LLC*, No. CV 17-4337, 2018 WL 3642221, at *7 (E.D. Pa. Aug. 1, 2018) (quoting *Kewanee Oil v. Bicron Corp.*, 416 U.S. 470, 475 (1974)).

At the pleadings stage, a plaintiff must "sufficiently identify the information it claims as a trade secret and allege facts supporting the assertion that the information is indeed protectable as such."  *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380-81 (3d Cir. 2021) (citing 18 U.S.C. §§ 1836(b), 1839(3)); *Cole's Wexford Hotel, Inc. v. Highmark, Inc.*, No. 2:10-CV-01609-JFC,

---

[12]    The elements of a DTSA claim and a PUTSA claim are "substantively identical." *EMC Outdoor, LLC v. Stuart*, No. CV 17-5172, 2021 WL 1224064, at *11 (E.D. Pa. Mar. 31, 2021); *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018) ("Although the DTSA and the PUTSA use different wording to define a trade secret, they essentially protect the same type of information. Both define a trade secret as information that: (a) the owner has taken reasonable means to keep secret; (b) derives independent economic value, actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and (d) others who cannot readily access it would obtain economic value from its disclosure or use." (citing 18 U.S.C. § 1839(3) and 12 Pa. Cons. Stat. § 5302)).

2019 WL 3778090, at *13 (W.D. Pa. May 31, 2019) ("A party claiming rights to a trade secret bears the burden of defining the information for which protection is sought with sufficient definiteness to permit a court to apply the criteria for protection."); *Oakwood Lab'ys LLC*, 999 F.3d at 906 (explaining that information that is "alleged to be a misappropriated trade secret must be identified with enough specificity to place a defendant on notice of the bases for the claim being made against it").

Courts considering whether a plaintiff's factual averments support the plaintiff's claim that certain information has "protected status as a trade secret … consider whether the owner of the information 'has taken reasonable measures to keep it secret' and whether the 'information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *Oakwood Lab'ys LLC*, 999 F.3d at 905 (quoting 18 U.S.C. § 1839(3)). As is evident, most of these factors "are directed at gauging the secrecy of the information" in question because "the most important characteristic of a trade secret is that it is in fact secret." *Nova Chemicals, Inc. v. Sekisui Plastics Co.*, 579 F.3d 319, 327-28 (3d Cir. 2009) (citing James Pooley, Trade Secrets § 4.04 (2009)). With respect to the misappropriation element of trade-secret claims, "[t]here are three ways to establish misappropriation": "improper acquisition, disclosure, or use of a trade secret without consent." *Oakwood Lab'ys LLC*, 999 F.3d at 907-08 (citing 18 U.S.C. § 1839(5)).

In this matter, Everest argues that the VB Plaintiffs have not plausibly alleged misappropriation of trade secrets. Everest contends that it used the VB Plaintiffs' rent terms as part of a legitimate tower aggregation business and that the VB Plaintiffs' rent terms are not protectable trade secrets under the DTSA and PUTSA because they were (a) in the hands of third

17

parties who had no obligation to keep them in confidence; (b) readily available by permissible means; and (c) they were, in some instances, inherited from predecessors-in-interest instead of being the result of the VB Plaintiffs' development of secret information that would afford them an economic advantage.  (Docket No. 41, pgs. 10-16; Docket No. 43, pgs. 2-9).  The VB Plaintiffs respond that they need not show by their averments that they *perfectly* protected their trade secrets; rather, they need only show they took *reasonable measures* to keep their trade secrets secret.  The VB Plaintiffs also argue the question of whether their protective measures were reasonable is a question of fact that ought to be decided after discovery.  For the reasons explained herein, the Court finds that—at present—the VB Plaintiffs have failed to plausibly allege trade secret misappropriation.

The Third Circuit's decision in *Oakwood* and discussion of trade secrets principles therein is helpful to the Court's assessment of the plausibility of the VB Plaintiffs' trade secret claims.  In *Oakwood*, the Third Circuit reviewed the dismissal of trade secret claims.  The plaintiff in that case (Oakwood) was a technology-based specialty pharmaceutical company focused on the research and development of sustained release injectable drugs involving microsphere systems (among other things).  Oakwood alleged its trade secrets included "the information laying out its design, research and development, test methods and results, manufacturing processes, quality assurance, marketing strategies, and regulatory compliance related to its development of a microsphere system for drug delivery, including peptide-based drugs."  *Id.* at 907.  Oakwood amended several times and, in the final iteration of its complaint, also identified its trade secrets to include "the variables that affect the development of its microsphere products, including the data, peptide-specific release profiles, and other discoveries associated with those variables, which it collected through extensive trial and error testing."  *Id.* (internal quotation marks and citation

omitted).   Reviewing the allegations, the Third Circuit disagreed with the district court's determination that Oakwood had not adequately alleged misappropriation of trade secrets and explained that "Oakwood gave a very precise example by pointing to a particular document, the Leuprolide Memo, that it had disclosed to [one of the defendants] under a confidentiality agreement, and it specified the contents of that document as containing trade secrets."  *Id.*  The Third Circuit further noted that Oakwood had "attached other documents specifying in detail secrets related to the Microsphere Project that Oakwood accuses the Defendants of taking and using."  *Id.*  Accordingly, the Third Circuit decided that "a reasonable inference," indeed perhaps the "only reasonable inference – is that the trade secrets identified in the Complaint are the ones Oakwood is claiming were misappropriated" such that "[]the District Court's demand for further precision in the pleading is … misplaced."  *Id.*  In the Third Circuit's estimation, the pleadings in that case had "unquestionably" put the defendants including their former employee on notice "of the trade secret information that is at issue."  *Id.*

Unlike in *Oakwood*, the VB Plaintiffs' allegations of protectable trade secrets are not sufficiently specific regarding the information in question for the VB Plaintiffs to have alleged plausible trade-secrets claims.  The VB Plaintiffs generally allege that their pricing terms, price structure information, escalator amounts, and timing constitute trade secret(s) that were misappropriated by Everest.[13]  But beyond those vague allegations in the Amended Complaint, it is unclear: whether the information in question is solely the price of rent; whether the same price-term and price-structure information the VB Plaintiffs seek to protect now was disclosed in

---

[13]     The VB Plaintiffs also allege that their formulae, models, and market analyses used to develop their pricing terms, price structure information, escalator amounts, and timing are confidential (Amended Complaint at ¶¶ 41-42); however, the VB Plaintiffs do not appear to have alleged that the landlords necessarily had access to their formulae, models, and market analyses such that this information might have been improperly shared with Everest.

predecessor-in-interest contracts that lacked any confidentiality provision (even if the contract was later amended to include a confidentiality clause), or whether the information in question was disclosed in offer letters to landlords without any non-disclosure agreement in place.  Without greater detail, the Court is unable to determine—with sufficient precision—what information the VB Plaintiffs have sought to protect.  *See Mallet & Co. Inc*, 16 F.4th at 364 (vacating the district court's finding of likelihood of success on the merits of a trade secrets misappropriation claim because the plaintiff had proffered a list of purportedly protected information, some of which might be protected and some of which might not be protected).[14]

The VB Plaintiffs' imprecision in their allegations is particularly problematic because without a precise identification of the information that the VB Plaintiffs sought to protect, it is impossible for the Court to evaluate whether the VB Plaintiffs have adequately alleged secrecy.  If the Court is to evaluate whether the VB Plaintiffs have supplied factual averments to support each

---

[14]    The VB Plaintiffs repeatedly refer to VB landlords' "confidentiality obligations" (*see e.g.*, Docket No. 42, pg. 14 n.8); however, it is not clear to the Court that confidentiality *obligations* are alleged in the Amended Complaint.  The VB Plaintiffs seem to concede as much in their brief in opposition to the motion to dismiss wherein they argue: "Nowhere in VB's [Amended Complaint] does VB allege that Landlords do not agree to the confidentiality obligations VB imposes on the Landlords, **and the reasonable inference from VB's allegations is that the Landlord *does* agree to keep the terms confidential.**"  (*Id.* (emphasis added)).  In the Court's view, the requested inference—inferring an agreement from an alleged request—is too big a gap for the Court to fill with a reasonable inference.

The Court does not mean to imply that confidentiality agreements are always required or that there are no instances in which a confidentiality obligation could be implied.  The Supreme Court discussed how such implied obligations can arise in *Kewanee Oil Co.* wherein the Court explained that a trade secret holder might reveal his or her secret to employees or licensees with an "express or implied restriction of nondisclosure or nonuse."  416 U.S. at 475 (discussing Ohio's law of trade secrets).  But to the extent that the VB Plaintiffs have relied on their allegations of making requests to landlords to maintain confidentiality of offers or pricing and price structure terms in VB Contracts without arriving at any agreement to keep that information confidential, the Court cannot draw an inference of a confidentiality obligation.  The situation is, of course, different to the extent that the VB Plaintiffs allege including confidentiality provisions in certain VB Contracts.  But, as discussed at length in this Memorandum Opinion, the vagueness of the VB Plaintiffs' allegations of trade-secret protected information in the Amended Complaint make it difficult for the Court to determine what—if any—protective measures were taken with respect to specific information.

element of their trade secrets claims, there must be greater specificity in their complaint. Otherwise, it is impossible for the Court to determine whether any actionable instances of trade secret misappropriation are alleged in this matter.  For instance, with respect to type-1 contracts, the Court is hard pressed to infer adequate secrecy to the extent that the VB Plaintiffs allege that any of the individual VB Plaintiff's rent terms were shared in a predecessor-in-interest contract if that prior agreement lacked any confidentiality provision.  With respect to type-3 contracts, the Court is at a loss as to why the individual VB Plaintiffs who are party to this action—who would presumably know what their negotiations of VB Contracts entailed—have not provided greater detail concerning whether information subject to confidentiality provisions in VB Contracts was disclosed during negotiations.

The Court does not imply that any disclosure would negate the VB Plaintiffs' trade-secret misappropriation claims.  "[N]ot all disclosures will destroy a trade secret"—*e.g.*, a licensing agreement—though, in instances where a third-party is "*not required to maintain the secrecy of any information it ha[s] acquired*," the information can "los[e] its trade secret status."  *Nova Chemicals, Inc.*, 579 F.3d at 328 (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1982) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information ... his property right is extinguished.")); *Cole's Wexford Hotel*, 2019 WL 3778090, at *13 ("Furthermore, if a party discloses its trade secret to others 'who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, [the party's] property right is extinguished.'  Finally, a trade secret can lose its status if it becomes stale or becomes public information.").  *But see Mazcon, a Kurtz Bros. Co., LLC v. BEG Grp. LLC*, No. 1:19-CV-40, 2020 WL 4583867, at *3 (W.D. Pa. Aug. 10, 2020) (deciding a trade secret misappropriation claim was adequately pleaded where a purported

disclosure to a third party was merely a "preliminary confidential discussion with the [Department of Environmental Protection]" because the court was required at pleadings to "accept the classified nature of that communication as true.").[15]   However, greater particularity in pleadings is necessary for the Court to evaluate what exactly the various VB Plaintiffs have sought to protect and whether they can plead adequate secrecy to plausibly allege the existence of a trade secret.  *See SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1257 (3d Cir. 1985) (addressing trade secret protection under

---

[15]        In addition to arguing that the VB Plaintiffs' price terms and pricing structure cannot be protected trade secrets, Everest makes much of the idea that even according to the VB Plaintiffs' vision of a legitimate and lawful tower aggregation scheme the price terms and pricing structure relevant to a particular VB Contract would eventually become known if such an aggregator was able to secure an agreement to be the intermediary between the landlord and a VB Plaintiff once the rent checks started to come in.  (Docket No. 41, pg. 14).  Everest argues that this hypothetical with a so-called legitimate tower aggregator shows that the information asset in question is "readily ascertainable through proper means" and thus not subject to trade secret protection.  (*Id.* at pg. 15 (citing 18 U.S.C. § 1839(3)(B) and 12 Pa. Cons. Stat. § 5302)).  The Court is unconvinced. If the VB Plaintiffs had alleged specific protectable information that had been kept sufficiently secret to warrant protection, the reality that a VB Plaintiff's agreement with another aggregator might give that tower aggregator access to such information would not necessarily destroy trade secret protection by showing the information could be accessed through proper means.  As the courts have explained, "not all disclosures will destroy a trade secret."  *Nova Chemicals, Inc.*, 579 F.3d at 328.  In the Court's estimation, accepting Everest's hypothetical readily-ascertainable-through-proper-means argument would require the Court to draw inferences in Everest's favor which, of course, the Court may not do on Everest's motion to dismiss.

         The Court likewise finds unpersuasive Everest's argument that the VB Plaintiffs' rent terms cannot be trade secrets unless they were developed with confidential formulae and that the VB Plaintiffs will struggle to make such a showing with respect to their inherited contracts because it's not apparent from the Amended Complaint that their predecessors employed any trade-secret-protected formulae for setting rent terms.  (Docket No. 41, pg. 15).  Everest argues that for alleged non-technical trade secrets the subject matter in question must be "the product of time and effort."  (*Id.* (citing *Nicolo v. Patterson Belknap Webb & Tyler, LLP*, No. 2:13CV706, 2016 WL 5661737, at *3 (W.D. Pa. Sept. 30, 2016))).  The case Everest cites for support of its argument—*Nicolo*—appears to be distinguishable.  In *Nicolo*, the court conceded that the courts "have struggled to define the contours of the trade secret doctrine in the context of general, non-technical information."  *Id.*  The information that was purportedly subject to the trade secret doctrine in that case was alleged to be facts generally showing that the plaintiff "ha[d] done nothing to market or develop his patents and does not have any particular plan in place to do so."  *Id.*  The plaintiff argued for trade secret protection, saying that he derived independent economic value from not allowing this information—which would decrease offers on his patents—to be generally known.  *Id.*  But the court explained that, in addition to lacking authority indicating a plaintiff could protect that "type of nebulous and unhelpful information," the plaintiff had failed to "articulate how his lack of diligence … provides him with any actual or potential independent economic value."  *Id.*  Thus, the Court held that he could not demonstrate his so-called trade secrets were "the product of effort and diligence or that they provide him with any independent economic advantage over his competitors."  *Id.*  That case is far afield of this one.

Pennsylvania law, and holding that "[t]he district court erred as a matter of law in holding that knowledge of alternate suppliers of parts, and their prices, is protectible as a trade secret"); *Mazcon, a Kurtz Bros. Co.*, 2020 WL 4583867, at *2 (explaining that "a complaint does not need to disclose the trade secrets to state a claim"; however, "it is not enough to point to broad areas of technology" or another protectable category of secret "and assert that something there must have been secret and misappropriated").  For this reason, the Court will grant Everest's motion to dismiss insofar as it will dismiss the VB Plaintiffs' DTSA and PUTSA claims without prejudice to amendment.[16]

    C.    <u>Remaining Claims</u>

Everest has argued that, in the event the Court dismisses the VB Plaintiffs' Lanham Act and trade secrets claims, then the Court should also dismiss the VB Plaintiffs' remaining claims because they are predicated on the same alleged conduct.  The Court agrees.  The VB Plaintiffs resist this conclusion and argue that their Amended Complaint includes adequate allegations of Everest being unjustly enriched by using their "confidential" pricing information, interfering with contractual and prospective contractual relationships with VB's landlords by inducing disclosure of "confidential pricing terms and price structure," and engaging in unfair competition by wrongfully using VB's "confidential information."  (Docket No. 42, pg. 25 (citing Amended Complaint at ¶¶ 117, 123, 137, 146)).  However, such allegations of confidentiality are deficient because they are conclusory in the same way as the VB Plaintiffs' trade-secret allegations are deficient.  And, even if the VB Plaintiffs' state-law claims were independently viable, the Court would decline to exercise jurisdiction under 28 U.S.C. § 1367(c).

---

[16]    In light of the Court's decision that the VB Plaintiffs have failed to state a plausible claim of trade secrets misappropriation, the Court will not reach Everest's argument that the landowners must be joined as necessary parties pursuant to Fed. R. Civ. P. 19 if the trade secrets claims survive the motion to dismiss.

**IV.**     **Conclusion**

For all the foregoing reasons, Everest's motion to dismiss the VB Plaintiffs' Amended Complaint is **granted** insofar as the VB Plaintiffs' claims are dismissed without prejudice pursuant to Rule 12(b)(6).  An Order consistent with this Memorandum Opinion follows.

*/s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated: May 23, 2024

cc/ecf: All counsel of record