**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VERTICAL BRIDGE REIT, LLC; VERTICAL BRIDGE NTCF, LLC; VERTICAL BRIDGE DEVELOPMENT, LLC; VERTICAL BRIDGE TOWERS, LLC; ECO-SITE, LLC; VB RUN, LLC; CIG COMP TOWER, LLC; VB BTS, LLC; VERTICAL BRIDGE 500, LLC; MIDWEST NT 1 LLC; MIDWEST NT 2, LLC; VERTICAL BRIDGE VBTS, LLC; VB BTS II, LLC; VERTICAL BRIDGE S3 ASSETS, LLC; VB-S1 ASSETS, LLC; THE TOWERS, LLC; VERTICAL BRIDGE CC FM, LLC; VERTICAL BRIDGE CCR, LLC; VB NIMBUS, LLC; VERTICAL BRIDGE CC AM, LLC; VOGUE XIII, LLC; VERTICAL BRIDGE REAL ESTATE, LLC; PRECISION CELL ASSETS, LLC; TORO VERTICAL, LLC; BRIDGER CELL ASSETS, LLC; VBHV, LLC; DATAPATH VERTICAL BRIDGE II, LLC; NTCH-VB, LLC; VERTICAL BRIDGE TOWERS IV, LLC; VBT SUB 2, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 2:23-cv-1017-WSH |
| *Plaintiffs*, | ) ) ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| EVEREST INFRASTRUCTURE PARTNERS, INC.; EIP HOLDINGS II, LLC, | ) ) ) | |
| *Defendants*. | ) ) | |

**<u>SECOND AMENDED COMPLAINT</u>**

Plaintiffs Vertical Bridge REIT, LLC; Vertical Bridge NTCF, LLC; Vertical Bridge

Development, LLC;  Vertical Bridge Towers, LLC; Eco-Site, LLC; VB Run, LLC; CIG

Comp Tower, LLC; VB BTS, LLC; Vertical Bridge 500, LLC; Midwest NT 1, LLC; Midwest

NT 2, LLC; Vertical Bridge VBTS, LLC; VB BTS II, LLC; Vertical Bridge S3 Assets, LLC;

VB-S1 Assets, LLC; The Towers, LLC; Vertical Bridge CC FM, LLC; Vertical Bridge CCR, LLC; VB Nimbus, LLC; Vertical Bridge CC AM, LLC; Vogue XIII, LLC; Vertical Bridge Real Estate, LLC; Precision Cell Assets, LLC; Toro Vertical, LLC; Bridger Cell Assets, LLC; VBHV, LLC; Datapath Vertical Bridge II, LLC; NTCH-VB, LLC; Vertical Bridge Towers IV, LLC; and VBT SUB 2, LLC (collectively, "Vertical Bridge"), by and through their attorneys, K&L Gates LLP, file this second amended complaint against Defendants Everest Infrastructure Partners, Inc. and EIP Holdings II, LLC (collectively, "Everest"), stating as follows:

## **INTRODUCTION**

1.      This case involves the telecommunications infrastructure industry, referred to herein as the "cell tower industry" or simply "tower" industry.  Plaintiff Vertical Bridge and Defendant Everest are tower companies, participants in the tower industry, and direct competitors with one another.

2.      The case arises out of Everest's unlawful practice of obtaining through improper means Vertical Bridge's valuable, confidential and proprietary financial information so that it can gain a competitive advantage over Vertical Bridge.  This behavior is a violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, ("DTSA"), and the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S.A. § 5301, *et seq.*, ("PUTSA").  It also constitutes tortious interference with contract and unfair competition.

3.      Tower companies compete with one another for towers and telecom tenants on those towers.  Every tower company's revenue is a function of how many rent-paying tenants it has on its towers.  The number of rent-paying tenants on a tower company's towers depends upon how many towers in advantageous locations the tower company has to offer its telecom

tenants.   The more towers a tower company has, the larger its market share and the larger its revenue.

4.      To acquire additional towers, tower companies must obtain property rights with respect to those towers.  Tower companies typically do not own the real property on which towers sit, but enter into leases, licenses, or easements with respect to that real property.

5.      The financial arrangements between tower companies and their landlords involve the payment of rent or a license fee by the tower company to the landlord, either on a monthly or annual basis, typically with periodic increases over time.  In some cases, in addition to rent or a license fee being paid to the landlord, these financial arrangements also include a share of the revenue that the tower company receives from its telecom tenants being paid to the landlord.  These financial arrangements are collectively referred to as "financial" information by way of shorthand.

6.      The financials with respect to any particular piece of real property on which a tower sits are a function of multiple factors and can vary widely from site to site even within the same general geographic area.  These factors include topography, proximity to other towers, orientation with respect to residential or commercial areas, proximity to large man-made or natural structures, FAA regulations, FCC regulations, state and local regulations, zoning ordinances, local and national real estate market conditions, the types (*e.g.* radio, tv, cellular, etc.) and number of telecom tenants who can feasibly operate from the tower, and a prediction of how the relevant real estate market will develop in the medium and long terms.

7.      To the best of their ability, tower companies diligently guard the secrecy of the individual site-to-site financial information for their tower ground leases, the financial

information across their national tower portfolio, and the financial models that are used to develop both individual and portfolio financials. They do so for good reason. If Tower Company A were to obtain the secret financial information of Tower Company B, Tower Company A would obtain an enormous advantage in the market at the expense of Tower Company B, because such knowledge would allow Tower Company A to undercut Tower Company B's existing relationships with both ground landlords and telecom tenants and to unfairly compete in the bidding for new tower acquisitions and tower builds. Tower Company A would be able to do so without spending any of the time, resources, and investments Tower Company B spent on originally developing the financial information.

8.      This type of advantage is exactly what Everest attempts to obtain at Vertical Bridge's and other tower companies' expense. Everest induces Vertical Bridge's landlords to improperly disclose Vertical Bridge's confidential and proprietary ground lease financial information. Notably, while Everest has feigned disbelief as to the confidential and proprietary nature of financial information in the tower industry in an attempt to justify its unlawful actions, Everest's real-world conduct to prevent disclosure of its own similar financial information belies its litigation-inspired position; specifically, Everest attempts to keep secret its own information even as it misappropriates the similar secret information of others.

## PARTIES

9.      Vertical Bridge NTCF, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

4

10.     Vertical Bridge Development, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida, and is party to at least the AL-5142 lease (Exhibit F).

11.     Vertical Bridge Towers, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida, and is party to at least the GARDI-WS-105608 lease.

12.     Eco-Site, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida, and is party to at least the KS-5068 and MO-5167 leases.

13.     VB Run, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

14.     CIG Comp Tower, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

15.     VB BTS, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

16.     Vertical Bridge 500, LLC is a limited liability company formed under the laws of Arizona with its principal place of business located in Boca Raton, Florida, and is party to at least lease TX-5779 (Exhibit H).

17.     Midwest NT 1, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

18.     Midwest NT 2, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

19.     Vertical Bridge VBTS, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

20.     VB BTS II, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida, and is party to at least the Granville West lease.

21.     Vertical Bridge S3 Assets, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

22.     VB-S1 Assets, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida, and is a party to at least the IL-5154, WI-5082, and FL-5057 leases.

23.     The Towers, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

24.     Vertical Bridge CC FM, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

25.     Vertical Bridge CCR, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

26.     VB Nimbus, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

27.     Vertical Bridge CC AM, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

28.     Vogue XIII, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

29.     Vertical Bridge Real Estate, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

30.     Precision Cell Assets, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

31.     Toro Vertical, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

32.     Bridger Cell Assets, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

33.     VBHV, LLC is a limited liability company formed under the laws of Wisconsin with its principal place of business located in Boca Raton, Florida.

34.     Datapath Vertical Bridge II, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

35.     NTCH-VB, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

36.     Vertical Bridge Towers IV, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

37.     VBT SUB 2, LLC is a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

38.     Each of the plaintiff entities are wholly controlled subsidiaries of Vertical Bridge REIT, LLC, also a limited liability company formed under the laws of Delaware with its principal place of business located in Boca Raton, Florida.

39.     Each and every Vertical Bridge entity described in ¶¶ 9–38 above enters into ground leases of the four types discussed at ¶ 80 below.  Each and every entity takes the same

steps to protect the confidential, proprietary ground-lease financial information discussed at ¶¶ 60–62 below.

40.     To date, Vertical Bridge is aware of Everest's unlawful acquisition of confidential, proprietary financial information found in leases where VB-S1 Assets, LLC, Vertical Bridge Development, LLC, Vertical Bridge 500, LLC, VB BTS II, LLC, Vertical Bridge Towers, LLC, and Eco-Site, LLC are the tenants.

41.     Upon information and belief, for each of the Vertical Bridge entities that are parties this action, Everest has attempted to obtain and/or is in the process of attempting to obtain confidential, proprietary ground-lease financial information contained in leases where that entity is the ground lease tenant.

42.     Vertical Bridge reserves all rights to revise or supplement the parties included herein as necessary pursuant to discovery regarding Everest's scheme and the leases it has targeted for interference.

43.     Defendant Everest Infrastructure Partners, Inc. is a corporation formed under the laws of Delaware with its principal place of business in Pittsburgh, Pennsylvania.

44.     Defendant EIP Holdings II, LLC, an affiliate of Everest Infrastructure Partners, Inc., is a limited liability company formed under the laws of Delaware with its principal place of business in Pittsburgh, Pennsylvania.

## JURISDICTION AND VENUE

45.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action involves claims arising under federal law, and this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because

those claims form part of the same case or controversy under Article III of the United States Constitution.

46.     This Court has personal jurisdiction over Defendants because they have their principal place of business within this district.

47.     Although Defendants have targeted Vertical Bridge sites across the country, venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and a substantial part of the events giving rise to this dispute occurred within this district, including the execution of agreements between Defendants and Vertical Bridge's landlords, as well as the initiation and perpetuation of Everest's scheme against Vertical Bridge.

## FACTUAL ALLEGATIONS

### A.  Tower Industry Business

48.     For all purposes relevant here, national wireless carriers, television stations, government entities, and radio broadcasting companies ("telecom tenants") typically broadcast from telecommunications infrastructure, including telecommunications towers, building rooftops, small cells, and billboards.   By way of shorthand, telecommunications infrastructure is collectively referred to herein as "towers," telecommunications infrastructure companies – such as Vertical Bridge and Everest – are referred to as "tower companies," and the industry at large is referred to as the "tower industry."

49.     The tower industry is comprised of tower companies that own and operate the towers on which the telecom tenants have their equipment and from which they broadcast.

50.     Tower companies sometimes own the land on which their towers sit, and sometimes have perpetual easements for their towers.  More commonly, however, tower

companies execute ground leases or licenses with third-party landlords who own the land on which the tower sits.  For purpose of this complaint, only the ground-lease/license scenario is relevant.  By way of shorthand, ground leases and licenses are collectively referred to as "ground leases" herein.

51.     Tower companies compete with each other for towers and telecom tenants. The more towers they have, the more tenants they have, and the more revenue they have from tenant rent.  This means that tower companies also compete for ground leases.  To acquire additional towers, a tower company must enter into additional ground leases for the right to operate a tower on a third party's real property.

52.     The key metric of a tower company's profitability is its Tower Cash Flow ("TCF").  TCF is a function of telecom tenant rent – a tower company's source of revenue – minus expenses, the most significant of which (for all sites at issue here) are the costs associated with ground leases.  These costs include the rent or license fee, and, in some cases, a share of the telecom rent.  The TCF also takes into account the costs tower companies have spent and/or expect to spend in executing and/or acquiring ground leases and installing towers.

53.     Based on the direct experience of Vertical Bridge (which has been in the tower industry for a decade) and on the experience of its employees (some of whom have worked in the tower industry for three or more decades), it is tower industry practice to maintain the secrecy of ground lease financial information as much as possible, and to keep such information from competitors.  This is because this information, if it became known to a competitor, would give that competitor an advantage in the competition for ground leases, thereby improving the competitor's TCF at the expense of the TCF of the tower company

whose confidential ground-lease financial information had been disclosed.

54.     American Tower Corporation, the largest tower company in the U.S., has long claimed that its ground-lease financial information is confidential, proprietary trade secret information that provides it with a competitive advantage from not being known or readily ascertainable.  *See TriStar Investors, Inc. v. American Tower Corp.*, No. 3:12-cv-0499-M, 2014 WL 1327663, ECF No. 9 (N.D. Tex. Apr. 3, 2014) (wherein American Tower Corporation alleged that its financial information was proprietary and trade secret-protected).

55.     Tower companies routinely protect such information by including confidentiality and non-disclosure provisions in their ground leases, designating offer letters to landlords as confidential, and redacting all financial information from publicly-recorded Memorandum of Lease ("MOL") filings to the fullest extent allowed by law.[1]

**B. Vertical Bridge's Business**

56.     Vertical Bridge REIT, LLC, the parent company of the Plaintiff entities, was founded in 2014.  Like other tower companies in the industry, Vertical Bridge owns, manages, and operates towers, and leases space on those towers to its telecom tenants ("Tenants").  In many cases – and all relevant cases here – Vertical Bridge has a ground lease ("Ground Lease" or "Lease") with a landlord who owns the land under which Vertical Bridge's tower sits (the "Landlord").

57.     Like other tower companies, TCF is the key metric of Vertical Bridge's profitability.  Consistent with the practice of other tower companies, Vertical Bridge competes

---

[1] There are rare instances where a ground lease is publicly available because the landlord is a government entity and the ground lease is therefore a public contract subject to government disclosure laws, such as the Freedom of Information Act or state/local equivalents.  However, because the financial information for ground leases is site-specific, occasional disclosures of such leases do not reveal substantial information about the tower company's national network or the company's overall pricing trade secrets.  At most, these disclosures reveal a tower company's financial information with respect to other government-entity landlords, but not landlords generally.

in the industry for telecom tenants and towers so as to maximize its TCF. This means that Vertical Bridge must compete with other tower companies for landlords – keeping the towers it has and acquiring additional towers requires maintaining existing ground leases and entering into additional ground leases.

58.    In order to maximize its TCF, Vertical Bridge has spent millions of dollars and thousands of person-hours developing a proprietary financial model that evaluates the profitability of existing and potential tower sites individually and in the aggregate on a national level. The model employs unique, propriety software containing analytic tools and Vertical Bridge's proprietary internal data (as well as publicly available data) to generate TCF scenarios for particular tower sites, for tower sites across specific regions, and for Vertical Bridge's national infrastructure portfolio.

59.    Vertical Bridge uses this model as part of its decision-making process for what towers to acquire and where, how much to bid for acquisitions, where to build new towers and on what time frame, and what financial terms to offer Vertical Bridge Tenants and Landlords.

60.    For every Vertical Bridge Ground Lease – whether it is a new lease documented on Vertical Bridge's form in the first instance or an acquired lease for an existing tower – Vertical Bridge employs its proprietary financial model. For new Leases, Vertical Bridge uses the model to set the financials. For acquired Leases, Vertical Bridge does not acquire Leases that are inconsistent with the model.

61.    The financial information discussed above includes the following:

        a.    In every Ground Lease, there is a provision that specifies how much
              rent Vertical Bridge must pay the Landlord or the amount of the license

fee that Vertical Bridge must pay to the Landlord.  Some rental/fee provisions are monthly whereas others are annual.

b.   In every Ground Lease, there is a provision that specifies by how much the rent or license fee goes up after a certain period of time. These are escalators.  By way of example only, and to use simple numbers, rent in a particular Ground Lease could be $800 per month for the first 5 years of the Lease term and then increase by $200, or 25%, for a total of $1000 for the next 5 years, with $200 increases every five years.

c.   In some but not all Ground Leases, there is a provision that – in addition to rent/fee and any escalators – requires Vertical Bridge to pay the Landlord a share of the rent that Vertical Bridge receives from its telecom tenants that operate their broadcasting equipment from Vertical Bridge's Tower that sits on the Landlord's property.  The revenue share could appear in the form of a percentage of the telecom tenant's rent or a flat fee.  By way of example only, and using simple numbers, a revenue share provision might entitle a Landlord to 5% of the rent from one telecom tenant and an additional $200 from any new telecom tenants that come onto the tower after the lease is signed.

62.   The financial information above, Vertical Bridge's proprietary financial model, and other similar financial information that can be determined from the Leases are hereinafter referred to as the "Vertical Bridge Trade Secret Information."

63.   As is the case with all tower companies, the financial information in Vertical Bridge's Ground Leases is specific to each tower and is determined by – or is at least

consistent with – the TCF valuation for that tower developed using Vertical Bridge's propriety financial model that is discussed at ¶¶ 52, 57–59 above. Towers within a few miles from one another can, and in many cases do, have widely different financial information in their Ground Leases.

64.     Like other tower companies in the tower industry, Vertical Bridge keeps its Vertical Bridge Trade Secret Information secret as much as possible, and takes all reasonable measures to prevent disclosure of this information, as follows:

a.     Vertical Bridge typically does not disclose its Vertical Bridge Trade Secret Information to anyone other than the Landlords to whom this information applies – not even to Vertical Bridge's own telecom tenants that are operating from the Tower subject to each Ground Lease.  Vertical Bridge redacts this information from its Ground Leases before providing a copy of the Leases to telecom tenants as part of Vertical Bridge's sublease with the telecom tenants.  In those rare circumstances where Vertical Bridge does disclose this information with its Tenants, that disclosure is subject to contractual confidentiality requirements;

b.     Vertical Bridge incorporates confidentiality provisions into Leases that prohibit Landlords from disclosing the financial terms of their Leases to third parties without Vertical Bridge's permission;

c.     Vertical Bridge designates offer letters to Landlords as "Privileged and Confidential"; and the confidentiality provision within such offer letters

prevents Landlords from disclosing the offer letter itself, as well as any financial information disclosed in connection with the offer;

d.   Vertical Bridge takes steps to ensure that all Vertical Bridge Trade Secret Information is specifically redacted in all publicly recorded MOLs to the fullest extent allowed by law.

65.   Internal measures that Vertical Bridge takes to keep its Vertical Bridge Trade Secret Information confidential include, but are not limited to:

a.   Maintaining electronic documentation referring or reflecting its financial information on an internal, password-protected database;

b.   Closely monitoring Vertical Bridge's internal database activity to ensure that this financial information is not divulged, shared, or otherwise misappropriated;

c.   Maintaining physical copies of documentation referring or reflecting this information within a secure room that only limited personnel have access to;

d.   Prohibiting Vertical Bridge employees from publicly uploading any documentation referring to or reflecting this information;

e.   Requiring Vertical Bridge employees to sign confidentiality/non-disclosure agreements prior to accessing documentation referring to or reflecting this information;

f.   Prohibiting Vertical Bridge employees from disclosing or sharing any of this financial information without prior written authorization; and

g.      Requiring Vertical Bridge employees to immediately destroy, delete, or

return all originals and copies of any documentation referring to or

reflecting this information upon termination of the individual's

employment with Vertical Bridge.

66.     The measures Vertical Bridge takes to keep its pricing terms a secret are

consistent with those taken by most tower companies throughout the industry.

67.     Vertical Bridge's form Ground Lease includes a standard confidentiality

provision.  This form is used for all new leases that Vertical Bridge enters into.

68.     As discussed further below, Vertical Bridge also acquires certain Ground

Leases from predecessors-in-interest through purchases and assignments.  Vertical Bridge

takes steps to keep the pricing information in those Ground Leases confidential as well, as

discussed in ¶ 110 below.

**C.  Tower Aggregation Companies**

69.     Tower aggregators pay landlords up-front lump sums in exchange for obtaining

a ground interest, usually in the form of an easement, and take an assignment of the landlord's

interest in the corresponding ground lease in order to step into the shoes of the landlord and

receive the tower company's rent stream, while the landlord retains fee simple in the land.

70.     The tower aggregator then assumes the landowner's interest in its ground lease

with the tower company and receives the monthly rent payments that the company would

have made to the landowner.  In so doing, the tower aggregator receives a steady stream of

income and the landowner exchanges that rent stream for the aggregator's one-time up-front

payment.

71.     Tower aggregators differ from tower companies in that they typically do not

own, manage, or operate towers, or have relationships with telecom tenants.

**D. Everest's Business**

72.     Unlike Vertical Bridge and all other tower companies, Everest's business includes both acting as a tower company and engaging in an extreme form of tower aggregation.

73.     For example, Everest owns, operates, and purchases towers, and holds itself out as a tower company, but also approaches landowners with offers to buy the landowners' revenue stream, as part of its tower aggregation practice.

74.     Everest has taken the position that none of the ground lease financial information discussed herein constitutes confidential or trade-secret-protected information, regardless of whether a ground lease contains confidentiality provisions.

75.     Even as Everest takes this position with respect to the confidential information of its competitors, Everest attempts to maintain the secrecy of its own information. Everest inserts stringent confidentiality provisions in its own ground-lease related documents.

76.     For example, in Everest's offer letters sent to Vertical Bridge's Landlords, which the Landlords are required to share with Vertical Bridge under the terms of Ground Leases that contain "right of first refusal" provisions, Everest inserts a provision stating that each offer "is made on a strictly private and confidential basis" and may not be disclosed without Everest's prior written consent. True and correct copies of the Beaver Lake offer letter and the Auburn Lease offer letter will be attached as Exhibits A–B,[2] respectively.

77.     Everest has engaged and to this day continues to engage in a systematic effort to obtain Vertical Bridge Trade Secret Information to gain a competitive advantage over and

---

[2] In connection with Vertical Bridge's concurrently-filed Motion to File Documents Under Seal, Vertical Bridge will attach all exhibits identified herein upon an order from the Court granting Vertical Bridge's Motion.

to inflict competitive harm on Vertical Bridge.

78.    Specifically, Everest has induced and to this day continues to induce Vertical Bridge's Landlords (as well as the landlords of every other major tower company) to share the valuable, proprietary, and confidential financial information in their Ground Leases with Everest.

79.    Everest does this for several purposes:

a.    The Vertical Bridge Trade Secret Information in Ground Leases – the site-specific monthly rent, escalator amount and timing, and any revenue share – is in large part how participants in the tower industry compete with one another for towers and the real estate interests that underlie those towers. The financial information in Vertical Bridge's Leases gives Vertical Bridge an advantage over its competitors in the market because it is the product of – or at least consistent with – Vertical Bridge's propriety model. Despite knowing this information is confidential and proprietary, Everest induces Vertical Bridge's Landlords to improperly disclose Vertical Bridge's Ground Leases in order to obtain this economically and competitively valuable information at Vertical Bridge's expense. Everest is able to use this Vertical Bridge Trade Secret Information without spending any of the initial resources, person-hours, or costs it took for Vertical Bridge to develop the financial information.

b.    The Vertical Bridge Trade Secret Information in each Ground Lease is not only economically valuable in and of itself, but is also economically

valuable in the aggregate.  The more financial data Everest obtains regarding particular towers, the better Everest understands the pricing on Vertical Bridge's overall national portfolio and the proprietary model that analyzes and values that portfolio site-to-site and in the aggregate.   Everest induces Vertical Bridge's Landlords to disclose Vertical Bridge's Ground Leases so that Everest can harvest as much site-specific information as possible and in so doing gain insight into Vertical Bridge's nationwide site valuation patterns.

c.      Everest uses the misappropriated Vertical Bridge Trade Secret Information to, in certain instances, bid for and/or obtain easements and assignments of beneficial rights at Vertical Bridge Tower sites.

## E.   The Lease Types

80.   Each of Vertical Bridge's Ground Leases with its Landlords fall into four separate categories or types:[3]

> **Type 1:** Ground Leases that originated with Vertical Bridge that have always been subject to confidentiality/non-disclosure provisions, including during the negotiation process;
>
> **Type 2:** Ground Leases that were assigned to Vertical Bridge as part of a Tower acquisition and that at all times had confidentiality/non-disclosure provisions included within them;
>
> **Type 3:** Ground Leases that were assigned to Vertical Bridge where originally there was no confidentiality/non-disclosure agreement but, after assignment, Vertical Bridge and the Landlord modified the Ground Lease to reflect the parties' understanding of their confidentiality/non-disclosure obligations; and
>
> **Type 4:** Ground Leases that were assigned to Vertical Bridge as part of a Tower acquisition that do not contain confidentiality/non-disclosure provisions.

---

[3] Each Vertical Bridge Plaintiff is a party to each type of lease, each Plaintiff takes the same steps described herein to maintain the confidentiality of its valuable ground-lease pricing information.

81.     Upon information and belief, Everest has targeted all four types of Leases.

82.     Upon information and belief, Everest expressly discourages Landlords from seeking Vertical Bridge's consent before disclosing the financial information within the Ground Leases to Everest and/or represents to the Landlords that Vertical Bridge has no right to confidentiality with respect to this information, notwithstanding the presence of express confidentiality/non-disclosure agreements.

### 1.   Type 1 Leases: Vertical Bridge Leases

83.     Every one of these Leases is on a Vertical Bridge form, which contains a confidentiality provision.

84.     The Vertical Bridge Trade Secret Information in each of these Leases was developed using Vertical Bridge's proprietary pricing model, as described in ¶ 52, 57–59.

85.     Prior to execution of these Leases, Vertical Bridge designates correspondence with Landlords in which the Vertical Bridge Trade Secret Information is negotiated as confidential.  Offer letters are designated "privileged and confidential," and all draft Leases already contain the confidentiality provision.

86.     Vertical Bridge also takes the steps to maintain confidentiality of its financial information as described in ¶¶ 64–67 with respect to each Type 1 Ground Lease.

87.     Exhibits C–E, respectively, are Type 1 Leases in Everest's possession that it improperly and without Vertical Bridge's knowledge or consent acquired from Vertical Bridge's Landlords.

88.     Everest could not have obtained these Leases absent wrongful misappropriation of the same.

### i.   Pierce Lease

89.     Exhibit C is an example of a Type 1 Lease that Everest induced Vertical Bridge's Landlord to disclose, which Lease includes Vertical Bridge Trade Secret Information (hereinafter, the "Pierce Lease").

90.     Section 3 of the Pierce Lease sets forth the confidential rent amount Vertical Bridge will pay to the Landlord for use of the Landlord's property located in Idaho (Site No. ID-5033), which amount was developed using Vertical Bridge's proprietary pricing strategy, described at ¶¶ 52, 57–59.  *See* Ex. C at § 3.

91.     Section 3 of the Pierce Lease sets forth the confidential rent escalator amount, *i.e.*, the percentage that rent will increase and the timing of such increase.  *See* Ex. C at § 3.

92.     The Pierce Lease includes a confidentiality provision which reads, in pertinent part: "Landlord shall keep the terms of this Agreement confidential, and shall not disclose any terms contained within this Agreement to any third party other than such terms as are set forth in the Memorandum of Lease."  *See* Ex. C at § 31(i).  The Memorandum of Lease does not include the Vertical Bridge Trade Secret Information.

93.     Upon information and belief, Everest induced Vertical Bridge's Landlord to share a copy of the Pierce Lease with Everest to wrongfully gain access to Vertical Bridge Trade Secret Information.

94.     Upon information and belief, Everest used Vertical Bridge Trade Secret Information within the Pierce Lease, including the rent, escalator, and revenue share terms, to craft an offer to purchase an interest in the site to Vertical Bridge's Landlord based on Vertical Bridge's confidential financial terms.

### ii.  Weis Lease

95.     Exhibit D is another example of a Type 1 Lease that Everest induced Vertical

Bridge's Landlord to disclose, which also includes Vertical Bridge Trade Secret Information (hereinafter, the "Weis Lease").

96.     Section 3 of the Weis Lease sets forth the confidential rent amount Vertical Bridge will pay to the Landlord for use of the Landlord's property located in Idaho (Site No. ID-5034), which amount was developed using Vertical Bridge's proprietary pricing strategy, described at ¶¶ 52, 57–59.  *See* Ex. D at § 3.

97.     Section 3 of the Weis Lease sets forth the confidential rent escalator amount, *i.e.*, the percentage that rent will increase and the timing of such increase.  *See* Ex. D at § 3.

98.     The Weis Lease includes a confidentiality provision which reads, in pertinent part: "Landlord shall keep the terms of this Agreement confidential, and shall not disclose any terms contained within this Agreement to any third party other than such terms as are set forth in the Memorandum of Lease."  *See* Ex. D at § 31(i).  The Memorandum of Lease does not include the Vertical Bridge Trade Secret Information.

99.     Upon information and belief, Everest induced Vertical Bridge's Landlord to share a copy of the Weis Lease with Everest to wrongfully gain access to Vertical Bridge Trade Secret Information.

100.    Upon information and belief, Everest used Vertical Bridge's confidential information within the Weis Lease, including the rent, escalator, and revenue share terms, to craft an offer to purchase an interest in the site to Vertical Bridge's Landlord based on Vertical Bridge Trade Secret Information.

### iii.  Morehead Lease

101.    Exhibit E is another example of a Type 1 Lease that Everest induced Vertical Bridge's Landlord to disclose, which also includes Vertical Bridge Trade Secret Information

(hereinafter, the "Morehead Lease").  The Morehead Lease was not disclosed as part of Everest's bundle of leases identified in its Motion to Dismiss at ECF No. 20.

102.    Section 5 of the Morehead Lease sets forth the confidential rent amount Vertical Bridge will pay to the Landlord for use of the Landlord's property located in Morehead, North Carolina (Site No. NC-3015), which amount was developed using Vertical Bridge's proprietary pricing strategy, described at ¶¶ 52, 57–59.  *See* Ex. E at § 5.

103.    Section 5 of the Morehead Lease includes a confidential percentage of the rent escalator amount escalator amount that Vertical Bridge is required to pay for use of the site. *See* Ex. E at § 5.

104.    Section 5 of the Morehead Lease also includes a confidential revenue share provision outlining the revenue share amount due for each Tenant that Vertical Bridge allows to use the Tower.  *See* Ex. E at § 5.

105.    The Morehead Lease includes a confidentiality provision which reads, in pertinent part, that, in addition to the Lease itself, neither party may "disclose Confidential information to any other person or entity . . . except as may be required by law or applicable judicial process."  *See* Ex. E at § 26(i).  The term "Confidential Information means information, except as may be in the public domain, about either Party's . . . purchasing, accounting, marketing, merchandising, pricing, selling, research and development . . . as disclosed in connection with this [Lease]."  *See id.*

106.    Upon information and belief, Everest induced Vertical Bridge's Landlord to share a copy of the Morehead Lease with Everest to wrongfully gain access to Vertical Bridge Trade Secret Information.

107.    Upon information and belief, Everest used Vertical Bridge's confidential,

proprietary financial information within the Morehead Lease, including the rent, escalator, and revenue share terms, to craft an offer to purchase an interest in the site to Vertical Bridge's Landlord based on Vertical Bridge's confidential financial terms.

### 2. Type 2 Leases: Vertical Bridge's Acquired Leases with Confidentiality Provisions

108.    Vertical Bridge regularly purchases or assumes Ground Leases from other telecommunications infrastructure and/or broadcasting companies, collectively referred to as its "predecessors," to acquire the predecessor's right and interest in Ground Leases with the Landlords.

109.    The financial information in each of the predecessor Leases is not generally known to third parties and is protected from disclosure to third parties through, at least, confidentiality provisions in the predecessor Leases.  Based upon Vertical Bridge's understanding of industry practice, Vertical Bridge believes and understand the predecessors to have taken reasonable measures to safeguard and protect the confidentiality of their financial information, including the measures described at ¶¶ 60–62.

110.    In addition, after acquisition, Vertical Bridge takes steps to maintain the confidentiality of the Vertical Bridge Trade Secret Information in the predecessor Leases (Types 2–4), including:

    a.    Redacting pricing terms from most underlying Leases prior to providing the Leases to Vertical Bridge's Tenants located on the corresponding sites; and

    b.    Taking steps to ensure that all Vertical Bridge Trade Secret Information is specifically redacted in all publicly recorded MOLs to the fullest

extent allowed by law.

111.     Exhibit F is a Type 2 Lease in Everest's possession that it improperly and without Vertical Bridge's knowledge or consent acquired from Vertical Bridge's Landlord.

112.     Everest could not have obtained the Vertical Bridge Trade Secret Information in Exhibit F absent wrongful misappropriation of the same.

### i.     Auburn Lease

113.     Exhibit F is an example of a Type 2 Lease that Everest induced Vertical Bridge's Landlord to disclose, which also includes Vertical Bridge Trade Secret Information that Vertical Bridge acquired from its predecessor (hereinafter, the "Auburn Lease").  The Auburn Lease was not disclosed as part of Everest's bundle of leases identified in its Motion to Dismiss at ECF No. 20.

114.     Section 4 of the Auburn Lease sets forth the confidential rent amount Vertical Bridge will pay to the Landlord for use of the Landlord's property located in Lee County, Alabama (Site No. AL-5142), which amount was developed by Vertical Bridge's predecessor, as described in ¶ 108, and is consistent with Vertical Bridge's proprietary pricing strategy, described at ¶¶ 52, 57–59.  *See* Ex. F at § 4.

115.     Section 4 of the Auburn Lease sets forth the confidential rent escalator amount, *i.e.*, the percentage that rent will increase and the timing of such increase.  *See* Ex. F at § 4.

116.     The Auburn Lease includes a confidentiality provision which reads, in pertinent part, that the Lease "and any information exchanged between the Parties regarding the Agreement are confidential," and "[n]either Party shall provide copies of [the Lease] or any other confidential information to any third party, without the prior written consent of the other Party, as required by law.  If disclosure is required by law, prior to disclosure, the Party

shall notify the other Party and cooperate to take lawful steps to resist, narrow, or eliminate the need for that disclosure." *See* Ex. F at § 29.

117.    Using the Vertical Bridge Trade Secret Information contained in the Lease, Everest crafted an offer to Vertical Bridge's Landlord to purchase an interest on the site, which is reflected in Exhibit B.

118.    As is evident from Everest's offer letter to the Landlord regarding the Auburn Lease, Everest relied on and incorporated Vertical Bridge Trade Secret Information in crafting its offer to the Landlord.

119.    Specifically, Everest used its knowledge of Vertical Bridge Trade Secret Information in order to craft an offer to the Landlord to pay rent exceeding three times the amount of rent Vertical Bridge is currently paying under the Lease. *Compare* Ex. F at § 4, *with* Ex. B at § 2.

120.    Everest's offer also includes identical financial information as that contained in the Auburn Lease, *see* Ex. F at § 4.

121.    Everest's offer even states that the offer "is based on the following terms of the current lease for the cell tower operated on the Property," and provides the exact rent amount and rent escalator in the Auburn Lease. *See* Ex. B at § 1.

122.    The financial information contained in Everest's offer could not have been known without misappropriation of Vertical Bridge Trade Secret Information.

### 3.  Type 3 Leases: Vertical Bridge's Acquired Leases That Were Amended to Include Confidentiality Provisions

123.    In instances where Vertical Bridge acquires predecessor Leases that do not have a confidentiality or non-disclosure provision (described more fully in Section E(4)

below), Vertical Bridge, in some instances, requires the Landlord to execute an amendment to the predecessor Lease to include a confidentiality provision.

124. The amendment to the Lease memorializes Vertical Bridge's and the Landlord's understanding that the terms of the Lease, including the Vertical Bridge Trade Secret Information therein, shall be treated as confidential and not be disclosed to third parties.

125. Oftentimes, the amendment to the Lease also includes new or revised financial terms, *i.e.*, new rent, escalator, and/or revenue share terms that Vertical Bridge developed using its proprietary pricing model.

126. Upon information and belief, and based on industry practice, both before and after the amendment the Landlords are aware of and understand that they had an obligation to keep the pricing terms of the Leases confidential, whether or not the Lease previously contained a confidentiality provision.

127. Additionally, the Landlords receive drafts of the amendment prior to execution, which all include the confidentiality provision.

128. Upon information and belief, Everest has induced Vertical Bridge's Landlords to give Everest copies of the Type 3 Leases, which include Vertical Bridge Trade Secret Information, and Everest further has made representations to the Landlords that they did not need to obtain Vertical Bridge's consent to provide the Leases, despite the clear confidentiality provisions preventing such disclosure.

129. Vertical Bridge has not consented to Everest's acquisition of any of the Type 3 Leases.

130. Everest could not have obtained these Leases absent wrongful

misappropriation of the same.

### 4. Type 4 Leases: Vertical Bridge's Acquired Leases That Do Not Include Confidentiality Provisions

131.    Not every Lease acquired from Vertical Bridge's predecessors includes a confidentiality provision; however, the Vertical Bridge Trade Secret Information in each Lease is treated as confidential by Vertical Bridge after acquisition.

132.    Prior to acquisition, Vertical Bridge believes and asserts that, based upon industry practice, its predecessors took reasonable measures to maintain the secrecy of such information, including certain measures described at ¶¶ 60–62.

133.    Based upon industry practice, Vertical Bridge believes and asserts that Landlords are aware of their obligation to keep the Vertical Bridge Trade Secret Information confidential, whether or not the Lease contains a confidentiality provision.

134.    After acquisition, Vertical Bridge engages in measures to maintain the confidentiality of the proprietary financial information, including the measures set forth in ¶¶ 61 and 64–67 above.

135.    Exhibits G–H are Type 4 Leases in Everest's possession that it improperly and without Vertical Bridge's knowledge or consent acquired from Vertical Bridge's Landlords.

136.    Everest could not have obtained these Leases absent wrongful misappropriation of the same.

#### i.    Beaver Lake Lease

137.    Exhibit G is an example of a Type 4 Lease that Everest induced Vertical Bridge's Landlord to disclose, which includes Vertical Bridge Trade Secret Information that Vertical Bridge acquired from its predecessor (hereinafter, the "Beaver Lake Lease").  The

Beaver Lake Lease was not disclosed as part of Everest's bundle of leases identified in its Motion to Dismiss at ECF No. 20.

138.   Sections 1.8 and 1.14 of the Beaver Lake Lease set forth the confidential rent and fees amount Vertical Bridge will pay to the Landlord for use of the Landlord's property located in Beaver Lake, Texas (Site No. TX-5779), which amount was developed by Vertical Bridge's predecessor, as described herein at ¶ 108, and which amount is consistent with Vertical Bridge's proprietary pricing strategy, described at ¶¶ 52, 57–59.  *See* Ex. G at §§ 1.8; 1.14.

139.   The Beaver Lake Lease allows the Landlord and Vertical Bridge to publicly record only a short-form MOL, rather than the Lease itself.  *See* Ex. G at § 24.8.  The MOL does not include the Vertical Bridge Trade Secret Information.

140.   Using the Vertical Bridge Trade Secret Information contained in the Lease, Everest crafted an offer to Vertical Bridge's Landlord to purchase an interest on the site, which is reflected in Exhibit A.

141.   As is evident from Everest's offer letter to the Landlord regarding the Beaver Lake Lease, Everest relied on and incorporated Vertical Bridge Trade Secret Information in crafting its offer to the Landlord.  *Compare* Ex. G at § 1.8, *with* Ex. A at § 2.

142.   Everest's offer includes identical financial information as that contained in the Beaver Lake Lease, *see* Ex. G at § 1.8.

143.   The pricing information contained in Everest's offer could not have been known without misappropriation of Vertical Bridge Trade Secret Information.

144.   Ultimately, the Landlord did not accept Everest's offer to purchase an interest at the site.

###### ii. Custar Lease

145.   Exhibit H is an example of a Vertical Bridge Lease that Everest induced Vertical Bridge's Landlord to disclose, which also includes Vertical Bridge Trade Secret Information that Vertical Bridge acquired from its predecessor (hereinafter, the "Custar Lease").  The Custar Lease was not disclosed as part of Everest's bundle of leases identified in its Motion to Dismiss at ECF No. 20.

146.   Sections 1 and 4 of the Custar Lease set forth the confidential rent and fees amount that Vertical Bridge will pay to the Landlord for use of the Landlord's property located in Custar, Ohio (Site No. OH-5354), which amount was developed by Vertical Bridge's predecessor, as described herein at ¶ 108, and which amount is consistent with Vertical Bridge's proprietary pricing strategy, described at ¶¶ 52, 57–59.  *See* Ex. H at §§ 1; 4.

147.   Section 4 of the Custar Lease sets forth a confidential rent escalator, *i.e.*, the percentage that rent will increase and the timing of such increase.  *See* Ex. H at § 4.

148.   The Custar Lease provides that the Landlord and Vertical Bridge may publicly record only a short-form MOL, rather than the Lease itself.  *See* Ex. H at § 24(b).  The MOL does not include the confidential, proprietary ground-lease information.

149.   Using the secret pricing information contained in the Lease, Everest crafted an offer to Vertical Bridge's Landlord to purchase an interest on the site, which is attached hereto as Exhibit I.

150.   As is evident from Everest's offer letter to the Landlord regarding the Custar Lease, Everest relied on and incorporated Vertical Bridge's confidential, proprietary pricing terms in crafting its offer to the Landlord.  *Compare* Ex. H at § 4, *with* Ex. I at §§ 1–2.

151.   Everest's offer also includes identical pricing information as that contained in

the Custar Lease, *see* Ex. I at § 1.

152.    The financial information contained in Everest's offer could not have been known without misappropriation of Vertical Bridge's confidential, proprietary information.

153.    Ultimately, the Landlord did not accept Everest's offer to purchase an interest at the site.

**F. Vertical Bridge and Everest's Course of Dealings Following Knowledge of Everest's Misconduct**

154.    On January 25, 2022, Vertical Bridge's outside counsel sent Everest a letter warning Everest that Vertical Bridge suspected Everest was potentially engaging in unlawful conduct with respect to Landlords including, among others, tortiously interfering with such Leases.  The parties subsequently held a telephone conference to discuss Vertical Bridge's concerns.  Vertical Bridge indicated that it was still investigating Everest's conduct, and warned Everest against any illegal conduct, even as Vertical Bridge affirmed that the parties had had some cordial business dealings, and that Vertical Bridge did not consider Everest's practices to be illegal or inappropriate in every individual instance.

155.    Over the course of the next year and a half, Vertical Bridge continued to investigate Everest's practices to the best of its ability.  The parties did have some non-problematic business dealings – or business dealings that appeared to Vertical Bridge at the time to be non-problematic – as Vertical Bridge continued to investigate.

156.    During the course of investigation, Vertical Bridge executed certain rights of first refusal for some of its Tower sites, as investigation was still ongoing.  However, once additional facts were uncovered and Everest continued to improperly contact Vertical Bridge's Landlords, it became apparent that Everest was misappropriating Vertical Bridge

Trade Secret Information, and was in fact engaging in illegal and inappropriate

conduct.  When Everest refused to cease its unlawful conduct, Vertical Bridge had no choice

but to file this lawsuit.

157.    Everest's scheme has resulted, and continues to result, in injury to Vertical

Bridge, including but not limited to loss of market share, loss of value in Vertical Bridge

Trade Secret Information, reputational damage with Landlords and telecom tenants, and

increased operational costs.

158.    Upon information and belief, Everest has approached dozens (if not hundreds)

of Vertical Bridge's Landlords, whose Ground Leases encompass all four types described

above, and has attempted to induce all of these Landlords to improperly disclose to Everest

the financial information (site-specific rent, escalator amounts and timing, and any revenue

share) in those Leases.

159.    As of this filing date, Vertical Bridge is aware of at least 16 Leases where

Everest has succeeded in obtaining Vertical Bridge Trade Secret Information.

**COUNT I**
**FEDERAL DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *et seq*.)**

160.    Vertical Bridge repeats and re-alleges each and every paragraph above as if

fully set forth herein.

161.    Vertical Bridge uses its Vertical Bridge Trade Secret Information to enter into

and acquire Leases with Landlords for Towers across the country, which facilitates cellular

communications as well as regional and national broadcasting; thus, this information is

related to services used in, or intended for use in, interstate commerce.

162.    Vertical Bridge's Trade Secret Information with respect to its Leases' site-

specific rent amounts, its escalators, including the amount and timing of the same, and its

revenue share amounts is entitled to trade secret protection under the DTSA, which allows an owner of trade secrets to recover damages for the misappropriation of its trade secrets.

163.    Vertical Bridge has invested and continues to invest substantial time, resources, and expense into developing its rent, escalator, and revenue share information for Leases in order to maintain its competitive place in the market.

164.    Based upon industry practice and conversations with industry participants, Vertical Bridge believes and asserts that its predecessors invested substantial time, resources, and expenses into developing the rent, escalator, and revenue share information in the predecessor financial information.

165.    The Vertical Bridge Trade Secret Information confers a competitive advantage to Vertical Bridge with respect to its competitors in the tower industry.  Vertical Bridge's financial strategy and terms have allowed it to grow into the fourth largest owner and operator of telecommunications infrastructure in the United States.

166.    Vertical Bridge has taken reasonable measures to maintain the secrecy of its Vertical Bridge Trade Secret Information.

167.    Vertical Bridge expends substantial time and expense in developing and deploying its protections to maintain the secrecy of its Vertical Bridge Trade Secret Information.

168.    For the reasons alleged herein, Vertical Bridge understands and believes that the tower industry considers financial information, including rent, escalators, and revenue share information to be confidential, proprietary trade secret information.

169.    Vertical Bridge uses its Vertical Bridge Trade Secret Information to contract with Landlords to obtain access to real property on which to put Towers, and thereafter

Vertical Bridge derives revenue from subleases on those Towers to its Tenants.  As such, the information has independent economic value to Vertical Bridge.

170.    The information likewise would have independent economic value for competitors if they were to obtain this confidential, proprietary trade secret information, as it would allow competitors to undercut Vertical Bridge by negotiating with Landlords knowing the precise terms of existing Leases.

171.    Vertical Bridge's Trade Secret Information is not generally known to the public or readily accessible by the public using proper means.

172.    Vertical Bridge's Trade Secret Information derives independent value from not being generally known to the public or readily accessible by the public using proper means.

173.    Everest knowingly induces the Landlords to provide it with Vertical Bridge's Trade Secret Information in breach of the Landlords' contractual duties to maintain the secrecy of the financial terms of their Leases.

174.    Everest knows that the Leases contain Vertical Bridge's Trade Secret Information and that the Landlords have a duty to maintain the secrecy of that information because Everest has seen copies of Leases that expressly contain confidentiality provisions, and because rent terms, escalators, and revenue share information is regularly viewed as confidential information within the tower industry.  Everest itself treats its financial terms as confidential in its offer letters and includes confidentiality provisions relating to the same. *See* Exs. A–B, I.

175.    Vertical Bridge has never consented to or authorized any Landlords to disclose any Vertical Bridge Trade Secret Information to Everest.  Nor has Vertical Bridge consented

to or authorized Everest to use the improperly obtained Vertical Bridge Trade Secret Information.

176.    Everest willfully and maliciously misappropriates Vertical Bridge's Trade Secret Information by acquiring and using the information to directly and wrongfully compete with Vertical Bridge.

177.    For instance, Everest uses Vertical Bridge's Trade Secret Information to undercut Vertical Bridge in negotiations with Landlords, soliciting Landlords to contract with Everest in furtherance of Everest's unlawful business practices.

178.    As alleged above, Everest uses Vertical Bridge's Trade Secret Information that it unlawfully solicits from Landlords, and therefore misappropriates Vertical Bridge's trade secrets in violation of the DTSA.

179.    Everest's misappropriation of Vertical Bridge's Trade Secret Information has caused Vertical Bridge harm by depreciating the independent economic value of Vertical Bridge's trade secret-protected information attributable to the secrecy of such information.

180.    As a direct and proximate result of Everest's improper conduct, Vertical Bridge has sustained damages and losses in an amount to be determined at trial.

181.    Vertical Bridge is entitled to damages pursuant to the DTSA, including its costs, attorneys' fees, and exemplary damages.

182.    Everest's acquisition and use of Vertical Bridge's trade secret-protected, valuable financial information has caused and will continue to cause Vertical Bridge irreparable harm.  Unless permanently enjoined, Everest's misappropriation, as alleged herein, will continue to cause Vertical Bridge irreparable harm, loss, and injury.

## COUNT II
## PENNSYLVANIA UNIFORM TRADE SECRETS ACT (12 Pa. C.S.A. § 5301 *et seq.*)

183.    Vertical Bridge repeats and re-alleges each and every paragraph above as if fully set forth herein.

184.    Vertical Bridge's Trade Secret Information with respect to its Leases' site-specific rent amounts, its escalators, including the amount and timing of the same, and its revenue share amounts is entitled to trade secret protection under the PUTSA, which allows an owner of trade secrets to recover damages for the misappropriation of its trade secrets.

185.    Vertical Bridge has invested and continues to invest substantial time, resources, and expense into developing its rent, escalator, and revenue share information for Leases in order to maintain its competitive place in the market.

186.    Based upon industry practice and conversations with industry participants, Vertical Bridge believes and asserts that its predecessors invested substantial time, resources, and expenses into developing the rent, escalator, and revenue share information in the financial information.

187.    The Vertical Bridge Trade Secret Information confers a competitive advantage to Vertical Bridge with respect to its competitors in the tower industry.  Vertical Bridge's pricing strategy and terms have allowed it to grow into the fourth largest owner and operator of telecommunications infrastructure in the United States.

188.    Vertical Bridge has taken reasonable measures to maintain the secrecy of its confidential, proprietary financial information.

189.    Vertical Bridge expends substantial time and expense in developing and deploying its protections to maintain the secrecy of its Trade Secret Information.

190.    For the reasons alleged herein, Vertical Bridge understands and believes that the tower industry considers financial information, including rent, escalators, and revenue share information to be confidential, proprietary trade secret information.

191.    Vertical Bridge uses its Vertical Bridge Trade Secret Information to contract with Landlords to obtain access to real property on which to put Towers, and thereafter Vertical Bridge derives revenue from subleases on those Towers to its Tenants.  As such, the information has independent economic value to Vertical Bridge.

192.    The information likewise would have independent economic value for competitors if they were to obtain this Vertical Bridge Trade Secret Information, as it would allow competitors to undercut Vertical Bridge by negotiating with Landlords knowing the precise terms of existing Leases.

193.    Vertical Bridge's Trade Secret Information is not generally known to the public or readily accessible by the public using proper means.

194.    Vertical Bridge's Trade Secret Information derives independent value from not being generally known to the public or readily accessible by the public using proper means.

195.    Everest knowingly induces the Landlords to provide it with Vertical Bridge's Trade Secret Information in breach of the Landlords' contractual duty to maintain the secrecy of the pricing terms of their Leases.

196.    Everest knows that the Leases contain confidential, proprietary financial information and that the Landlords have a duty to maintain the secrecy of that information because Everest has seen copies of Leases that expressly contain confidentiality provisions, and because rent terms, escalators, and revenue share information is regularly viewed as confidential information within the tower industry.  Everest itself treats its pricing terms and

37

as confidential in its offer letters and includes confidentiality provisions relating to the same. *See* Exs. A–B, I.

197.     Vertical Bridge has never consented to or authorized any Landlords to disclose any Vertical Bridge Trade Secret Information information to Everest.  Nor has Vertical Bridge consented to or authorized Everest to use the improperly obtained Vertical Bridge Trade Secret Information.

198.     Everest willfully and maliciously misappropriates Vertical Bridge's Trade Secret Information by acquiring and using the information to directly and wrongfully compete with Vertical Bridge.

199.     For instance, Everest uses Vertical Bridge's Trade Secret Information to undercut Vertical Bridge in negotiations with Landlords, soliciting Landlords to contract with Everest in furtherance of Everest's unlawful business practices.

200.     As alleged above, Everest uses Vertical Bridge's Trade Secret Information that it unlawfully solicits from Landlords, and therefore misappropriates Vertical Bridge's trade secrets in violation of the PUTSA.

201.     Everest's misappropriation of Vertical Bridge's Trade Secret Information has caused Vertical Bridge harm by depreciating the independent economic value of Vertical Bridge's trade secret-protected information attributable to the secrecy of such information.

202.     As a direct and proximate result of Everest's improper conduct, Vertical Bridge has sustained damages and losses in an amount to be determined at trial.

203.     Vertical Bridge is entitled to damages pursuant to the PUTSA, including its costs, attorneys' fees, and exemplary damages.

204.    Everest's acquisition and use of Vertical Bridge's trade secret-protected, valuable financial information has caused and will continue to cause Vertical Bridge irreparable harm.  Unless permanently enjoined, Everest's misappropriation, as alleged herein, will continue to cause Vertical Bridge irreparable harm, loss, and injury.

## COUNT III
## UNJUST ENRICHMENT

205.    Vertical Bridge repeats and re-alleges each and every paragraph above as if fully set forth herein.

206.    Vertical Bridge has involuntarily conferred a benefit upon Everest of which Everest has knowledge.

207.    Specifically, Everest has acquired multiple Leases that contain confidential, proprietary financial information regarding Vertical Bridge's rent, escalators, and revenue share Lease terms.

208.    Everest appreciated the benefit of Vertical Bridge's confidential, proprietary financial information by using that information to negotiate with Vertical Bridge's Landlords under more favorable terms and thereby obtain a competitive advantage against Vertical Bridge.

209.    Everest has retained, and continues to retain, the benefit conferred upon it without providing any compensation to Vertical Bridge for the benefit.

210.    The circumstances are such that it would be inequitable for Everest to retain the benefit of the use of Vertical Bridge's confidential, proprietary financial information.

## COUNT IV
## TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS

211.    Vertical Bridge repeats and re-alleges each and every paragraph above as if fully set forth herein.

212.    Vertical Bridge has valid and enforceable contractual relationships with various Landlords, which are memorialized in Leases.

213.    Everest specifically targets Leases for interference.

214.    Many of the Leases Everest targets include confidentiality provisions, which prevent the Landlord from disclosing Vertical Bridge's confidential, proprietary financial information to third parties.

215.    Everest intentionally interferes with the contractual relationships between Vertical Bridge and its Landlords when Everest induces the Landlords to disclose Vertical Bridge's confidential, proprietary financial information, in violation of the Landlords' confidentiality obligations to Vertical Bridge.

216.    Everest's interference violates the DTSA, PUTSA, and each Lease's confidentiality provisions.

217.    Everest intentionally interferes with the contractual relationships between Vertical Bridge and its Landlords with the intent of harming Vertical Bridge.

218.    In so interfering, Everest has acted and continues to act without any privilege or justification.

219.    Everest acted and continues to act wrongfully in intentionally interfering with Vertical Bridge's contractual relationships with its Landlords.

220.    Everest's intentional interference has caused Vertical Bridge's Landlords to breach the confidentiality provisions in the Leases.

221.    As a direct and proximate cause of Everest's improper conduct, Vertical Bridge has sustained damages and losses in an amount to be determined at trial.

## COUNT V
## <u>TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS</u>

222.    Vertical Bridge repeats and re-alleges each and every paragraph above as if fully set forth herein.

223.    Vertical Bridge has a long history of renewing its Leases with Landlords upon expiration of the final term.  Indeed, this is standard industry practice.

224.    Everest has knowledge of the existence of the Leases, the terms therein, and the business relationship between Vertical Bridge and its Landlords.

225.    Many of the Leases Everest targets include confidentiality provisions, which prevent the Landlord from disclosing Vertical Bridge's confidential, proprietary financial information to third parties.

226.    Everest is aware that there is a reasonable likelihood that Vertical Bridge will attempt to renew its contractual relationships with various Landlords.

227.    Based on Vertical Bridge's history with Landlords, which reflects that Landlords routinely renew their Leases, there is a reasonable likelihood that Landlords would renew their Leases but for Everest's interference.

228.    Everest knew of the confidential nature of rent, escalator, and revenue share terms within Leases, yet requested such confidential, proprietary financial information from Vertical Bridge's Landlords to structure offers to the Landlords in order to obtain an interest in the property where Vertical Bridge's Towers sit.

229.    Everest knew that acquiring the Leases through Vertical Bridge's Landlords would result in the Landlords breaching the confidentiality provisions within the Leases.

230.    Everest's interference violates the DTSA, PUTSA, and each Lease's confidentiality provisions.

231.    Everest intentionally interferes with Vertical Bridge's prospective contractual relationships by using the wrongfully obtained confidential, proprietary financial information to negotiate with Vertical Bridge's Landlords under more favorable terms and thereby obtain a competitive advantage against Vertical Bridge.

232.    Everest has demonstrated its desire and intent to prevent the Landlords from renewing or extending the Leases, and either knew or should have known that interference with Vertical Bridge and its Landlords' prospective contractual relations was substantially likely to occur as a result of Everest's tortious conduct.

233.    Everest intentionally interferes with the prospective contractual relationships between Vertical Bridge and its Landlords with the intent of harming Vertical Bridge.

234.    Everest is not privileged or justified in its interference with Vertical Bridge's prospective contractual relationships.

235.    As a direct and proximate cause of Everest's improper conduct, Vertical Bridge has sustained damages and losses in an amount to be determined at trial.

## COUNT VI
## UNFAIR COMPETITION

236.    Vertical Bridge repeats and re-alleges each and every paragraph above as if fully set forth herein.

237.    As set forth herein, Everest engages in unfair and/or deceptive business practices.

238.    Vertical Bridge has the right to be free from unfair competition caused by Everest's unfair and/or deceptive business practices and wrongful use of Vertical Bridge's confidential, proprietary financial information.

239.    Vertical Bridge has the right to be free from unfair competition caused by Everest's interference with Vertical Bridge's existing and prospective contractual relations.

240.    Upon information and belief, Everest uses and intends to continue to use Vertical Bridge's confidential, proprietary financial information in order to gain an unfair competitive advantage over Vertical Bridge.

241.    Upon information and belief, Everest uses and intends to continue to use Vertical Bridge's confidential, proprietary financial information to interfere with existing and prospective Leases.

242.    Everest has benefitted by, or will benefit by reason of, and as a direct result of, its unfair competitive acts.

243.    Everest's unfair competitive acts are willful, wanton, and malicious.

244.    Because of Everest's unfair competitive acts, Vertical Bridge has suffered actual damages, and will likely suffer loss of its expectancy interests with Landlords induced by Everest's unfair competitive acts.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court issue a judgment in its favor and enter an order:

(i)     Directing Everest to provide an accounting of all sums earned by Everest from its unlawful actions described in the Complaint;

(ii)    Permanently enjoining Everest from engaging in unfair competition with Vertical Bridge, misappropriating Vertical Bridge's confidential information and trade secret-protected information, and tortiously interfering with Vertical Bridge's existing and prospective contractual relationships with Landlords;

(iii)   Awarding to Vertical Bridge any and all monetary damages sustained as a result of Everest's unlawful actions described in the Complaint, including actual, consequential, special, exemplary, treble, and punitive

damages, lost profits, loss of business expectancy, and disgorgement of Everest's profits;

(iv)     Awarding to Vertical Bridge the cost of the suit, including attorneys' fees, as well as pre- and post-judgment interest; and

(v)     Such other relief as the Court deems to be fair and appropriate.


Dated: June 6, 2024                                      /s/ *Kelsi E. Robinson*
                                                        David R. Osipovich (PA ID No. 306687)
                                                        Anna Shabalov (PA ID No. 315949)
                                                        Jessica L.G. Moran (PA ID No. 325912)
                                                        Kira M. Geary (PA ID No. 330334)
                                                        **K&L Gates LLP**
                                                        K&L Gates Center
                                                        210 Sixth Avenue
                                                        Pittsburgh, PA 15222
                                                        Tel: (412) 355-6500
                                                        david.osipovich@klgates.com
                                                        anna.shabalov@klgates.com
                                                        jessica.moran@klgates.com
                                                        kira.geary@klgates.com

                                                        Kelsi E. Robinson (PA ID No. 330452)
                                                        **K&L Gates LLP**
                                                        10100 Santa Monica Boulevard
                                                        Los Angeles, CA 90067
                                                        Tel: (310) 552-5060
                                                        kelsi.quarles@klgates.com

                                                        *Attorneys for Plaintiffs Vertical Bridge REIT, LLC; Vertical Bridge NTCF, LLC; Vertical Bridge Development, LLC;  Vertical Bridge Towers, LLC; Eco-Site, LLC; VB Run, LLC; CIG Comp Tower, LLC; VB BTS, LLC; Vertical Bridge 500, LLC; Midwest NT 1, LLC; Midwest NT 2, LLC; Vertical Bridge VBTS, LLC; VB BTS II, LLC; Vertical Bridge S3 Assets, LLC; VB-S1 Assets,*

*LLC; The Towers, LLC; Vertical Bridge CC FM, LLC; Vertical Bridge CCR, LLC; VB Nimbus, LLC; Vertical Bridge CC AM, LLC; Vogue XIII, LLC; Vertical Bridge Real Estate, LLC; Precision Cell Assets, LLC; Toro Vertical, LLC; Bridger Cell Assets, LLC; VBHV, LLC; Datapath Vertical Bridge II, LLC; NTCH-VB, LLC; Vertical Bridge Towers IV, LLC; and VBT SUB 2, LLC*