**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VERTICAL BRIDGE REIT, LLC, et al. | Case No. 2:23-cv-1017-WSH |
| Plaintiff, | Judge W. Scott Hardy |
| v. | |
| EVEREST INFRASTRUCTURE PARTNERS, INC.; EIP HOLDINGS II, LLC, | |
| Defendants. | |

**VERTICAL BRIDGE'S BRIEF IN OPPOSITION TO
EVEREST'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 1

RESPONSE TO EVEREST'S "STATEMENT OF FACTS" ...................................... 4

ARGUMENT .................................................................................................................. 7

       I.      VERTICAL BRIDGE ADEQUATELY PLEADED ITS TRADE
              SECRETS CLAIM PURSUANT TO THIS COURT'S INSTRUCTIONS .......... 7

              1.    TYPE 1 LEASES………..……………………………………………………..12

              2.    TYPE 2 LEASES…………….…………………………………………...13

              3.    TYPE 3 LEASES…………….…..……………………………………...14

              4.    TYPE 4 LEASES……………………………………………...………...14

      II.     THE FACT THAT LEGITIMATE AGGREGATORS MAY GAIN ACCESS TO
              VERTICAL BRIDGE'S TRADE SECRETS THROUGH PROPER MEANS
              DOES NOT DESTROY TRADE SECRET PROTECTION……………….…..16

      III.    VERTICAL BRIDGE'S REMAINING CLAIMS DO NOT "RISE AND FALL"
              WITH ITS FEDERAL CLAIMS…………………………………………..19

      IV.    NO FURTHER PARTIES ARE REQUIRED UNDER FRCP 19(a)(1)(B)(i)….19

              1.    VERTICAL BRIDGE'S LANDLORDS DO NOT HAVE AN INTEREST
                  RELATING TO THE SUBJECT OF THE ACTION…………………………..20

               2.    PROCEEDING WITHOUT VERTICAL BRIDGE'S LANDLORDS
                  WOULD NOT IMPAIR OR IMPEDE THE LANDLORDS' ABILITY TO
                  PROTECT THE INTEREST……………………………………………………23

CONCLUSION ....................................................................................................... .24

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Glades Pharms., LLC v. Call, Inc.*,
    2005 WL 563726 (E.D. Pa. Mar. 9, 2005)........................................................................20, 23

*Advanced Fluid Sys., Inc. v. Huber*,
    958 F.3d 168 (3d. Cir. 2020)..............................................................................10, 11, 17, 19

*Brinkmeier v. Graco Children's Prods., Inc.*,
    767 F. Supp. 2d 488 (D. Del. 2011).........................................................................................14

*Cichonke v. Bristol Twp.*,
    2015 WL 1345439 (E.D. Pa. Mar. 25, 2015)...........................................................................15

*Consentino v. Wingard*,
    2017 WL 8941229 (W.D. Pa. Jan. 12, 2017)...........................................................................16

*Creque v. Texaco Antilles Ltd.*,
    409 F.3d 150 (3d. Cir. 2005).....................................................................................................5

*Elias Indus., Inc. v. Kissler & Co., Inc.*,
    2021 WL 2141509 (W.D. Pa. May 26, 2012)..........................................................................12

*Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*,
    80 F.4th 223 (3d Cir. 2023) .....................................................................................................20

*In re Estate of Siedler*,
    135 N.E.3d 128 (Ill. App. Ct. 2019) .........................................................................................5

*G&L Plumbing, Inc. v. Kibbe*,
    2023 WL 6881597 (D. Mass. Oct. 18, 2023)…….............................................................11, 19

*Hearing Lab Tech., Inc. v. Hearing Instruments, Inc.*,
    2017 WL 3208676 (W.D. Pa. July 27, 2017) .........................................................................21

*Hertz v. Luzenac Grp.*,
    576 F.3d 1103 (10th Cir. 2009) .........................................................................................11, 19

*Highland Tank & Mfg. Co. v. PS Intern., Inc.*,
    393 F.Supp.2d 348 (W.D. Pa. 2005)........................................................................................10

*Hollander v. Etymotic Research, Inc.*,
    726 F. Supp. 2d 543 (E.D. Pa. 2010) ......................................................................................14

*Holmes Grp., Inc. v. Vornado Air Circulation Sys.*,
    535 U.S. 826 (2002) .................................................................................20

*Ilapak, Inc. v. Young*,
    2020 WL 2787689 (E.D. Pa. May 29, 2020) ..........................................18

*Lessel, Winkle, Yard, Inc. v. Advanced Telecommunications Network, Inc.*,
    1994 WL 263322 (E.D. Pa. June 10, 1994) ...........................................20

*Long v. Holtry*,
    673 F. Supp. 2d 341 (M.D. Pa. 2022) .....................................................15

*Niemuth v. Gaston*,
    688 S.W.3d 51 (Mo. Ct. App. 2024) .........................................................5

*NOVA Chems., Inc. v. Sekisui Plastics Co.*,
    579 F.3d 319 (3d Cir. 2009) ............................................................3, 11

*Peterson v. Johnston & Rhodes Bluestone, Co.*,
    2019 WL 3202166 (M.D. Pa. Jul. 16, 2019) ...........................................19

*SI Handling Sys., Inc. v. Heisley*,
    753 F.2d 1244 (3d Cir. 1985) ......................................................3, 11, 12

*Spice Jazz LLC v. Youngevity Int'l, Inc.*,
    2019 WL 4573705 (S.D. Cal. Sept. 19, 2019) ....................................21, 23

*Syncsort Inc. v. Innovative Routines, Intern., Inc.*,
    2011 WL 3651331 (D. N.J. Aug. 18, 2011) ..............................................9

*Tristar Investors, Inc. v. Am. Tower Corp.*,
    2014 WL 1327663 (N.D. Tex. Apr. 3, 2014) .............................................6

*Tungsten Heavy Powder and Parts, Inc. v. Global Tungsten & Powders Corp.*,
    2018 WL 3304550 (M.D. Pa. Jul. 5, 2018) .............................................19

*VBS Dist., Inc. v. Nutrivita Lab., Inc.*,
    811 Fed. App'x 10005 (9th Cir. 2020) ...................................................10

*Warman v. Local Yokels Fudge, LLC*,
    2022 WL 17960722 (W.D. Pa. Dec. 27, 2022) .......................................15

## Other Authorities

Fed. R. Civ. P. 12 ....................................................................... *passim*

Fed. R. Civ. P. 19 ....................................................................... *passim*

## INTRODUCTION

Everest's Motion to Dismiss Vertical Bridge's Second Amended Complaint (the "Complaint" or "Compl.") is largely premised on a single, invalid proposition: In order to maintain the secrecy of the financial information in its ground leases and thereby be entitled to trade-secret protection, Vertical Bridge is required to execute separate, express, formal confidentiality agreements at every stage of the ground-lease negotiation process.  According to Everest, it does not matter that three of the four types of executed ground leases at issue in Vertical Bridge's Complaint indisputably contain *express* confidentiality/non-disclosure provisions.  Everest still demands that Vertical Bridge's Complaint be dismissed in its entirety because Vertical Bridge does not allege that – *in addition* to express confidentiality provisions in executed leases (the very provisions Everest induces landlords to breach to obtain Vertical Bridge's financial information), Vertical Bridge *also* secured express confidentiality agreements from the moment it or one of its predecessors-in-interest began speaking to each landlord about the possibility of executing a ground lease, and for each stage of the negotiation process that followed.  Everest cannot support its proposition with any case law, since it is axiomatic in trade secret law that only *reasonable* measures are required to preserve secrecy – a requirement of multiple, overlapping express confidentiality agreements is far from reasonable.  It is not surprising that to even get this proposition off the ground, Everest must brazenly mischaracterize this Court's prior ruling, the relevant case law, and the Complaint.

In the Introduction to its Memorandum of Law in Support of Everest's Motion to Dismiss the Complaint at Dkt. 54 ("MTD Brief"), Everest cites as support for its invalid proposition the following passage the Court's Memorandum Opinion at Dkt. 44 (the "Memorandum Opinion"):

> [T]o the extent that the VB Plaintiffs have relied on their allegations of making requests to landlords to maintain confidentiality of offers or pricing and price structure terms in VB Contracts without arriving at any *agreement* to keep the information confidential, the Court cannot draw an inference of a confidentiality obligation.  MTD Brief, at 1 (Everest's emphasis) (citing Memorandum Opinion, at 20 n.14).

Everest then argues that Vertical Bridge's entire Complaint must be dismissed with prejudice because Vertical Bridge "*still* does not allege any instance—ever—where a landlord *agreed* to keep Vertical Bridge's offers confidential." *Id.* (original emphasis). This argument – which is at the heart of Everest's entire MTD Brief – fails for at least three reasons.

**First**, the argument is factually false. Vertical Bridge's Complaint identifies four types of at-issue ground leases, three of which contain express confidentiality/non-disclosure provisions to **which the relevant landlords obviously and unambiguously agreed when they executed the legally enforceable contracts containing confidentiality/non-disclosure provisions**. *See* Compl., at ¶¶ 83–86, 92, 98, 105, 109, 116, 123–24, 126–27. For these three types of leases – types 1–3 in the Complaint – the lynchpin of Everest's argument holds only if "reasonable measures" under trade secret law demands more than express, written confidentiality/non-disclosure provisions and requires that every step of the negotiation process from first approach through execution be protected by a separate confidentiality agreement. The law is not so, as Everest's MTD Brief makes clear. Everest does not cite a single case to support such a legal requirement anywhere. Indeed, in the same Memorandum Opinion footnote that Everest quotes to support its proposition that multiple confidentiality agreements are always required for trade secret protection, this Court unambiguously states that "[t]he **Court does not mean to imply that confidentiality agreements are always required** …." Memorandum Opinion, at 20 n.14 (emphasis added). Everest converts "confidentiality agreements are not always required" to "an express, contractual confidentiality agreement is never sufficient and will be invalid unless there are additional confidentiality agreements."

**Second**, Everest ignores that the Court's statement addressed specifically type 4 leases, *i.e.*, leases without confidentiality agreements. *See* Memorandum Opinion, at 20 n.14 (referring to Dkt. 42, at 14 n.8 wherein Vertical Bridge counters an argument Everest made exclusively with respect to leases without confidentiality/non-disclosure provisions). The Court's statement does not apply to the other three types of ground leases – ones with express confidentiality/non-disclosure provisions – and Everest fails to provide any reason why it would. To the contrary, by

signing these leases with express confidentiality/non-disclosure provisions, the landlords necessarily agreed to the confidentiality/non-disclosure provisions contained within them.[1]

***Third***, Everest's argument violates the Rule 12 standard. Everest assumes facts that it does not bother expressly alleging and which, even if it did allege, this Court could not accept as true for purposes of a Rule 12 motion. For its claim, Everest attacks a strawman by focusing on "offers" for ground leases, not the ground leases themselves. There is nothing before the Court that even suggests, let alone establishes, that for any particular at-issue ground lease, there was an "offer" not covered by a confidentiality agreement that had the same content as the financial information in actual, fully-executed leases that are the subject of the Complaint. In fact, Everest makes up the "offer" construct out of whole cloth and the Court should reject it out of hand.

In sum, and as demonstrated in further detail below, Everest resorts to making up facts and citing to misleadingly cherry-picked excerpts from its authorities[2] – including this Court's Memorandum Opinion – to support the legally untenable argument at the heart of its MTD Brief. Everest does get one thing right, however: this Court did give Vertical Bridge "clear instruction" on how to amend its Complaint in a way that would clarify and bolster its trade secret allegations. And Vertical Bridge has followed those instructions. The Complaint clearly identifies the four types of ground leases at issue, provides concrete examples of each type, points to specific provisions in each type that contain the at-issue trade secret-protected financial information, and exhaustively identifies the reasonable measures Vertical Bridge takes to maintain the secrecy of this information, both generally and type-by-type. Everest's Motion to Dismiss should therefore be denied in its entirety and the case should proceed to discovery.

---

[1] Moreover, even with respect to type 4 leases, Vertical Bridge's Complaint alleges facts to support the reasonable inference that even in the absence of a written confidentiality/non-disclosure agreement, based on industry custom and practice, both Vertical Bridge's predecessors and type 4 landlords kept the at-issue financial information secret. *See* Compl., at ¶¶ 64–66, 131–34; Dkt. 56, Declaration of Robert Paige ("R. Paige Dec.") at ¶¶ 11–23.

[2] In the Introduction to its MTD Brief, Everest also offers partial quotes and citations to *NOVA Chems., Inc. v. Sekisui Plastics Co.*, 579 F.3d 319, 327 (3d Cir. 2009) and *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1257 (3d Cir. 1985). Neither case supports Everest's proposition.

### RESPONSE TO EVEREST'S "STATEMENT OF FACTS"

Everest offers a "Statement of Facts" that isn't any such thing.  Rather, Everest uses this section of its MTD Brief to make rhetorical hay out of the unremarkable fact that Vertical Bridge's Complaint has some changes from its previous complaints, as though Vertical Bridge should be penalized for revisions made in response to the Court's instructions and guidance in the Memorandum Opinion.  Vertical Bridge briefly addresses each of Everest's points.

*In light of the Court's Memorandum Opinion, Vertical Bridge left its Lanham Act claim out of the Complaint pending further case developments*:  The Court dismissed Vertical Bridge's Lanham Act claim without prejudice, with leave to amend.  However, in doing so the Court indicated that Vertical Bridge's allegations regarding Everest's false statements to landlords had a "future-looking or hypothetical framing" that the Court found problematic.  Memorandum Opinion, at 14.  Without discovery at this stage of the proceedings, Vertical Bridge does not currently possess sufficient information to add further specifics to what it considers to be Everest's false statements to landlords.  Vertical Bridge therefore dropped its Lanham Act claim, but reserves the right to seek permission from the Court to reintroduce the claim at a later date if discovery uncovers additional facts supporting such a claim.

*Vertical Bridge exercised its right of first refusal ("ROFR") with respect to certain Everest offers to landlords and waived its ROFR with respect to certain others because the offers were "bona fide" as that term is properly understood:* Everest's attempt to support its argument by reference to Vertical Bridge's decisions on ROFRs is misleading at best.  Tellingly, Everest does not provide any explanation to the Court regarding the circumstances surrounding ROFRs or the definition of a "bona fide" offer under the law.  Vertical Bridge respectfully submits this omission was intentional because a full understanding of ROFRs shows that Vertical Bridge's decision on whether to agree or reject ROFRs has nothing to do with whether Vertical Bridge's confidential financial information is entitled to trade secret protection.

ROFRs are triggered by a "bona fide" offer from a third-party purchaser that a property owner decided to accept.  *See Creque v. Texaco Antilles Ltd.*, 409 F.3d 150, 155 (3d. Cir. 2005)

4

("A right of first refusal to purchase real property is not triggered by the mere conveyance of that property. Only when the conveyance is marked by arms' length dealing and a change in control of the property may that right be exercised."); *Niemuth v. Gaston*, 688 S.W.3d 51, 56 (Mo. Ct. App. 2024) ("[A] right of first refusal … can only be exercised if two conditions are met: first, the right of first refusal must be triggered by a bona fide and enforceable offer to purchase the property, meaning an offer that is made honestly and with serious intent, and second, the owner of the property must have decided to accept that third-party offer."); *In re Estate of Siedler*, 135 N.E.3d 128, 135 (Ill. App. Ct. 2019) ("The term 'third party purchaser' is used at times in defining a right of first refusal in lease agreements.  In such situations, a bona fide offer from a third party means an offer from a 'stranger' to the lease.").

As far as Vertical Bridge is presently aware, in each instance where Everest made an offer to a Vertical Bridge landlord, this offer was a "bona fide" offer in that it was an arms' length offer from a third party that each landlord was ready to accept, subject to Vertical Bridge's decision as to whether to exercise the ROFR.  As such, Vertical Bridge's ROFR was necessarily triggered in each case where Everest made a bona fide offer,[3] and Vertical Bridge had only two options available to it: it either had to exercise the ROFR on the same terms as the Everest offer or waive the ROFR and accept Everest as its landlord.  In some cases, Vertical Bridge chose the former option and in some the latter, but neither entailed any waiver of trade secret protection.  The fact that Everest's offers were based on misappropriated trade secrets did not render those offers non-bona-fide for ROFR-trigger purposes.  Conversely, the fact that these offers were bona fide, arms' length offers to purchase a landlord's property interests does not excuse or ameliorate the trade secret misappropriation Everest engaged in to craft these offers.[4]

---

[3] Everest's ROFR argument fails as a matter of trade secret law and ROFR law, but even if it did not, it would only affect some of the at-issue ground leases/trade secrets.  As alleged in the Complaint, Everest has obtained trade secret-protected information in ground leases where it never made an offer to a landlord or where it did but the landlord never accepted the offer, *i.e.*, where no Vertical Bridge ROFR was ever triggered.

[4] Everest's argument in this section also implies the existence of a requirement that a party seeking trade secret protection must declare a trade secret violation in some specific way (Everest doesn't

***Everest is in fact an illegitimate aggregator but spelling this out is not necessary for the current version of the Complaint:*** Everest argues that because Vertical Bridge no longer includes allegations expressly contrasting Everest's unlawful conduct with that of "legitimate" aggregators, Vertical Bridge somehow conceded either that there are no legitimate aggregators or that Everest is a legitimate aggregator. MTD Brief, at 4–5. The discussion contrasting the behavior of legitimate aggregators with Everest's unlawful practices was largely in support of the Lanham Act claim, which is absent from the Complaint for the reasons explained above.[5] With respect to the trade secrets claim, the contrast between legitimate and illegitimate aggregators only matters insofar as legitimate aggregators, unlike Everest, do not misappropriate tower companies' trade secrets prior to making offers to landlords.[6] Additional pleading on this point is unnecessary, because the Court already rejected Everest's argument that it is free to induce landlords to divulge trade secret-protected information in ground leases merely because a (legitimate) aggregator can obtain the legal right to this information by purchasing the ground lease rights. *See* Memorandum

---

specify how) prior to actually filing suit. No such requirement exists and, notably, Everest makes no argument that Vertical Bridge is outside the statute of limitations for any of its claims. Moreover, as Everest is well aware and as Vertical Bridge alleges in the Complaint, the parties discussed Everest's unlawful behavior more than a year before Vertical Bridge finally had to file suit. During those discussions, Vertical Bridge specifically warned Everest that, in Vertical Bridge's view, Everest was behaving improperly vis-à-vis Vertical Bridge's landlords and certain of Everest's offers, and Vertical Bridge was investigating Everest's behavior. Vertical Bridge only filed suit once it became clear that Everest was, *inter alia*, misappropriating Vertical Bridge's trade secrets and tortiously interfering with Vertical Bridge's leases. *See* Compl., at ¶¶ 154–59.

[5] Vertical Bridge's "legitimate aggregator" discussion was neither "non-credible" nor novel, as Everest well knows. The contrast between the two is something that American Tower highlighted in its pleadings against Tri-Star, which was owned and operated by the same people that now own and operate Everest. *See Tristar Investors, Inc. v. Am. Tower Corp.*, 2014 WL 1327663 (N.D. Tex. Apr. 3, 2014).

[6] Citing to paragraph 60 of the Complaint, Everest argues that in order to determine whether a potential acquisition is "consistent" with Vertical Bridge's pricing model, Vertical Bridge must "see[] the lease terms in advance." MTD Brief at 5. In other words, Everest makes yet another false assumption in its favor in concluding that Vertical Bridge must engage in the same unlawful behavior as Everest. This is unsupported by the plain language of paragraph 60. In fact, Vertical Bridge does what Everest should and seeks permission from the trade secret owner – subject to all requisite confidentiality obligations – to review any trade secret-protected information. Nothing in ¶ 60 or elsewhere in the Complaint supports any inference to the contrary.

Opinion, at 22 n.15.

## ARGUMENT[7]

### I.   VERTICAL BRIDGE ADEQUATELY PLEADED ITS TRADE SECRETS CLAIM PURSUANT TO THIS COURT'S INSTRUCTIONS

Everest's primary argument—that Vertical Bridge's entire Complaint must be dismissed because Vertical Bridge failed to allege that any landlords have agreed to maintain the secrecy of the financial information for which Vertical Bridge claims trade secret protection, MTD Brief, at 6–9—fails as a matter of law and fact.

In support of its erroneous argument, Everest claims that Vertical Bridge's "third complaint makes it clear that the supposed trade secrets have all, at one point or another, been in landlord hands without any confidentiality obligations, and therefore cannot be trade secrets." *Id.* at 7. As support for this claim, Everest primarily quotes language from footnote 14 of the Court's Memorandum Opinion. *Id.*

Everest's characterization of this Court's statement, however, is misleading in two ways. First, in its quoting, Everest uses three stars by way of ellipses to elide the Court's key qualifier regarding confidentiality obligations:

> The Court does not mean to imply that confidentiality agreements are always required or that there are no instances in which a confidentiality obligation could be implied. The Supreme Court discussed how such implied obligations can arise in *Kewanee Oil Co.* wherein the Court explained that a trade secret holder might reveal his or her secret to employees or licensees with an "express or implied restriction of nondisclosure or nonuse." 416 U.S. at 475 (discussing Ohio's law of trade secrets). Memorandum Opinion, at 20 n.14.

Second, and even more egregiously, Everest acts as if the Court's statement in the quoted passage from footnote 14 applies to ***all*** of the types of ground lease at issue, when it applies to just

---

[7] The Court is fully familiar with the Rule 12 legal standard, which appears in Vertical Bridge's prior briefing and the Court's Memorandum Opinion. Vertical Bridge will therefore not waste space reiterating it here.

one.[8]  Everest even omits from its quotation the internal reference that makes this limitation clear. In footnote 14, the Court addresses itself to a discussion in Vertical Bridge's Opposition to Everest's second motion to dismiss regarding ***only those ground leases that do not contain express confidentiality/non-disclosure language***.  *See* Memorandum Opinion, at 20 n.14; Dkt. 42, at 14 n.8; Dkt. 41, at 6.

Everest's two mischaracterizations of the footnote work in tandem: it is necessary to omit the Court's unambiguous statement that confidentiality agreements are not a *sine quo non* for purposes of trade secret protection because with that statement in place it becomes utterly clear that the rest of footnote 14 can only be a discussion of leases without confidentiality agreements.

Restored to its complete form and placed in its proper context, footnote 14 instructs Vertical Bridge to allege, if it can, the extent to which Vertical Bridge has maintained the secrecy of the financial information in type 4 leases, given that these leases do not themselves contain express confidentiality/non-disclosure provisions (which the Court makes clear is not dispositive as to whether adequate secrecy has been maintained for trade secret purposes).  In its Complaint, Vertical Bridge complies with this instruction, alleging that it is industry custom and practice to keep financial information in ground leases secret; that tower companies do their best to take all available reasonable measures to maintain secrecy, especially with respect to competitors; and that "Landlords are aware of their obligation to keep the Vertical Bridge Trade Secret Information confidential, whether or not the Lease contains a confidentiality provision." *See* Compl., at ¶¶ 53–55, 131–134. Vertical Bridge also submitted the sworn declaration of its Executive Vice President of Mergers and Acquisition, Robert Paige, a 35-year veteran of the tower industry, supporting these allegations, and stating, *inter alia*, that "tower companies generally add the extra measure of

---

[8] The Complaint, taking its cue from the Court's discussion in the Memorandum Opinion, refers specifically to "types" of leases, goes into much greater detail than the First Amended Complaint regarding each type, and provides examples.  However, the types themselves are substantively the same as in the First Amended Complaint – Vertical Bridge leases containing express confidentiality/non-disclosure provisions, acquired leases containing express confidentiality/ non-disclosure provisions, acquired leases that at one point did not contain such provisions but then were amended to add them, and acquired leases without such provisions.

safety of a confidentiality provision in a ground lease or license where possible.  However, this is just one measure among many that tower companies use to maintain the secrecy of their ground lease/license financial information." R. Paige Dec. at ¶ 19.[9]

As for leases that do contain express confidentiality/non-disclosure provisions, Everest's claim that "Vertical Bridge does not allege that any landlord ever *agreed* to keep the 'trade secrets' in offers a secret" can be dismissed out of hand as both (a) factually false and (b) devoid of any support in the law.  MTD Brief, at 8.

The claim is factually false because Vertical Bridge alleged that type 1 and type 2 leases contain and have always contained express confidentiality/non-disclosure provisions.  *See* Compl., at ¶¶ 80, 83, 92, 98, 105, 109, 116.   By *executing* these leases, the relevant landlords necessarily agreed to the confidentiality/non-disclosure provisions within them.   And with type 3 leases, a landlord's subsequent execution of a lease amendment adding confidentiality/non-disclosure language places that lease on the same footing as a type 1 or type 2 lease.  Moreover, Vertical Bridge alleged that "both before and after the amendment the landlords are aware of and understand that they had an obligation to keep the pricing terms of the Leases confidential, whether or not the Lease previously contained a confidentiality provision." *Id*., at ¶ 126.  Vertical Bridge therefore does allege that, with respect to ground lease types 1–3, the relevant landlords have agreed—and understand they have agreed—to keep Vertical Bridge's ground lease financial information secret.

Everest's claim also has no support in the law because it depends on the existence of a requirement that a party, to maintain trade secret protection, must separately enter into express

---

[9] *See Syncsort Inc. v. Innovative Routines, Intern., Inc.,* 2011 WL 3651331, at *16 (D. N.J. Aug. 18, 2011), where a court in this Circuit found that reasonable measures for trade secret purposes were present in circumstances where, *inter alia*, "[i]t is standard industry practice to market software through licensing agreements that impose confidentiality obligations on customers ... [A] participant in the software development market could be deemed to have been aware at least of a high probability that there was a confidentiality agreement protecting the software."  Here, it is accepted custom and practice in the tower industry to treat all financial information within ground leases as confidential, whether or not there is an express confidentiality/non-disclosure provision in the ground lease.

confidentiality agreements at every step of the contract negotiation process, even where the contract being negotiated and which is ultimately executed contains express confidentiality/non-disclosure language.  There is, of course, no such requirement.  Nor does a single case Everest cites support its position.  Indeed, this Court has rejected such a requirement, previously holding that "the circulation of a matter alone is not sufficient to preclude trade secret protection if the matter was circulated with at least an implied restriction." *Highland Tank & Mfg. Co. v. PS Intern., Inc.*, 393 F.Supp.2d 348, 354 (W.D. Pa. 2005); *see also Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 179–80 (3d. Cir. 2020) (rejecting the argument that a "formal non-disclosure or confidentiality agreement" was required for trade secret protection and finding that "even if the Authority did not contractually bind itself to do so, it nevertheless believed it had an obligation to preserve the confidentiality of AFS's designs, and at all relevant times it conducted itself in a manner consistent with that belief."); *VBS Dist., Inc. v. Nutrivita Lab., Inc.*, 811 Fed. App'x 10005, 1009 (9th Cir. 2020) ("Providing alleged trade secrets to third parties does not undermine a trade-secret claim so long as the information was provided on an understanding of confidentiality" and acknowledging this is so "even though no confidentiality appears in the written agreement between that vendor and VBS").  Here, for each type of ground lease, Vertical Bridge alleged sufficient facts that establish, at a minimum, an "implied restriction" on the landlords' dissemination of ground lease financial information.  *See* Compl. at ¶¶ 83–86, 92, 98, 105, 109–10, 116, 123–27, 131–34, 139, 148.  Moreover, Vertical Bridge alleged that all landlords for all four types of leases understood their obligation to preserve the confidentiality of Vertical Bridge's ground lease financial information. *See* Compl., at ¶¶ 83, 109, 126, 133.

Moreover, not only does Everest fail to offer any legal support for the notion that separate express confidentiality/non-disclosure agreements must be signed in the course of negotiating, and prior to the execution of, a contract containing an express confidentiality/non-disclosure provision, but Everest also does not offer any evidence – or even any specific allegations – that any landlord actually did not consider Vertical Bridge's financial information to be secret.  Everest also fails to provide a shred of evidence, or even any specific allegations, that any of the financial information

at issue in the Complaint is in the public domain or readily accessible to anyone, let alone to Vertical Bridge's competitors.  *See Advanced Fluid Sys.*, 958 F.3d at 180 ("conspicuously absent from the record is any hint as to why, if AFS's trade secrets were so readily obtainable … Appellants felt it necessary to engage in a coordinated, clandestine campaign of tortious conduct to obtain them."); *G&L Plumbing, Inc. v. Kibbe*, 2023 WL 6881597, at *5 (D. Mass. Oct. 18, 2023) (finding likelihood of reasonable success on the merits of a trade secrets claim in the context of a motion for preliminary injunction where "there is no suggestion that the alleged trade secrets exist elsewhere in the public domain"); *Hertz v. Luzenac Grp.,* 576 F.3d 1103, 1114 (10th Cir. 2009) (denying summary judgment motion where there was no evidence that a readily available public source contained the identities of counter-plaintiff's customers).  And Everest fails to provide any evidence that the financial information in any ***offers*** made to landlords is the same as the information in the ***final, executed ground leases containing confidentiality/non-disclosure provisions to which the landlords necessarily agreed when they executed the leases.***

For all of these reasons, Everest's main argument for dismissal fails as to each ground lease type.  To the extent Everest's main argument includes any type-specific variations, further specific rebuttals are provided below.[10]

---

[10] Everest cites to a handful of cases in support of its main argument, each of which either stands for an undisputed, general statement of trade secret law or is inapposite here.  In *Nova Chems.*, the court does say that "the most important characteristic of a trade secret is that it is in fact secret" – an undisputed truism – in the context of commenting that "four of [the] six factors [for determining if something is a trade secret] are directed at gauging the secrecy of the information…."  *Nova Chems.*, 579 F.3d at 327.  Importantly, however, two sentences later the *Nova Chems.* court writes: "[N]ot all disclosures will destroy a trade secret."  *Id.*  And that of course is the point here: there is no dispute that Vertical Bridge's ground lease financial information is in the hands of the landlords who are parties to the relevant ground leases, but that mere fact does not destroy Vertical Bridge's trade secret protection with respect to that financial information if it has taken reasonable measures to keep the information secret.  *SI Handling* affirmed the district court's finding of trade secret protection (on a completely different procedural posture – a motion for preliminary injunction – and on a fully-developed factual record) for "costing and pricing information." *SI Handling*, 753 F.2d at 1260, 1263.  It rejected trade secret protection for the identity of "alternate suppliers of … bearings, and their respective prices" because those suppliers obviously knew their own identity, knew their own prices, and had the right to sell their products in the market unfettered from any restrictions.  *Id.* at 1257.  This bears no resemblance to the present case, where the at-issue financial information is alleged to be secret as to everyone except Vertical Bridge and each

1.      **Type 1 Leases**[11]

In seeking to distract the Court from the core fact that the type 1 lease landlords ***all***
***affirmatively executed leases containing express confidentiality provisions***, and that Everest
misappropriated financial information by inducing breach of those very provisions, Everest objects
that Vertical Bridge's designation of offer letters as "Privileged and Confidential" does not mean
landlords agreed to such designation.  MTD Brief, at 9.  That offer letter designation, however,
does not exist in a vacuum.  It is coupled with industry practice, Compl. at ¶¶ 64–66, and the
landlords' subsequent execution of express confidentiality provisions, *id*. at ¶¶ 83, 92, 98, 105,
giving rise to the inescapable inference that landlords understood and agreed to keep Vertical

---

individual landlord (with no landlord having access to the information in any other landlord's
lease) and where most of the at-issue leases contain express confidentiality/non-disclosure
provisions.  In *Profit Point Tax Techs., Inc. v. DPAD Grp., LLC*, the court dismissed plaintiff's
trade secret claims after plaintiff admitted to disclosing its trade secrets to contractors and
customers but failed "to identify *any* specific measures it took to ensure individuals kept its
information secret…." 2020 WL 759952, at *6 (W.D. Pa. Jan. 29, 2020) (emphasis added).  In
*Elias*, the court dismissed plaintiff's trade secret claim without prejudice where plaintiff "d[id] not
allege *any measures*, such as conditioning access to [the] Information on non-disclosure, to ensure
that Plaintiff's customers would keep [the] Information secret rather than sharing it with other
interested parties in the industry." *See Elias Indus., Inc. v. Kissler & Co., Inc.*, 2021 WL 2141509,
at *5 (W.D. Pa. May 26, 2012) (emphasis added).  Vertical Bridge's Complaint alleges detailed
specific measures, unlike the plaintiffs in *Profit Point* and *Elias*.

[11] Everest takes a shot in the MTD Brief at attempting to limit Vertical Bridge's allegations to just
the sites corresponding to the examples that it attaches to its Complaint.  *See* MTD Brief, at 9
("Vertical Bridge … finally identifies sites on which it bases its allegations.").  Vertical Bridge's
allegations encompass all of the sites corresponding to all of the ground lease financial information
that Everest has misappropriated, including sites presently unknown to Vertical Bridge.  Vertical
Bridge included examples of specific leases that it already knows Everest misappropriated in
response to the Court's instructions regarding providing additional detail and clarity regarding the
specific trade secrets at issue.  *See* Memorandum Opinion, at 18–23; *Oakwood Lab.'s v. Thanoo*,
999 F.3d 892, 907 (3d Cir. 2021) ("Oakwood gave a very precise example by pointing to a
particular document and it specified the contents of that document as containing trade secrets.  It
attached other documents specifying in detail secrets … that Oakwood accuses the Defendants of
taking and using. The Defendants here unquestionably are on notice of the trade secret information
that is at issue.").  But these examples are by no means exhaustive.  Notably, the list of sites
Vertical Bridge is aware of is significantly larger than the eight sites Everest has falsely claimed
are the only ones at issue.  *Compare* Dkt. 21, Exs. 1–8, *with* Compl. at Exs. C–H.

Bridge's financial information confidential, both before and after executing the leases.

Indeed, although Everest further objects that Vertical Bridge includes its financial information within draft leases it provides to landlords, MTD Brief, at 9, the confidentiality provision that appears in the final agreement, ***to which the landlords have indisputably agreed***, likewise appears in the draft leases.  As a result, the course of dealings pleaded here indicates landlords are well aware, both before and at the time of reviewing the draft leases, that the financial information is expected to be kept secret.  *See* Memorandum Opinion, at 21–22 (citing *Mazcon, a Kurt Bros. Co., LLC v. BEG Grp. LLC*, 2020 WL 4583867, at *3 (W.D. Pa. Aug. 10, 2020) ("deciding a trade secret misappropriation claim was adequately pleaded where a purported disclosure to a third party was merely a 'preliminary confidential discussion . . .' because the court was required at the pleadings to 'accept the classified nature of that communication as true.'")).

### 2. Type 2 Leases

Everest's argument on type 2 leases falls back on the same fallacies as its type 1 argument, objecting to Vertical Bridge's supposed failure to allege that its predecessors requested landlords keep offer terms confidential.[12]  MTD Brief at 11.  As explained above, the focus on offer terms is a red herring, as there is no allegation (and Everest doesn't even bother expressly asserting) that any arguably non-confidential offer contains the same content as a final, executed ground lease with a confidentiality/non-disclosure provision.  Furthermore, the express confidentiality obligations contained in executed ground leases between predecessors and landlords, which Everest ignores, *see* MTD Brief, at 12–13 and Compl. at ¶ 80, coupled with allegations regarding standard industry practice and landlords' understanding based on course of dealing, Compl. at ¶ 109, demonstrate sufficient measures taken for trade secret protection of financial information reflected in type 2 leases.

Everest's only additional argument in this section boils down to the erroneous contention that because Vertical Bridge made an allegation in its Complaint "upon information and belief,"

---

[12] Everest makes a fuss about a typo in the Complaint at ¶¶ 109 and 132 wherein Vertical Bridge referred to ¶¶ 60–62, but meant to refer to ¶¶ 64–65.  *See* MTD Brief at 12.

its claim to trade secret protection must be discounted entirely.[13]  MTD Brief, at 12.  The allegation in question, however, is concrete and grounded in Vertical Bridge's "understanding of industry practice."  Compl. at ¶ 109.  And it is further supported by Mr. Paige's sworn declaration filed in support of Vertical Bridge's Motion to Seal.  *See* R. Paige. Dec. at ¶¶ 11–12 ("It is tower industry practice to maintain the secrecy of ground lease financial information as much as possible, and to keep such information from competitors").  Thus, contrary to Everest's claim, the allegation at issue is far from simply a "formulaic recitation of the elements of a cause of action."  MTD Brief, at 12.

### 3.  Type 3 Leases

Everest asks this Court, without citing any supporting authority, to "ignore" type 3 leases altogether simply "because [Vertical Bridge] does not identify any instance where this has actually happened."  MTD Brief, at 13.  But, as alleged in the Complaint, Vertical Bridge does not yet know the full scope of Everest's ongoing misappropriation scheme.  *See* Compl., at ¶¶ 158–59. Conspicuously, Everest does not represent that it *has not* obtained any type 3 leases.  It merely suggests that Vertical Bridge does not know definitively whether Everest misappropriated leases of this particular type.  That is precisely what discovery is for.

### 4.  Type 4 Leases

Everest's argument on type 4 leases flies in the face of the Court's prior refusal to find that "confidentiality agreements are always required …."  Memorandum Opinion at 20 n.14.  The Court

---

[13] In support of its argument, Everest confuses the holding in *Minielly v. Acme Cryogenics, Inc.* by arguing that *Minielly* stands for the proposition that pleading "upon information and belief" is only appropriate if the facts are solely within the defendant's control.  2016 WL 12216040, at *7 (E.D. Pa. Mar. 28, 2016).  Not so.  *Minielly* cites to *Brinkmeier v. Graco Children's Prods., Inc.*, 767 F. Supp. 2d 488, 496 (D. Del. 2011), which explained that "pleading based upon information and belief is permitted…when essential information lies uniquely *within another party's control*; however the pleading must still 'set[] forth the specific facts upon which the belief is reasonably based.'"  *See also Hollander v. Etymotic Research, Inc.*, 726 F. Supp. 2d 543 (E.D. Pa. 2010) (same).  Under this standard, Vertical Bridge's allegation that its predecessors have taken reasonable measures to safeguard their financial information, supported by specific facts relating to industry practice, is sufficiently pleaded.

should again decline Everest's repeated invitation to adopt a rigid, legally erroneous requirement of an express confidentiality provision as a prerequisite to trade secret protection.  Under both DTSA and PUTSA, there is no "one-size-fits-all" approach for reasonable measures to maintain secrecy.[14]  Whether each trade secret holder employed reasonable measures to keep the trade secret confidential will vary from case to case.  *See Warman v. Local Yokels Fudge, LLC*, 2022 WL 17960722, at *11 (W.D. Pa. Dec. 27, 2022) (citations omitted) ("Courts have held that . . . 'the determination of whether a plaintiff's efforts to maintain the secrecy of its alleged trade secrets were reasonable is not a question susceptible of black-or-white analysis.'").  Although Everest objects to the absence of a confidentiality provision in type 4 leases, it does not argue that Vertical Bridge's other measures to maintain secrecy were unreasonable under the circumstances or fell short of tower industry standards.  Indeed, Everest could not credibly make such a fact-intensive argument on a motion to dismiss.  *Cichonke v. Bristol Twp.*, 2015 WL 1345439, at *13 n.19 (E.D. Pa. Mar. 25, 2015) ("At the motion to dismiss phase, Defendants' unsupported assertions cannot contradict Plaintiff's allegations in the Amended Complaint."); *Long v. Holtry*, 673 F. Supp. 2d 341, 352 (M.D. Pa. 2022) ("[I]n deciding a motion to dismiss, the court is not here to weigh the evidence; instead, the court must take Plaintiffs' well-pleaded facts as true.").  Moreover, the reasonable measures Vertical Bridge pleaded are exactly the kind of measures frequently found to be sufficient for trade secret protection (including in the cases Everest cites), regardless of the existence of confidentiality agreements.  *See*, *e.g.*, *Oakwood Labs*, 999 F.3d at 896 (finding that plaintiff took reasonable measures to protect its trade secrets where plaintiff advised its employees that its information must be held confidential, password protect edits electronically stored

---

[14] Courts have routinely found that confidentiality provisions are not required for trade secret protection where other measures to maintain secrecy were reasonable.  *See Howmedica*, 2022 WL 16362464, at *18–19 (D.N.J. Oct. 28, 2022) (whether plaintiff took reasonable measures to protect secrecy was a question of fact where plaintiff only required non-disclosure agreements "at times"); *Swift Bros. v. Swift & Sons, Inc.*, 921 F. Supp. 267, 277 (E.D. Pa. 1995) ("The defendants assert that the plaintiff had no confidentiality agreements…Such agreements are not necessary in every case, however, if the other precautions taken by the plaintiff are sufficient.").

information, executed NDAs with its scientists, vendors, suppliers, and business partners, and generally controlled access to its information).[15]

## II.     The Fact that Legitimate Aggregators May Gain Access to Vertical Bridge's Trade Secrets Through Proper Means Does Not Destroy Trade Secret Protection

Everest stamps its foot and insists that the Court reconsider the argument it already rejected – that because Everest could purportedly acquire Vertical Bridge's trade secrets through "permissible means," its acquisition through misappropriation should be excused.  MTD Brief, at 16.[16]  Everest's argument is akin to claiming that if someone steals a television that is otherwise for sale, such conduct is not unlawful because the television *could have been* properly purchased even if it was not in fact so acquired.

This Court has already addressed and correctly rejected this argument:

> In addition to arguing that the VB Plaintiffs' price terms and pricing structure cannot be protected trade secrets, Everest makes much of the idea that even according to the VB Plaintiffs' vision of a legitimate and lawful tower aggregation scheme the price terms and pricing structure relevant to a particular VB Contract would eventually become known if such an aggregator was able to secure an agreement to be the intermediary between the landlord and a VB Plaintiff once the rent checks started to come in.  […]  Everest argues that this hypothetical with a so-called legitimate aggregator shows that the information asset in question is 'readily ascertainable through proper means' and thus not subject to trade secret protection.  […]  The Court is unconvinced.  If the VB Plaintiffs had alleged specific protectable information that had been kept sufficiently secret to warrant protection, the reality that a VB Plaintiff's agreement with another aggregator might give that tower aggregator access to such information would not necessarily destroy trade

---

[15] Everest also makes much of the fact that certain ground leases entered into by Vertical Bridge's predecessors have not yet been amended to add confidentiality language.  MTD Brief, at 15.  That is immaterial where other reasonable measures for secrecy have been pleaded, especially given the sheer volume of ground leases Vertical Bridge has acquired and continues to amend.  Consistent with Everest's inappropriate habit of "draw[ing] inferences in Everest's favor," *see* Memorandum Opinion, at 22 n.15, Everest claims that "the Court can only infer that it was not possible to incorporate [confidentiality] provisions" in the type 4 leases "presumably because the landlords refused."  MTD Brief, at 15.  This is off base and inconsistent with Vertical Bridge's well-pled allegations, which contain no suggestion whatsoever that such amendments were rejected.

[16] Separately, this entire argument is predicated on allegations from a prior iteration of Vertical Bridge's Complaint and should be disregarded on that basis.  *See Consentino v. Wingard*, 2017 WL 8941229, at *2 (W.D. Pa. Jan. 12, 2017) (rejecting defendant's argument that plaintiff's claims should be dismissed based on allegations set forth in a previous filing).

> secret protection by showing the information could be accessed through proper means. As the courts have explained, "not all disclosures will destroy a trade secret." *Nova Chemicals, Inc.*, 579 F.3d at 328. In the Court's estimation, accepting Everest's hypothetical readily-ascertainable-through-proper-means argument would require the Court to draw inferences in Everest's favor which, of course, the Court may not do on Everest's motion to dismiss.

Memorandum Opinion, at 22, n.15. Other courts in this Circuit have agreed with this Court in finding that disclosure of trade secrets to certain parties does not destroy trade secret protection. *See, e.g.*, *Mazcon*, 2020 WL 4583867, at *3; *see also Nova Chemicals, Inc.*, 579 F.3d at 328 ("not all disclosures will destroy a trade secret.").

In the MTD Brief, Everest reiterates this same argument and complains that the Court got it wrong because:

> The Court noted … that it was unconvinced … stating 'the reality that a *VB Plaintiff's agreement with another aggregator* might give that tower aggregator access to such information would not necessarily destroy trade secret protection.' […] Respectfully, Vertical Bridge never alleged agreements between VB Plaintiffs and 'legitimate' aggregators. To the contrary, Vertical Bridge alleged that the 'legitimate' aggregators reach agreement with *landlords* (just as Everest does). MTD Brief, at 17 (Everest's emphasis).

Respectfully, it's Everest who has both the facts and the law wrong here. Everest's entire argument is based on an unsupported hypothetical, not on Vertical Bridge's allegations (certainly not any allegations in the Complaint, or even on allegations in the previous complaints). Everest is basically faulting this Court for misunderstanding its unsupported hypothetical and thereby not drawing the inferences Everest wants.

Putting aside the Rule 12 problem with this whole endeavor that the Court has previously noted, Everest's argument fails on the terms of its own hypothetical, which the Court understood just fine. When legitimate aggregators acquire an interest in Vertical Bridge's sites, they step into the shoes of the landlords and assume the landlords' contractual rights and obligations vis-à-vis Vertical Bridge, including obligations to be bound by express contractual confidentiality provisions requiring them to treat as confidential the trade secret-protected financial information contained in the ground leases. So, as the Court properly observed, legitimate aggregators do

absolutely enter into agreements with Vertical Bridge.  Everest does as well in those instances where Vertical Bridge declines to exercise a triggered ROFR, but only after it has already misappropriated Vertical Bridge's trade secrets.

Moreover, Everest's claim that legitimate aggregators acquire the trade secrets when "they receive the rental stream from Vertical Bridge" undermines Everest's entire argument, since acquiring the trade secrets *through the trade secret owner* is consistent with trade secret protection. *See Ilapak, Inc. v. Young*, 2020 WL 2787689, at *4 (E.D. Pa. May 29, 2020) (stating that "confidential business information cannot be trade secret[] if [it is] easily or readily obtained, without great difficulty, through some independent source *other than the trade secret holder*") (emphasis added).  Thus, the fact that legitimate aggregators may acquire Vertical Bridge's trade secrets *from* Vertical Bridge *after* acquiring an interest in Vertical Bridge's sites does not destroy trade secret protection or allow aggregators like Everest to improperly acquire the trade secrets *without Vertical Bridge's consent* and *before* acquiring an interest in Vertical Bridge's sites, as the Court recognized.  *See* Memorandum Opinion at 22 n.15.

Additionally, Vertical Bridge has not only alleged that Everest misappropriated one or two leases that include its trade secrets; rather, Vertical Bridge has alleged that Everest – not just an aggregator but a competing tower company – is engaged in a nationwide scheme to misappropriate Vertical Bridge's confidential financial information in order to gain an advantage in the tower industry competition for additional towers, and thereby for additional revenue and market share. Compl., at ¶ 79.  In some cases Everest succeeds in obtaining an interest in a Vertical Bridge site. But in all cases Everest's misappropriation advances its goal of obtaining as much of Vertical Bridge's financial data as it can so that it can steal Vertical Bridge's propriety national pricing model.  *See id*.  No individual landlord or legitimate aggregator has the ability or the interest to do this: one or two or a handful of financial data points will not give insight into the model that originated that financial data.  But the more confidential ground leases Everest appropriates, the closer it gets to hacking the model itself, which is its aim. *See id*.

Finally, and crucially, nowhere in its "readily-ascertainable-through-proper-means" discussion either in the prior motion or in this Motion does Everest present any evidence or even any specific allegations (again, putting aside the Rule 12 standard) showing how exactly it could have obtained Vertical Bridge's ground lease financial information from any source other than the landlords whom Everest admitted it approaches and induces to divulge this information, notwithstanding express confidentiality/non-disclosure provisions and industry custom/practice. Everest obtains this information by misappropriating it. Legitimate aggregators obtain it by entering into agreements that gives them the right to this information. Otherwise, as Vertical Bridge has alleged: "Vertical Bridge's Trade Secret Information is not generally known to the public or readily accessible by the public using proper means." Compl., at ¶ 171; *see also Advanced Fluid Sys.*, 958 F.3d at 180; *G&L Plumbing, Inc.*, 2023 WL 6881597, at *5; *Hertz,* 576 F.3d at 1114.

### III.   Vertical Bridge's Remaining Claims Do Not "Rise and Fall" With Its Federal Claims

Contrary to Everest's contentions, Vertical Bridge's unjust enrichment, tortious interference, and unfair competition claims do not rely solely on Everest's trade secret misappropriation, and so do not "rise and fall" with Vertical Bridge's trade secret claims. Instead, those claims relate to Everest's misappropriation of Vertical Bridge's confidential financial information, whether or not that information rises to the level of trade secrets. Specifically:

- *Unjust Enrichment*: Everest unjustly enriched itself by acquiring ground leases reflecting Vertical Bridge's confidential financial information, and further appreciated the benefit of such information by using it to structure its offers to Vertical Bridge's landlords. *See Peterson v. Johnston & Rhodes Bluestone, Co.*, 2019 WL 3202166, at *2 (M.D. Pa. Jul. 16, 2019).
- *Tortious Interference*: Everest improperly interfered with Vertical Bridge's ground leases by inducing the landlords to disclose information protected by confidentiality obligations (whether or not the information separately qualifies as trade secret) in Vertical Bridge's ground leases with the landlords.
- *Unfair Competition*: Everest improperly interferes with Vertical Bridge ground leases and wrongfully uses Vertical Bridge's confidential financial information (whether or not trade secret-protected). *See Tungsten Heavy Powder and Parts, Inc. v. Global Tungsten & Powders Corp.*, 2018 WL 3304550, at *3 (M.D. Pa. Jul. 5, 2018).

Accordingly, Vertical Bridge adequately alleged each of the foregoing claims.

## IV.   No Further Parties are Required Under FRCP 19(a)(1)(B)(i)

Everest once again takes the erroneous position that Vertical Bridge's landlords are necessary parties under Rule 19(a)(1)(B)(i).  However, it is axiomatic that the plaintiff is "the master of the complaint," *see Holmes Grp., Inc. v. Vornado Air Circulation Sys.*, 535 U.S. 826, 831 (2002), and Rule 19's limited exception to the general rule that plaintiff can decide which entities to sue has no applicability here.

### 1.   Vertical Bridges's Landlords Do Not Have an Interest Relating to the Subject of the Action

Everest incorrectly asserts that "[t]he core of Vertical Bridge's trade secret claim is that unidentified landlords breached their confidentiality obligations owed to Vertical Bridge by disclosing lease terms to Everest."  MTD Brief, at 19.  Not so.  The core of Vertical Bridge's trade secret claim is *Everest's* misappropriation of Vertical Bridge's confidential financial information.[17]

Indeed, the cases that Everest cites to, unlike the present dispute, all involve claims directly involving a third parties' interests or liability.  *See, e.g.*, *Glades Pharms., LLC v. Call, Inc.*, 2005

---

[17] Everest once again cites to *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, 80 F.4th 223, 233 (3d Cir. 2023) for support; however, *Epsilon* was inapposite the first time around and is inapposite now.  *Epsilon* involved several joint operating agreements with various oil and gas companies, one of which was the defendant, and the parties and non-party signatories to the agreements all had correlating rights and obligations under the agreements, such that the defendant's performance under the operating agreements directly impacted the non-parties' duties. *Id*. at 228. The defendant failed to perform under the operating agreements, and plaintiff brought a breach of contract action against the defendant. The court found that the co-signatories to the contract were necessary parties given the interplay between each party's rights and obligations, noting that "parties owning rights under *disputed contracts*, like the Absent [operating agreement] parties, generally have a legally protected interest under Rule 19(a)(1)(B)(i)." *Id*. at 233. Unlike *Epsilon*, however, the present dispute does not arise from a breach of contract claim, nor are the contracts dispositive in determining Everest's liability for misappropriation. Whereas disposing of the action in *Epsilon* necessarily would have impacted the co-signatories' rights under the contracts at issue, here, the gravamen of the action is based on Everest's misappropriation of Vertical Bridge's confidential financial information, which the landlords have no legally protected interest in.

WL 563726, at *1, *3 (E.D. Pa. Mar. 9, 2005) (copyright infringement action wherein the court found that nonparty former employee was an "active participant" in the case, since the employee "conspired with" defendant, and both the defendant and employee "actively concealed their activities" from plaintiff); *Lessel, Winkle, Yard, Inc. v. Advanced Telecommunications Network, Inc.*, 1994 WL 263322, at *2–3 (E.D. Pa. June 10, 1994) (action wherein plaintiff sued to recover amounts due under promissory notes issued pursuant to APA with defendant, in which shareholders had a financial interest); *Hearing Lab Tech., Inc. v. Hearing Instruments, Inc.*, 2017 WL 3208676, at *4 (W.D. Pa. July 27, 2017) (declaratory judgment action where plaintiff sought to have the court "declare [the nonparty employee's] employment covenants 'void and unenforceable'"); *Spice Jazz LLC v. Youngevity Int'l, Inc.*, 2019 WL 4573705, at *3–4 (S.D. Cal. Sept. 19, 2019) (finding that nonparty former employee was a necessary party where former employee "hatched a scheme" to steal plaintiff's business and bring it to defendant, the complaint was "mostly centered on [nonparty employee's] and Defendant's conduct," and the issues between plaintiff and the nonparty employee were simultaneously "being litigated in arbitration").

Unlike the cases Everest cites, *Salton, Inc. v. Philips Domestic Appliances and Personal Care B.V.* is similar the facts at issue here and is instructive of the Rule 19 standard in a trade secrets dispute. *See* 391 F.3d 871 (7th Cir. 2004). In *Salton*, Plaintiff Philips and defendant Salton were competing makers of kitchen appliances, and the intervening party, Electrical & Electronics ("E&E"), was a Hong Kong firm that developed coffee machines for the parties. *See Salton*, 391 F.3d at 874. E&E contracted with Philips to manufacture a new coffee brewing machine, and the contract restricted E&E from revealing any of Philip's proprietary information used to develop the machine. *Id*. at 874.

However, E&E subsequently used Philip's proprietary information to manufacture a similar machine for Philip's competitor, Salton. *Id*. at 875. Salton filed a declaratory relief action against Philips, and Philips filed counterclaims alleging trade secret misappropriation and copyright infringement. *Id*. at 875. The district court dismissed Salton's complaint and Philips' counterclaims, finding that E&E was a necessary party to the dispute but could not be joined. *Id*.

Philips filed a separate action against Salton alleging the same claims, which the district court also dismissed. The appellate court reversed.

Recognizing the "fact-intensive and multifaceted character of the inquiry" of indispensability under Rule 19, the appellate court found that the district court abused its discretion in dismissing the parties' claims, since E&E did not have a legally protected interest in the subject of Philips' action against Salton (despite E&E being a party to the contract obligating E&E to keep Philips' proprietary information confidential). The court explained that "Philips's essential claim in both suits [wa]s that Salton stole its intellectual property. The fact that Salton did so, Philips contends, in cahoots with E&E, which acted in effect as the conduit between Philips's intellectual property and Salton's competing coffee machine, would not in itself make E&E an indispensable party to Philips's suits." *Id*. at 877.  The court explained that the principle of joint and several liability governs misappropriation of trade secrets, and under that principle, "the victim [of the misappropriation] is not required to sue more than one of his oppressors." *Id*.  The court further explained the practical consideration for the principle: "To require the victim of a joint tort to sue all the joint tortfeasors would have the perverse effect of making it more difficult for plaintiffs to obtain relief the greater the number of their tormentors by increasing the plaintiffs' litigation expense . . . ." *Id*.

The court disagreed with the district court's conclusion that "to prove misappropriation by Salton, Philips will have to show that E&E broke its contract with Philips by revealing Philips's trade secrets to Salton without authorization." *Id*. at 880.  As the appellate court noted, "that is true in any case of tortious interference with contract." *Id*.  "[T]here is no rule that you cannot sue the interferer without also suing the party to your contract whom the defendant inveigled into breaking the contract." *Id*.  Accordingly, the appellate court concluded that "there [was] no basis for a finding that E&E [wa]s an indispensable party . . . ." *Id*. at 880; *see also Alpha Pro Tech, Inc.*, 984 F. Supp.2d at 459 (denying motion to dismiss under Rule 12(b)(7) and explaining that "[t]he mere fact . . . that Party A, in a suit against Party B, intends to introduce evidence that will indicate that a non-party, C, behaved improperly does not, by itself, make C a necessary party.");

22

*see also id*. at 458–59 (referencing *Salton* and noting that defendant's argument "boils down to the contention that to prove misappropriation," plaintiff will need to show that a nonparty breached its contract with plaintiff, but that was "insufficient to render th[e] absent party necessary under Rule 19(a)(1)(B)(i)"). Similarly, because (1) the gravamen of the dispute is *Everest's* misappropriation of Vertical Bridge's confidential financial information and (2) the landlords do not have an interest in the suit and are merely joint tortfeasors, the landlords are not necessary parties.

### 2. Proceeding without Vertical Bridge's Landlords Would Not Impair or Impede the Landlords' Ability to Protect Any Interest

Because the landlords' interests are not actually at stake, Everest cannot show that proceeding without the landlords would impair or impede their ability to protect any interests. "[T]he fact of the matter is that [plaintiff's] allegations, taken as true, simply identify [the landlords] as . . . joint tortfeasor[s] [with defendant]." *Alpha Pro Tech, Inc.*, 984 F. Supp.2d at 458. Because Vertical Bridge's landlords do not have a legally protected interest in the subject of the action, Rule 19(b) fails to mandate their joinder, and the Court's inquiry can stop there. *See Temple*, 498 U.S. at 8.

Even if the Court finds that the landlords have a legally protected interest here (it should not), Everest's argument to include the landlords is simply "an attempted end-run on the general rule that the plaintiff gets to decide who among alleged joint and several tortfeasors to sue." *Alpha Pro Tech, Inc.*, 984 F. Supp.2d at 458; *see also Owens-Illinois, Inc. v. Lake Shore Land Co., Inc.*, 610 F.2d 1185, 1191 (3d Cir. 1979) ("The fact that the absent person may be affected by the judgment does not of itself require his joinder if his interests are fully represented by parties present.").

Similar to the nonparties in the cases that Everest relies on, even if the landlords are found to be necessary parties, they are not indispensable parties that are required to be joined. *See*, *e.g.*, *Glades Pharm. LLC*, 2005 WL 563726, at *6 (finding that "dismissal for failure to join [former employee] as an indispensable party [wa]s inappropriate" and it was "unclear that complete relief could not be granted to [plaintiff] in [former employee]'s absence"); *Spice Jazz*, 2019 WL

4573705, at *4–5 (declining to dismiss the claims under Rule 19 where nonparty former employee who "hatched a scheme" with defendant was a necessary party, but was not indispensable).  As the Advisory Committees' notes to Rule 19 plainly instruct, "a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability."  *See* Fed. R. Civ. P. 19, Advisory Committee's Note to 1966 Amendments (emphasis added). Accordingly, although Everest used Vertical Bridge's landlords to misappropriate Vertical Bridge's confidential financial information, the landlords are merely permissive parties.  Vertical Bridge's valid decision not to sue those landlords cannot doom its case against Everest.

## **CONCLUSION**

In light of the foregoing, Vertical Bridge respectfully requests that the Court deny Everest's Motion in its entirety.

Dated: July 11, 2024                            Respectfully submitted,

                                                */s/ David R. Osipovich*
                                                David R. Osipovich (PA ID No. 306687)
                                                Anna Shabalov (PA ID No. 315949)
                                                Jessica L.G. Moran (PA ID No. 325912)
                                                Kira M. Geary (PA ID No. 330334)
                                                **K&L Gates LLP**
                                                K&L Gates Center
                                                210 Sixth Ave.
                                                Pittsburgh, PA 15222
                                                Tel: (412) 355-6578
                                                david.osipovich@klgates.com
                                                anna.shabalov@klgates.com
                                                jessica.moran@klgates.com
                                                kira.geary@klgates.com

                                                -and-

                                                Kelsi E. Robinson (PA ID No. 330452)
                                                **K&L Gates LLP**
                                                10100 Santa Monica Blvd., 8th Floor
                                                Los Angeles, CA 90067

Tel: (310) 552-5060
kelsi.robinson@klgates.com

***Attorneys for Plaintiff Vertical Bridge
REIT, LLC***

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 11, 2024, a true and correct copy of the foregoing was filed electronically with the Clerk of the Court using CM/ECF system and will be served upon the registered participants identified on the Notice of Electronic Filing.

<u>  /s/ David R. Osipovich</u>
David R. Osipovich
